# "EXHIBIT 1"

# "EXHIBIT 1"

## DECLARATION OF PATRICK H. HICKS IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY ADJUDICATION

I, Patrick H. Hicks, under penalty of perjury under the laws of the United States of America and the State of Nevada, declare and state as follows:

1.      I am an attorney admitted to practice law in the State of Nevada.  I am a Shareholder at the law firm of Littler Mendelson.  This firm represents Defendant in the matter entitled *Claudia Carlson and Joshua Hall v. Victoria Partners d/b/a Monte Carlo Resort and Casino* (Case No. 2:13-cv-00378-JCM-PAL).  I have personal knowledge of the matters stated herein and can testify thereof.

2.      Attached hereto as Exhibit 2 is a true and correct copy of relevant portions of Plaintiff Claudia Carlson's deposition transcript.

3.      Carlson was completely unable at her deposition to identify any alleged discriminatory acts in response to my basic examination questions.  Carlson and her counsel, Giselle Schuetz, then requested to take a break prior to Carlson completing her response to my pending question.  Even though Carlson had previously requested multiple breaks during her deposition, I agreed to take a one minute break so that Carlson could take medication, an Advil.  However following the short break, Ms. Schuetz requested yet another break to consult with Carlson even though a question was pending, which resulted in me contacting Magistrate Judge Leen for a dispute resolution conference.

4.      After I concluded my examination of Carlson, Ms. Schuetz requested a break before she commenced her examination.  Carlson and her counsel then took a break for an hour and 15 minutes.

5.      Attached hereto as Exhibit 3 is a true and correct copy of relevant portions of Plaintiff Joshua Hall's deposition transcript.

6.      In this litigation, Plaintiffs produced over 51 secretly taped conversations of their co-workers.  Twenty of those recordings were produced early in the litigation.  Thirty-one of these recordings were produced on the eve of Plaintiff Claudia Carlson's deposition after normal business

LITTLER MENDELSON, P.C.
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

hours. The 51 recordings entail more than 18 hours of taped conversations. Plaintiffs have only identified one of the 51 recordings (the restroom recording) as including an allegedly discriminatory remark.

7.  Attached hereto as Exhibit 4 is a true and correct copy of Defendant's forensic audio analysis expert Greg M. Stutchman's report and transcript of recording.

8.  Attached hereto as Exhibit 5 is a true and correct copy of relevant portions of the deposition of Jose Guzman.

9.  Attached hereto as Exhibit 6 is a true and correct copy of relevant portions of the deposition of Sharon Jones-Ono.

10.  Attached hereto as Exhibit 7 is a true and correct copy of relevant portions of the deposition of Patricia Diane Perry.

11.  Attached hereto as Exhibit 8 is a true and correct copy of relevant portions of the deposition of Ariana Basulto Leon.

12.  Attached hereto as Exhibit 9 is a true and correct copy of relevant portions of the deposition of Mary Jane Richardson.

13.  Attached hereto as Exhibit 10 is a true and correct copy of relevant portions of the deposition of Manuel Quiroga.

14.  Attached hereto as Exhibit 11 is a true and correct copy of correspondence between Rebecca Houlding and EEOC investigator Jake DeMarco, identified as bates numbers MC000326-MC000327.

15.  Attached hereto as Exhibit 12 is a true and correct copy of relevant portions of the deposition of Robert L. Goldstein.

16.  Attached hereto as Exhibit 13 is a true and correct copy of the Declaration of Joann Behrman-Lippert, Ph.D.

17.  Attached hereto as Exhibit 14 is a true and correct copy of a Counseling Notice dated 9/19/11 issued to Carlson, identified as bates numbers MC000639-MC000641.

18.  Attached hereto as Exhibit 15 is a true and correct copy of a Counseling Notice dated 9/30/11 issued to Carlson, identified as bates numbers MC000642-MC000643.

LITTLER MENDELSON, P.C.
ATTORNEYS AT LAW
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

1    19.    Attached hereto as Exhibit 16 is a true and correct copy of a Counseling Notice dated

2    10/18/11 issued to Carlson, identified as bates numbers MC000974-MC000975.

3    20.    Attached hereto as Exhibit 17 is a true and correct copy of a Suspension Pending

4    Investigation Notice issued to Carlson, identified as bates number MC000592.

5    21.    Attached hereto as Exhibit 18 is a true and correct copy of Carlson's Personnel

6    Action Notice regarding her termination, identified as bates numbers MC000935-MC000936.

7    22.    Attached hereto as Exhibit 19 is a true and correct copy of relevant portions of the

8    deposition of Dawn Marie Spain.

9    23.    Attached hereto as Exhibit 20 is a true and correct copy of relevant portions of the

10   telephonic deposition of Jennifer Klinefelter.

11   24.    Attached hereto as Exhibit 21 is a true and correct copy of relevant portions of the

12   deposition of Carol Wasson.

13   25.    Attached hereto as Exhibit 22 is a true and correct copy of relevant portions of the

14   deposition of Nivea Santiago.

15   26.    Attached hereto as Exhibit 23 is a true and correct copy of Carlson's Charge of

16   Discrimination filed with the EEOC on August 12, 2010, identified as bates number MC001206.

17   Attached hereto as Exhibit 24 is a true and correct copy of Carlson's Amended Charge of

18   Discrimination, identified as bates number MC001210.

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

3.

27.   Hall did not exhaust his administrative remedies regarding his claim for sexual harassment.   Attached hereto as Exhibit 25 is a true and correct copy of Hall's Charge of Discrimination filed with the EEOC on August 12, 2010, identified as bates number MC000536. Attached hereto as Exhibit 26 is a true and correct copy of Hall's Amended Charge of Discrimination, identified as bates number MC000540.

I declare under penalty of perjury that the foregoing statements are true and correct.

Executed in Las Vegas, Nevada, on June 26, 2014.

_____
PATRICK H. HICKS, ESQ.

Firmwide:127378039.1 060736.1054

LITTLER MENDELSON, P.C.
Attorneys At Law
3960 Howard Hughes Parkway
Suite 300
Las Vegas, NV 89169-5937
702.862.8800

# "EXHIBIT 2"

# "EXHIBIT 2"

Claudia Carlson    March 5, 2014
* * *Videotaped Deposition* * *

1                  UNITED STATES DISTRICT COURT

2                       DISTRICT OF NEVADA

3

4

5

6    CLAUDIA CARLSON and JOSHUA        )
     HALL,                            )
7                                     )
          Plaintiffs,                 )
8                                     )  Case No.
              vs.                     )  2:13-cv-00378-JCM-PAL
9                                     )
     VICTORIA PARTNERS d/b/a MONTE    )
10   CARLO RESORT AND CASINO,         )
                                      )
11        Defendant.                  )
     _____)

12

13

14        VIDEOTAPED DEPOSITION OF CLAUDIA CARLSON

15        Taken on Wednesday, March 5, 2014

16                  At 9:09 a.m.

17            Taken at the Office of:

18            Littler Mendelson, P.C.

19      3960 Howard Hughes Parkway, Suite 300

20              Las Vegas, Nevada

21

22

23

24

25   Reported By: Gale Salerno, RMR, CCR No. 542

Claudia Carlson    March 5, 2014
* * *Videotaped Deposition* * *

```
 1    APPEARANCES:

 2    For the Plaintiffs:

 3              GISELLE SCHUETZ, ESQUIRE
                MAX BARACK, ESQUIRE
 4              Law Offices of Joshua Friedman
                1050 Seven Oaks Lane
 5              Mamaroneck, New York  10543
                (212) 308-4338
 6              giselle@joshuafriedmanesq.com

 7
      For the Defendant:
 8
                PATRICK H. HICKS, ESQUIRE
 9              Littler Mendelson, P.C.
                3960 Howard Hughes Parkway, Suite 300
10              Las Vegas, Nevada  89169
                (702) 862-8800
11              phicks@littler.com

12

13    Also Present:

14              MR. TIM HARTMANSZERBIEC, Videographer

15              HILARY MUCKLEROY, ESQUIRE, MGM Resorts

16              NATHAN T.H. LLOYD, ESQUIRE, MGM Resorts

17              MR. JOSHUA HALL

18

19

20

21

22

23

24

25
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Claudia Carlson    March 5, 2014
* * *Videotaped Deposition* * *

Page 30

1     MR. HICKS: Well, does it or doesn't it?
2   I'm asking you.
3     MS. SCHUETZ: If you would like to have a
4   colloquy, I'm happy to step out and chat with you.
5   However, I'm not going to have this argument about
6   this question on the record.
7     MR. HICKS: Listen, we're going to have it
8   on the record because you keep interposing the
9   attorney/client privilege; well, you say it could
10  potentially --
11    MS. SCHUETZ: Yeah, it's a question that --
12    MR. HICKS: Let me finish.
13    MS. SCHUETZ: -- potentially calls for
14  attorney/client communications.
15    MR. HICKS: Well, potential isn't actual.
16  So if you're telling me that you had a discussion
17  with her, or somebody in your office had a discussion
18  with her and my question invades that, that's one
19  thing. I'll respect that.
20    But if you're just saying in this
21  theoretical world that could have been a conversation
22  so you don't get to ask her these questions, it
23  doesn't work that way.
24    MS. SCHUETZ: Counsel, I'm happy to
25  represent to you that we have discussions with our

Page 31

1   clients always concerning preservation issues
2   generally. More than that invades the
3   attorney/client privilege for me to tell you, and I'm
4   objecting to the question.
5     You are welcome to file a motion to compel
6   if that's what you feel you need to do. I'm happy to
7   follow up with you later on this issue.
8     MR. HICKS: Okay.
9   BY MR. HICKS:
10  Q.  So the computer that you used to apply for
11  all of these positions that you can't remember, it's
12  still in your possession?
13  A.  Yes.
14  Q.  And it's still at your home?
15  A.  Yes.
16  Q.  Have you ever provided that computer to
17  your counsel?
18    MS. SCHUETZ: Objection. Asked and
19  answered.
20    You can answer.
21    THE WITNESS: No.
22  BY MR. HICKS:
23  Q.  While you worked for the Monte Carlo, did
24  you ever secretly tape record conversations in the
25  workplace?

Page 32

1   A.  Yes.
2   Q.  When did you first start secretly tape
3   recording conversations at the Monte Carlo?
4   A.  I can't remember.
5   Q.  Let's see if we can narrow it down. What
6   year did you start?
7   A.  I can't remember.
8   Q.  Your employment at the Monte Carlo started
9   in June of 2003?
10  A.  Yes.
11  Q.  Did you secretly tape record any
12  conversations in 2003?
13  A.  No.
14  Q.  Did you secretly tape record any
15  conversations in 2004?
16  A.  No.
17  Q.  Did you secretly tape record any
18  conversations in 2005?
19  A.  No.
20  Q.  Did you secretly tape record any
21  conversations in 2006?
22  A.  No.
23  Q.  Did you secretly tape record any
24  conversations in 2007?
25  A.  No.

Page 33

1   Q.  Did you secretly tape record any
2   conversations in 2008?
3   A.  I can't remember.
4   Q.  So you may have, you just don't know?
5   A.  I can't remember the year or month or
6   anything. So I don't want to say something that I
7   could get confused or anything like. I can't
8   remember.
9   Q.  Did you secretly tape record any
10  conversations in 2009?
11  A.  I can't remember.
12  Q.  Did you secretly tape record any
13  conversations in 2010?
14  A.  I can't remember.
15  Q.  Did you secretly tape record any
16  conversations in 2011?
17  A.  I can't remember.
18  Q.  Did you secretly tape record any
19  conversations in 20 -- well, you were gone in 2011
20  so...
21    What did you secretly tape record
22  conversations in the workplace with? What device?
23  A.  An iPhone.
24  Q.  Whose iPhone?
25  A.  Mine.

Claudia Carlson    March 5, 2014
* * *Videotaped Deposition* * *

## Page 34

1    Q.  And so every time you secretly tape
2  recorded a conversation at the Monte Carlo, it was
3  with your own iPhone?
4    A.  Yes.
5    Q.  And how many conversations did you secretly
6  tape record at the Monte Carlo?
7    A.  To be honest, I don't remember.
8    Q.  Was it more or less than 200?
9    A.  I don't know.
10    A.  I don't know.
11    Q.  Was it more or less than 300?
12    A.  I don't know.
13    Q.  Was it more or less than 500?
14    A.  I don't remember.
15    Q.  So it could have been more than 500, you
16  just don't remember?
17    A.  I don't remember.
18    Q.  Did you at any point in time up until today
19  transfer or copy any of those secretly tape recorded
20  conversations so that they were somewhere other than
21  your iPhone?
22    A.  I believe they're in -- I record the app.
23  They stayed there, so if I hooked up my cell phone to
24  a computer, they come up.
25    Q.  So have you transferred or copied any of
26  those secretly tape recorded conversations to your

## Page 35

1  computer or anywhere else?
2    A.  I can't remember.
3    Q.  Did you give all of those secretly tape
4  recorded conversations to your counsel at the
5  beginning of this lawsuit?
6    A.  I can't remember.
7    Q.  Some of those conversations or alleged
8  conversations were quoted in the complaint that was
9  filed in this case, correct?
10    A.  Yes.
11    Q.  And is it safe to assume that those quotes,
12  that complaint was drafted by your attorneys?
13    A.  If it says that, yes.
14    Q.  And is it you that gave them those tape
15  recorded conversations?
16    MS. SCHUETZ:  I'm going to object that it's
17  confusing to the extent you're referring to every
18  conversation in the complaint.
19  BY MR. HICKS:
20    Q.  Prior to this lawsuit being filed, did you
21  give any of the secretly tape recorded conversations
22  to your counsel?
23    A.  Say it again.
24    Q.  Prior to this lawsuit being filed, did you
25  give any of those secretly tape record conversations

## Page 36

1  to your counsel?
2    A.  I can't remember.
3    Q.  Did you -- do you know whether or not
4  you've given your counsel all of the secretly tape
5  recorded conversations?
6    A.  I know I have a couple of weeks ago.
7    Q.  So last night --
8    A.  A couple of weeks ago.
9    Q.  Let me finish.  Last night on the eve of
10  your deposition, I received a flurry of secretly tape
11  recorded conversations that I had never gotten before
12  constituting over ten hours worth of conversations.
13  I think there were about 31 separately recorded
14  conversations.
15    Are those the conversations that you gave
16  to your counsel a couple of weeks ago?
17    A.  If she sent them to you, those are the ones
18  that I sent her.
19    Q.  Do you know why, if you gave those to your
20  counsel two weeks ago, I wasn't getting them until
21  last night?
22    A.  I don't know.
23    Q.  Why did you wait until two weeks ago to
24  give those secretly tape recorded conversations to
25  your counsel?

## Page 37

1    A.  We were having difficulties with the -- how
2  to send it, so I just sent them the iPhone so they
3  can figure it out.
4    Q.  When you say we are having difficulty, what
5  are you referring to?
6    A.  Well, on how to send it through e-mail or
7  anything like that.  I don't know anything about like
8  electronics, so I won't know how to send it over
9  there.  And I know Josh wouldn't know either, so I
10  just send them on my iPhone.
11    Q.  So you physically put your iPhone in the
12  mail and sent it to your lawyers?
13    A.  Yes.
14    Q.  And that happened two weeks ago?
15    A.  A few weeks ago.
16    Q.  So how did you get the previously delivered
17  messages to your attorneys?
18    A.  Can you repeat that?
19    Q.  Sure.  We know you gave some of those tape
20  recorded conversations to your attorneys when this
21  lawsuit was filed.
22    MS. SCHUETZ:  Objection.  Asked and
23  answered.  Also that's not a question.
24    MR. HICKS:  I haven't even finished my
25  question.  Counsel, so...

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

11 (Pages 38 to 41)

**Page 38**

1     MS. SCHUETZ: All right. Finish.
2   BY MR. HICKS:
3     Q. We know that you gave -- well, let me ask
4   you this: Did you give any of these 500-plus
5   secretly tape recorded conversations to your lawyers
6   before approximately two weeks ago?
7     MS. SCHUETZ: Objection to form.
8     You can answer.
9     THE WITNESS: I don't understand it.
10  BY MR. HICKS:
11    Q. Prior to two weeks ago, did you give your
12  attorneys any of these secretly tape recorded
13  conversations?
14    A. I still don't understand the question.
15    Q. Between the time your lawsuit was filed,
16  which was March of 2013, and approximately two weeks
17  ago when you gave your attorneys secretly tape
18  recorded conversations, had you given them any
19  secretly tape recorded conversations?
20    A. I have gave her a few of those that I
21  could, a file or a send. But I couldn't send the
22  rest of them. I couldn't figure it out, so I sent
23  the iPhone.
24    Q. Why did it take you almost a year to get
25  around to do that?

**Page 39**

1     A. I wouldn't know how to answer that.
2     Q. After this lawsuit was filed, did you
3   understand that you had an obligation to preserve
4   secretly tape recorded conversations?
5     A. Yes.
6     Q. And did you have -- did you understand you
7   had an obligation to give that material to your
8   attorneys?
9     A. Yes.
10    Q. So why did you wait until approximately two
11  weeks ago to give them secretly tape recorded
12  conversations?
13    A. I don't know.
14    Q. Do you know --
15    A. But I did.
16    Q. Do you know what are on those secretly tape
17  recorded conversations that were produced to me last
18  night?
19    A. I don't remember. But I know there's --
20  where they called my coworker the nigger word, and --
21  when I was working and when I feel afraid of walking
22  by myself. I couldn't even go to the rest room
23  because I was afraid. I had already been insulted,
24  so I had to carry something with me because they
25  would tell me anything again like they did all the

**Page 40**

1   time.
2     Q. My question is do you know what are on
3   those tapes that were provided to me last night
4   other --
5     MS. SCHUETZ: Objection. Asked and
6   answered.
7     MR. HICKS: Let me finish.
8   BY MR. HICKS:
9     Q. Other than what you've already testified
10  to?
11    MS. SCHUETZ: You can answer, Claudia.
12    THE WITNESS: Yes, I do.
13  BY MR. HICKS:
14    Q. You do know?
15    A. Yes.
16    Q. And to the best of your recollection, what
17  is on those tapes? And I'll be able to listen to
18  them at some point, and I'll let you go ahead and
19  gather yourself.
20    MR. HICKS: Counsel, obviously we welcome to
21  the right to recall this witness after having an
22  opportunity to listen to this --
23    MS. SCHUETZ: Well, that's something we can
24  discuss when --
25    MR. HICKS: Let me finish.

**Page 41**

1     MS. SCHUETZ: Go ahead.
2     MR. HICKS: I'm expressly on the record
3   letting you know that we reserve the right to
4   obviously exclude anything that's produced last
5   night, but also to recall this witness after we've
6   had an opportunity to listen to what I understand to
7   be over ten hours' worth of conversations that
8   weren't produced until the day before her
9   deposition -- the night before her deposition.
10    MS. SCHUETZ: Again, you're welcome to
11  reserve anything you like. As to whether we'll
12  consent to that, we'll see down the road.
13    MR. HICKS: I'm asking you now, given the
14  fact that that material wasn't provided to us in a
15  timely manner, and certainly not provided to us in
16  time for us to review it in preparation for today's
17  deposition, will you stipulate on the record that we
18  will be able to recall this witness?
19    MS. SCHUETZ: I will not stipulate to that
20  today.
21    MR. HICKS: Let me finish. I'm asking you
22  to stipulate today.
23    MS. SCHUETZ: Right. I'm not going to
24  stipulate to it today. Again, I'm happy to have a
25  conversation with you about it. We can have a

All-American Court Reporters (702) 240-4393
www.aacrlv.com

## Claudia Carlson    March 5, 2014
## * * *Videotaped Deposition* * *

16 (Pages 58 to 61)

### Page 58

1  which is your employment application dated May of
2  2003. Once you've looked at it and recognize it, let
3  me know and I'll ask you some questions about it.
4      Do you recognize Exhibit 1?
5  A. If this means Exhibit 1?
6  Q. Yes. And just so you know, during the day
7  we'll have documents with numbers on them, and that
8  one has a number 1 on the blue stamp.
9  A. Okay.
10  Q. Do you recognize Exhibit 1 as being your
11  employment application?
12  A. It's been so long that I don't remember it.
13  Q. Well, let's go to the last page of
14  Exhibit 1. Do you recognize your signature dated
15  May 19th, 2003?
16  A. Yes.
17  Q. And you read the language immediately above
18  your signature prior to signing it?
19  A. What was that?
20  Q. You read this document before you signed
21  it?
22  A. I probably did.
23  Q. And if we go to the first page of
24  Exhibit 1, this is your handwriting on the document?
25  A. Yes.

### Page 59

1  Q. And page 2, that's your handwriting?
2  A. Yes.
3  Q. Page 3 is your handwriting?
4  A. Yes.
5  Q. What position were you applying for in May
6  of 2003?
7  A. I can't remember.
8  Q. Was it a retail position?
9  A. I got the retail job, but I can't remember
10  if I put retail or not.
11  Q. You were hired as a retail sales host,
12  correct?
13  A. Yes.
14  Q. And you began your employment in June of
15  2003?
16  A. Yes.
17  Q. And shortly after you were hired, you were
18  provided copies of company documents such as employee
19  handbooks, correct?
20  A. I probably did. I can't remember.
21      MR. HICKS: Let's have marked as Exhibit 2
22  an acknowledgment dated June 2nd, 2003.
23      (Exhibit 2 was marked for
24      identification.)
25

### Page 60

1  BY MR. HICKS:
2  Q. Ms. Carlson, do you recognize your
3  signature on the bottom of Exhibit 2?
4  A. Yes.
5  Q. And that's your handwriting on the
6  document?
7  A. Yes.
8  Q. And where it says the date June 2nd, 2003,
9  that's your handwriting?
10  A. Yes.
11  Q. And on or about June 2nd, 2003, you
12  received a copy of the company's employee handbook,
13  correct?
14  A. I don't remember.
15  Q. I'm sorry?
16  A. I don't remember. I probably did.
17  Q. You don't have any reason to believe you
18  didn't, do you?
19  A. I don't remember.
20      MR. HICKS: Let's have marked as Exhibit 3
21  an acknowledgment signed by Ms. Carlson dated July (
22  2003.
23      (Exhibit 3 was marked for
24      identification.)
25

### Page 61

1  BY MR. HICKS:
2  Q. Ms. Carlson, do you recognize your
3  signature on Exhibit 3?
4  A. I don't remember it.
5  Q. I'm not asking if you remember it. I'm
6  asking do you recognize your signature?
7  A. No.
8  Q. So you don't know whether or not that's
9  your signature?
10  A. Yes. I don't remember if it's my signature
11  or not.
12  Q. I'm not asking if you remember. I'm simply
13  asking is that your signature? I'm not asking if you
14  remember signing it.
15  A. No.
16  Q. That's not your signature?
17  A. No. I remember signing as Arenas all the
18  time, but I don't know why it's Casildo.
19  Q. Do you recognize your own signature?
20      MS. SCHUETZ: Objection. Asked and
21  answered.
22      You can answer.
23      MR. HICKS: No, it hasn't.
24  BY MR. HICKS:
25  Q. Do you recognize your own signature?

# Claudia Carlson   March 5, 2014
## * * *Videotaped Deposition* * *

**Page 74**

1    Q. Specifically because you're Mexican?
2    A. Yes.
3    Q. And what is the basis for that opinion?
4    Why do you contend it was because you're Mexican?
5    A. Because everybody else was eating chips and
6    they pointed only me.
7    Q. Any other evidence or any other reason you
8    believe that you were counseled, but nobody else, was
9    because of your race, other than what you've already
10   told me?
11   A. Sharon Jones Ono is Caucasian. She didn't
12   get a warning. She witnessed for this. She was also
13   eating.
14   Q. And what is the basis for your contention
15   that it was because of your race, other than what
16   you've already told me?
17   A. Why else would they do it?
18   Q. And who is it that you claim was
19   discriminating against you because of your race when
20   you were disciplined for eating chips during the
21   show?
22   A. My boss.
23   Q. Who?
24   A. Bob.
25   Q. Bob Walker?

**Page 75**

1    A. Yes.
2    Q. In this lawsuit you're claiming that you
3    were discriminated against because of your race,
4    correct?
5    A. Yes.
6    Q. And you're claiming that you were
7    discriminated against because of your gender,
8    correct?
9    A. Yes.
10   Q. When was the first incident where you claim
11   you were discriminated against either because of your
12   race or your gender?
13   A. I can't remember.
14   Q. Tell me what you can remember. And what I
15   would like to do, Ms. Carlson, is have you walk
16   through chronologically who you claim discriminated
17   against you. And you can explain what happened, and
18   I'll ask you some questions about that, and then
19   we'll move on to the next one.
20   You've already told me about your
21   discipline as reflected in Exhibit 6. Was that the
22   first time you believe you were discriminated against
23   because of your race?
24   MS. SCHUETZ: Objection. Asked and
25   answered.

**Page 76**

1    You can answer.
2    THE WITNESS: I can't remember.
3    BY MR. HICKS:
4    Q. Please tell me any other incidents or
5    evidence that you claim to have that you were
6    discriminated against because of your race or gender
7    while you worked at the Monte Carlo?
8    A. I can't remember right now. There was so
9    many things that I can't...
10   Can I take a break to get water?
11   MS. SCHUETZ: Can she have some water?
12   MR. HICKS: Sure.
13   MS. SCHUETZ: Take a quick break.
14   MR. HICKS: No, we don't need to take a
15   break.
16   If you don't mind grabbing some water.
17   MS. SCHUETZ: That's fine.
18   THE WITNESS: I want to take a pill.
19   MS. SCHUETZ: I'm sorry. I think we do need
20   a break for a moment.
21   MR. HICKS: You know what, we've already
22   taken like four breaks in an hour and a half period.
23   What is the purpose of taking a break now?
24   MS. SCHUETZ: She's requested to take a
25   medication. I think she's not feeling very well.

**Page 77**

1    BY MR. HICKS:
2    Q. Do you need to take a break to take
3    medication?
4    A. Yes.
5    MR. HICKS: Well, let's take a, you know, a
6    minute break and --
7    MS. SCHUETZ: That's fine.
8    THE VIDEOGRAPHER: We're going off the
9    record at 11:07 a.m.
10   (A recess was taken from 11:07 a.m.
11   to 11:08 a.m.)
12   MR. HICKS: We have taken a break for the
13   purpose of the witness to take a pill, presumably.
14   Counsel is now asking to leave the room for
15   the purpose of what?
16   MS. SCHUETZ: I believe the witness would
17   like to ask me a question. If she would like to
18   speak with me, I plan to speak with her.
19   MR. HICKS: There could be nothing more
20   inappropriate at this juncture of the deposition than
21   for counsel to step outside the room while a question
22   is pending.
23   MS. SCHUETZ: Would you like your pending
24   question answered before she leaves the room?
25   MR. HICKS: Of course, I would like my

## Claudia Carlson   March 5, 2014
## * * *Videotaped Deposition* * *

21 (Pages 78 to 81)

**Page 78**

1   pending question.
2       MS. SCHUETZ: Claudia, would you be willing
3   to answer the question before you leave the room so
4   you can take the medication? Is that okay?
5       MR. HICKS: Is this being videotaped?
6       THE VIDEOGRAPHER: It is.
7       MR. HICKS: Let's have the witness sit
8   down, then, at least.
9       THE WITNESS: I won't be able to answer
10  that and sit here and take that, because I didn't
11  feel good earlier.
12      And make sure that it's on the recorder,
13  this is exactly what I went through while at the
14  Monte Carlo.
15  BY MR. HICKS:
16      Q.  Do you need to take medication?
17      A.  Yes, I do.  Do you want to see the bottle?
18      Q.  No.  As far as I'm concerned you can step
19  out of the room and take a medication.  I just don't
20  want coaching of the witness.
21      MS. SCHUETZ: Sir, we just need to take a
22  break. I'm not going to coach the witness. She's
23  extremely upset. We're going to take a break now.
24      MR. HICKS: Okay, I'm going to call the
25  magistrate --

**Page 79**

1       MS. SCHUETZ: Please do.
2       MR. HICKS: -- and ask that this come to a
3   stop.
4       MS. SCHUETZ: I would also like to speak
5   with the magistrate at this point.  So let's get them
6   on speaker phone when I come back into the room.
7       MR. HICKS: Absolutely.
8       MS. SCHUETZ: Come on, Claudia. Let's go
9   take a break.
10      THE VIDEOGRAPHER: We're going off the
11  record at 11:10 a.m.
12      (A recess was taken from 11:10 a.m.
13      to 11:16 a.m.)
14      (Call to the Magistrate.)
15      CLERK: Good morning. Judge Leen's
16  chambers.
17      MR. HICKS: Hi, this is Patrick Hicks with
18  Littler Mendelson, and I'm in a deposition
19  of one of the plaintiffs in one of Magistrate Judge
20  Leen's cases. And I have opposing counsel with me,
21  and we have an issue we would like to take up with
22  the Magistrate.
23      CLERK: Could you please tell me the case
24  number?
25      MR. HICKS: You bet. It's CV-00378.

**Page 80**

1       CLERK: What's the year?
2       MR. HICKS: It is 2013.
3       CLERK: 2013? Let me pull it up real
4   quick. Carlson versus Victoria Partners?
5       MR. HICKS: Yes.
6       CLERK: And what is the nature of the
7   dispute?
8       MR. HICKS: Sure. I am taking Plaintiff
9   Carlson's deposition. And while questions are
10  actually pending, Counsel is taking breaks and
11  stepping out and speaking with the witness, and I'm
12  objecting to that.
13      MS. SCHUETZ: And my position, this is
14  Giselle Schuetz, representing the plaintiff, is that
15  that is a complete mischaracterization of the events.
16      What actually just occurred was that the
17  witness was crying due to Counsel's inappropriately
18  hostile behavior, which he has been conducting
19  throughout this morning, unfortunately. And she
20  requested to take a medication, and that she wanted
21  to take a medication during the break and asked for a
22  break for that purpose.
23      MR. HICKS: And I could go on if you want.
24  I obviously object. The deposition, by the way, is
25  being videotaped. So the Q and A and the conduct

**Page 81**

1   will speaks for itself.
2       MS. SCHUETZ: I agree.
3       MR. HICKS: But this is the second time
4   while a question was pending that counsel stepped out
5   of the room with the deponent. I had no objection to
6   the deponent taking a pill and stepping out to take a
7   pill. What I objected to was Counsel -- she didn't
8   need Counsel to go with her, and Counsel is using
9   that opportunity to speak with the witness while a
10  question is pending.
11      MS. SCHUETZ: That's actually incorrect.
12  As soon as Patrick said he was concerned because a
13  question was pending, I said if you would like the
14  witness to answer the question first before we step
15  out so she can take her pill, then she can answer
16  that question first.
17      The witness sat back down, and Patrick
18  proceeded to continue trying to ask her a question.
19  However, at that point she was crying and fiddling to
20  take her medication.
21      So at that point, the record will show
22  things had completely fallen apart.
23      MR. HICKS: Well, in other words, while a
24  question was pending, Counsel stepped out of the room
25  with her client.

## Page 82

1    MS. SCHUETZ: Patrick, I have no interest
2 in stepping out of the room with my client while
3 questions are pending. However, if my client would
4 like to take a medication, she is entitled to take a
5 break to take medication.
6    Counsel has been extremely aggressive and
7 rude throughout this deposition. I don't know what
8 else to say. However, I would appreciate the
9 Magistrate advising him to change his demeanor to be
10 polite and professional for the rest of the day.
11    MR. HICKS: And this is Patrick. It's
12 being videotaped for a reason, and I'm more than
13 happy to stand on the tone and nature of the
14 questions.
15    CLERK: All right. The judge is right in
16 the middle of something at the moment.
17    Do you have a number that I can reach you
18 on to see when she would be available to -- did the
19 deposition just start? Have you guys been going for
20 a while?
21    MR. HICKS: It started at 9:00, but there
22 have been probably four or so breaks at the request
23 of the plaintiff.
24    MS. SCHUETZ: This is incorrect. Defendant
25 requested the first break.

## Page 83

1    CLERK: So I assume you expect it to go for
2 a while longer then?
3    MR. HICKS: Yeah. It will go all day.
4    CLERK: Okay. And is there a number in
5 that room that I or Judge Leen can give you a call
6 back on to either let you know when she can speak
7 with you on this matter, or to speak with you on this
8 matter?
9    MR. HICKS: You bet. It's 862-7751. And
10 that comes directly, as I understand it, into our
11 conference room here.
12    CLERK: All right. Let me speak with the
13 judge as soon as she takes a quick break, and I
14 will -- I or she will get back to you.
15    MR. HICKS: Great. Appreciate it.
16    MS. SCHUETZ: Thanks for your help.
17    CLERK: Bye-bye.
18    MR. HICKS: So we will go ahead and
19 continue, pending a call from the magistrate judge.
20    THE VIDEOGRAPHER: Just a moment. Here we
21 go.
22    We're back on the record at 11:21 a.m. You
23 may proceed.
24 BY MR. HICKS:
25    Q. Ms. Carlson, we took a break at your

## Page 84

1 request. While we were on break, you had an
2 opportunity to speak with your counsel.
3    There was a question pending when we took
4 the break. I believe your last answer was, that's
5 all I can recall, or words to that effect right now.
6    Do you have anything to add to your
7 previous answer? And if you need me to reask the
8 question, I can do that.
9    A. Can you please reask the question?
10    Q. Yes.
11    A. Because I went to take a pill.
12    Q. Other than --
13    A. And feel better. Because I was about to
14 get fainted.
15    Q. Other than what you already described
16 concerning being counseled for eating food during the
17 show, do you claim that you were subjected to any
18 other discrimination based on your race or your sex
19 while working at the Monte Carlo?
20    A. Can you please give me another way of that
21 question?
22    Q. Do you claim in this lawsuit that you were
23 discriminated because of your race while at the Monte
24 Carlo?
25    (The conference room phone rang.)

## Page 85

1    MR. HICKS: Magistrate Judge Leen is
2 calling back, so we're going to go -- we're going to
3 stop the video so we can take the call from the
4 Court.
5    THE VIDEOGRAPHER: We're going off the
6 video record at 11:23 a.m.
7    MR. HICKS: Hello?
8    CLERK: The judge will have ability to hear
9 you in about 15 minutes. Could you give a call back
10 in her chambers at that time?
11    MR. HICKS: You bet.
12    CLERK: Okay, thanks so much.
13    MS. SCHUETZ: Thank you.
14    CLERK: Bye-bye.
15    THE VIDEOGRAPHER: We're going back on the
16 record at 11:24 a.m.
17 BY MR. HICKS:
18    Q. Ms. Carlson, we went off the record for
19 just a moment because there was a phone call coming
20 from the magistrate judge.
21    Would you like me to rephrase the question?
22    A. Yes.
23    Q. Do you claim in this lawsuit that you were
24 discriminated against because of your race while
25 working at the Monte Carlo?

Claudia Carlson    March 5, 2014
* * *Videotaped Deposition* * *

Page 86

1    A.  Yes.
2    Q.  Do you claim in this lawsuit that you were
3  discriminated because of your sex while working at
4  the Monte Carlo?
5    A.  Yes.
6    Q.  Please tell me everything you can recall
7  that you claim was discrimination on the basis of
8  your race or your sex while you worked at the Monte
9  Carlo.
10    A.  I can't think right now because of my
11  headache, so I can't remember.
12    Q.  Who suggested to you, if anyone, that you
13  start secretly tape recording conversations at the
14  workplace?
15    A.  The union.
16    Q.  And who specifically at the union do you
17  contend suggested that?
18    A.  Floyd.
19    Q.  Who?
20    A.  Floyd.
21    Q.  And what's Floyd's last name?
22    A.  I can't remember.
23    Q.  And do you recall specifically what Floyd
24  said when he suggested that you secretly tape record
25  conversations at work?

Page 87

1    A.  I can't remember.
2    Q.  And when did Floyd make that suggestion?
3    A.  I can't remember.
4    Q.  Was anyone else present when Floyd made
5  that suggestion to you?
6    A.  I can't remember.
7    Q.  Did you discuss with Mr. Hall the fact that
8  Floyd had suggested you secretly tape record
9  conversations at work?
10    A.  I can't remember.
11    Q.  Did you tell anyone who was being recorded
12  that they were being secretly tape recorded?
13    A.  I can't remember.
14    Q.  When you were secretly tape recording
15  conversations at work, where did you have your iPhone
16  that was doing the recording?
17    A.  In my pocket; in my chest pocket.
18    Q.  Did Mr. Hall, to your knowledge, ever
19  secretly tape record conversations?
20    A.  I can't remember.
21    Q.  Did you ever have any conversations with
22  Mr. Hall about him secretly tape recording
23  conversations?
24    A.  I can't remember.
25    Q.  When -- you've already testified that you

Page 88

1  don't recall when the first secretly tape recorded
2  conversation took place.  Do you recall when the last
3  secretly tape recorded conversation took place?
4    A.  I can't remember.
5    Q.  And why were you secretly tape recording
6  conversations?
7    A.  Because the union told me that it will
8  prove what I was complaining for so long and nobody
9  would listen.
10    Q.  And so you secretly tape recorded
11  conversations at work so that you could prove what
12  you were saying was true?
13    A.  What I have filled the statements about,
14  what I have told my supervisors and my directors, and
15  nobody have done anything about it.  I even told the
16  vice president about it.
17    Q.  So you were secretly tape recording
18  conversations at work so that you could prove that
19  you were being discriminated against?
20    A.  Yes.
21    Q.  Did you ever give any of these secretly
22  tape recorded conversations to anybody in human
23  resources while you worked at the Monte Carlo?
24    A.  I can't remember.
25    Q.  Did you ever give any of these secretly

Page 89

1  tape recorded conversations to any member of
2  management while you worked at the Monte Carlo?
3    A.  I can't remember.
4    Q.  Did you ever play for any of your coworkers
5  any of these secretly tape recorded conversations
6  while you were working at the Monte Carlo?
7    A.  I can't remember.
8    Q.  Did you ever play for Mr. Hall while you
9  were working at the Monte Carlo any of these secretly
10  tape recorded conversations?
11    A.  I can't remember.
12    Q.  Did Mr. Hall ever play for you while you
13  were working at the Monte Carlo any conversations
14  that he secretly tape recorded?
15    A.  I can't remember.
16    Q.  Did Mr. Hall know that you were secretly
17  tape recording conversations?
18    A.  I can't remember.
19    Q.  Have you ever transcribed, meaning had put
20  into a print form, any of the secretly tape recorded
21  conversations?
22    A.  I can't remember.
23    Q.  In this lawsuit, it's your contention --
24  strike that.
25    Are you claiming in this lawsuit that you

Claudia Carlson    March 5, 2014
* * *Videotaped Deposition* * *

25 (Pages 94 to 97)

## Page 94

1  attorney and your husband, about your lawsuit?
2      A.  At this moment, I can't remember.
3      Q.  And have you spoken to those people, who
4  you can't remember right now, about the details of
5  your allegations in this lawsuit?  Or have you just
6  talked to them generally?
7      A.  Just generally.  Just about my depression
8  mainly.
9      Q.  Do you keep in touch with any current
10  employees of the Monte Carlo?
11      A.  Just Josh.
12      Q.  Referring to Mr. Hall?
13      A.  Yes.  And not really anymore.  Since my
14  depression started I don't talk to other friends.
15  They also work there, but I don't talk to them
16  because it reminds me of it, so...
17      Q.  Other than Mr. Hall, did you tell anyone
18  else that worked for or currently works for the Monte
19  Carlo that you were being deposed today?
20      A.  No.
21      MS. MUCKLEROY:  We have about a minute.
22      MR. HICKS:  Why don't we take a break.  And
23  I think it's about the time that we're supposed to
24  give the magistrate judge a call back.  So we'll go
25  off camera.  We'll stay on the record for purposes of

## Page 95

1  that call.
2      THE VIDEOGRAPHER:  We're going off the
3  video record and ending tape number two at 11:40 a.m.
4      (Off the video record.)
5      (Call to the magistrate's office.)
6      CLERK:  Good morning.  Judge Leen's
7  chambers.
8      MR. HICKS:  Hi.  This is Patrick Hicks with
9  Littler Mendelson.
10      CLERK:  Hi.  And do you have -- can you
11  tell me your last name again?
12      MS. SCHUETZ:  Giselle Schuetz.
13      CLERK:  Okay.  Just hold on one second.
14  I'll transfer you in to Judge Leen.
15      MS. SCHUETZ:  Thank you.
16      THE MAGISTRATE:  Good morning, Counsel.  I
17  understand you have a discovery dispute in the course
18  of the deposition, and you've asked for a dispute
19  resolution conference; is that correct?
20      MR. HICKS:  Yes.  That's correct, your
21  Honor.  This is Patrick Hicks.
22      MS. SCHUETZ:  This is Giselle Schuetz,
23  representing the plaintiff.
24      THE MAGISTRATE:  And do we have the court
25  reporter present to take stenographic notes of this

## Page 96

1  dispute resolution conference?
2      MR. HICKS:  We do, your Honor.  And she is,
3  in fact, doing so.
4      THE MAGISTRATE:  Excellent.  Okay.  Now,
5  who has the dispute, and who is the moving party for
6  request and relief from the Court?
7      MR. HICKS:  Sure, your Honor.  This is
8  Patrick Hicks.  I initiated the phone call because
9  within approximately an hour's time, there were two
10  separate instances where, despite my admonition at
11  the beginning of the deposition, Counsel breaks
12  outside the presence of the court reporter and
13  everybody else while questions were actually pending.
14      THE MAGISTRATE:  And before an answer wa[s]
15  provided?
16      MR. HICKS:  Yes.  And the purpose of my
17  call to the Court was simply to ask that Counsel be
18  advised that that's not appropriate.
19      What triggered the most recent -- what
20  triggered the phone call was that the deponent, who
21  is one of the two plaintiffs in this case, had asked
22  if she could take a pill.  And I, of course, said
23  yes.  But there was a question pending.  And she
24  wanted to step out to take the pill, which I had no
25  problem with, but I did object to Counsel stepping

## Page 97

1  out into the hallway and speaking with her while she
2  was taking her pill.
3      In fairness to Counsel, since we called
4  your chambers 20 minutes ago or 25 minutes ago, it
5  hasn't been a problem.
6      MS. SCHUETZ:  Your Honor, if I could just
7  state my position with regard to this.  I have no
8  interest in speaking with the plaintiff outside of
9  the court reporter's hearing before questions have
10  been answered.
11      Honestly, I think the question was not
12  still pending with regard to the most recent
13  incident.  I believe the witness had answered.  I
14  don't recall.  I'm happy to have the record read back
15  so we can clear it up either way.
16      But so that your Honor understands what's
17  been going on this morning, Mr. Hicks' demeanor ha[s]
18  been consistently abusive, rude and inappropriate to
19  this witness.  She was crying so profusely that she
20  had decided she needed to take an Advil for her
21  headache.  That was what prompted this entire need
22  for a break in the first place.
23      And since then Mr. Hicks has complained
24  there have been too many breaks because of the
25  witness crying.

Claudia Carlson    March 5, 2014
* * *Videotaped Deposition* * *

## Page 98

1   He additionally, when I attempted to speak
2   with him in the hall regarding his demeanor, yelled
3   at me in my face, demanded to know whether I had eve
4   tried a case, which I think is in a positive at this
5   point, and, you know, accused me of doing unethical
6   things.
7       So I honestly would like your Honor to
8   please explain to him that he's going to need to
9   change his demeanor for the remainder of the day
10  because it's inappropriate.
11      MR. HICKS: Your Honor, this deposition is
12  being videotaped, and I will absolutely stand on the
13  tone and tenor of every single question I've asked at
14  this deposition. I have not accused Counsel of any
15  unethical conduct.
16      We had a discussion about the fact that
17  there were 31 secretly tape recorded conversations
18  that the plaintiff provided to Counsel that we asked
19  for months ago that were not given to us until last
20  night. And that's the -- that will be the subject
21  most likely of a motion at some point.
22      But that is not what prompted this phone
23  call. And I will stand on any conduct that I've
24  engaged in here, and it's all on videotape.
25      MS. SCHUETZ: That's fine. And your Honor,

## Page 99

1   so that you understand --
2       THE MAGISTRATE: Counsel, I'm not going to
3   keep the point/counterpoint going back and forth.
4   I'm not there to have an opportunity to observe your
5   competing positions with respect to the
6   appropriateness and respect of conduct.
7       Counsel may not coach a witness during a
8   break or while a question is pending, and may not
9   speak to a witness before the witness provides an
10  answer. You know those rules.
11      Mr. Hicks, you know the rule is that you
12  will conduct yourself and comport your conduct the
13  same manner that you would conduct yourself in a
14  court with a witness on the witness stand with a
15  judge presiding.
16      So I expect both counsel to remember that
17  that is the purpose of the deposition is to obtain
18  discovery. And it is supposed to mirror in all
19  respects testimony that would be received in a court
20  of law, with a couple of exceptions:
21      One, there is no judge on the bench to
22  resolve your disputes about the appropriateness of
23  any questions.
24      And two, that the scope of discovery is
25  broader than what may be admissible in a court of

## Page 100

1   law.
2       But you are both to conduct yourselves as
3   you would if the witness was on a witness stand in a
4   court. And if you wouldn't do it in front of the
5   judge, you're not to do it at a deposition.
6       And if you have a dispute about how you've
7   behaved, I'm glad it's videotaped because that cuts
8   down on the amount of disputes about tone, the leve
9   of voice and the like.
10      So I expect both of you to conduct
11  yourselves like the professionals that I know you
12  are. And I know you're capable of it. And I know
13  how things get a little hot and heavy during
14  depositions sometimes, and tempers can flare, but
15  take a deep breath and behave like the excellent
16  lawyers that you both are. Okay?
17      MR. HICKS: Thank you.
18      MS. SCHUETZ: Thank you, Judge Leen.
19      THE MAGISTRATE: Have a good one.
20      MR. HICKS: Thank you.
21      THE MAGISTRATE: Have a good day now.
22      MR. HICKS: Bye-bye.
23      Why don't we take a five-minute break.
24      (A recess was taken from 11:48 a.m.
25      to 11:57 a.m.)

## Page 101

1   THE VIDEOGRAPHER: We're going back on the
2   record at 11:57 a.m. This marks the beginning of
3   media number three.
4       You may proceed.
5   BY MR. HICKS:
6   Q.  We're back on the record having taken a
7   short break at my request.
8       Subject to any potential future requests or
9   motion on my part to come back to question this
10  witness about evidence we did not receive until last
11  night, I am done.
12      MS. SCHUETZ: All right. I would like to
13  now take my own short break, if that's okay with
14  Counsel, to review my notes, and then I'll have some
15  questions for the witness.
16      MR. HICKS: All right.
17      MS. SCHUETZ: Thank you.
18      THE VIDEOGRAPHER: We're going off the
19  record at 11:57 a.m.
20      (A recess was taken from 11:57 a.m.
21      to 1:13 p.m.)
22      THE VIDEOGRAPHER: We're back on the record
23  at 1:13 p.m. This marks the beginning of media
24  number three, part two.
25      You may proceed.

Page 102

1    EXAMINATION
2  BY MS. SCHUETZ:
3    Q. Ms. Carlson, I'm going to have a few
4  questions for you now on direct following the
5  defendant's questions.
6    I believe we talked earlier about how you
7  were hired at the Monte Carlo into retail; is that
8  correct?
9    A. Yes.
10    Q. Okay. Did there come a time when you
11  changed to a different position within the Monte
12  Carlo?
13    A. Yes.
14    Q. Okay. And what was that?
15    A. Showroom usher.
16    Q. Okay. Could you describe for me what are
17  the tasks a showroom usher is supposed to do?
18    A. Yes. He needs to take guests to their
19  assigned seats, or direct them to their assigned
20  seats. And take cameras away if they're recording or
21  taking pictures.
22    Taking tickets when they come inside the
23  showroom. Directing them out when it's over. And
24  also they had us do -- I can't remember the name. At
25  the end they add another thing when they was in the

Page 103

1  show. They put us outside in the casino giving
2  information and brochures from the show. They called
3  it, I think ambassadors.
4    Q. Okay. And when you first became an usher,
5  did you have a supervisor?
6    A. Yes.
7    Q. And who was your supervisor then?
8    A. Bob Walker.
9    Q. Okay. And who were the other ushers who
10  you worked with, if any, in that job?
11    A. Joshua, Sharon, Gian Carlo, MJ, Joey,
12  Arianna, Dawn.
13    MR. HICKS: Who?
14    THE WITNESS: Dawn.
15    MR. HICKS: Sorry, thank you.
16    THE WITNESS: I can't remember right now.
17  BY MS. SCHUETZ:
18    Q. And Gian Carlo, was his name Gozzi or
19  Gozzi, something like that?
20    A. Something like that, I think.
21    Q. And was MJ, MJ Richardson? Was that her
22  last name?
23    A. I think so. I'm not sure.
24    Q. Not sure of her last name?
25    A. Nuh-uh.

Page 104

1    Q. And then what was Joey's last name?
2    A. Guzman.
3    Q. And what was Arianna's last name?
4    A. I can't remember her name, last name.
5    Q. Was it something like Basulto or Basulto?
6    A. I think it's Basulto.
7    Q. Basulto? Okay.
8    And what's Dawn's last name?
9    A. I can't remember.
10    Q. Okay. Did Sharon Jones Ono ever make a
11  statement to you while you were working at Monte
12  Carlo that you thought was offensive?
13    MR. HICKS: Objection. Leading.
14  BY MS. SCHUETZ:
15    Q. You can answer.
16    MR. HICKS: Counsel, let me remind you what
17  Magistrate Judge Leen said while we were on the
18  phone.
19    MS. SCHUETZ: Uh-huh.
20    MR. HICKS: And that was anything we
21  couldn't do in court, we can't do here.
22    MS. SCHUETZ: There's nothing inappropriate
23  about my question.
24    MR. HICKS: Except for the fact that it's
25  leading.

Page 105

1    MS. SCHUETZ: I disagree.
2  BY MS. SCHUETZ:
3    Q. You can answer the question.
4    A. Yes.
5    Q. What was that?
6    MR. HICKS: I'm sorry, can you re-read the
7  question?
8    (The record was read as requested.)
9    MR. HICKS: I stand by my objection.
10    MS. SCHUETZ: So my question if you can
11  read it back also.
12    (The record was read as requested.)
13    THE WITNESS: So many, the ones I remember
14  always in my head is that she was going to take my
15  Green Card.
16    Another one was that Mexicans take our jobs
17  while she was on the phone.
18  BY MS. SCHUETZ:
19    Q. Okay.
20    A. Another one, while they was on the phone
21  also, that she couldn't stand Mexicans. And that she
22  hated her daughter-in-law; why didn't she go back to
23  Mexico.
24    And also, while it was on the phone, she
25  said that she wishes that I was back in Mexico. Like

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

Page 106

1  I just wish she goes back to Mexico and stop taking
2  our jobs.
3      Q.  When Sharon Jones Ono made the comment
4  about the Green Card that you just testified to, was
5  anyone else present at that time?
6      A.  Yes.
7      Q.  Who was present?
8      A.  Josh. Joshua Hall.
9      Q.  And did you report that statement to
10  anyone?
11     A.  Yes.
12     Q.  Who?
13     A.  Bob Walker.
14     Q.  What did Bob Walker say to you, if
15  anything?
16     A.  I had asked him about a paper, because
17  someone had said that comment.  And he said that he
18  didn't believe they had any, I can't remember exactly
19  the words he say, but then we had a meeting.  And
20  Martha was there.
21     Q.  Okay.  So who was in that meeting with
22  Martha?
23     A.  Bob Walker, Martha and myself.
24     Q.  Okay.  And did you say anything to them in
25  that meeting?

Page 107

1      A.  I explained them what happened.  And before
2  I could even explain it, they were going, and like
3  around words.  That was like my first time I ever
4  complained about it, so I was really nervous and I
5  was new, too.  So I was scared I was going to lose my
6  job for complaining or anything.
7          So I couldn't tell them the name, and they
8  told me to go out.  When I got back in, I tried to
9  tell them the name, and Martha said it was too late
10  and they didn't want to hear the name or anything.
11  They just said it was over, the meeting was over.
12     Q.  To your knowledge, did Bob Walker do
13  anything in response to your complaint?
14     MR. HICKS:  Objection.  Leading.
15  BY MS. SCHUETZ:
16     Q.  You can answer.
17     A.  No.  He never posted anything or nothing
18  about racial jokes or anything like that.
19     Q.  Okay.  To your knowledge, did he speak with
20  Sharon Jones Ono about your complaint?
21     MR. HICKS:  Objection.  Leading.
22     THE WITNESS:  I don't know if he did.
23  BY MS. SCHUETZ:
24     Q.  Okay.  Earlier you testified about a
25  comment made by Sharon Jones Ono about her

Page 108

1  daughter-in-law; is that right?
2      A.  Yes.
3      Q.  Could you explain what was going on when
4  you heard that comment?
5      MR. HICKS:  Objection.  Leading.
6      THE WITNESS:  She would always complain
7  about her daughter-in-law.  Every time she had, like
8  in a fight with her, she would always come over.  And
9  in a little room we have, she would talk loud about
10  her and say all this stuff, bad stuff about her.  And
11  about his son leaving someone else for her, and that
12  she was this, she was that.  Like a whole bunch of
13  bad words about her.  And why don't she go back to
14  Mexico and marry her own, and stuff like that,
15  because her son is Caucasian, too.
16  BY MS. SCHUETZ:
17     Q.  Did she make comments like that on more
18  than one occasion?
19     MR. HICKS:  Objection.  Leading.
20     THE WITNESS:  Yes.  A lot.
21  BY MS. SCHUETZ:
22     Q.  Was it more than five times?
23     MR. HICKS:  Objection.  Leading.
24     THE WITNESS:  Yes.
25

Page 109

1  BY MS. SCHUETZ:
2      Q.  Was it more than ten times?
3      MR. HICKS:  Objection.  Leading.
4      MS. SCHUETZ:  We're going to need to call
5  the Court again, I think, because I don't agree that
6  these are leading questions.  So we can have the
7  transcript read to the Court, for instance, if you
8  would like her to pronounce upon whether those are
9  leading questions.
10     MR. HICKS:  I'm not asking at this point to
11  call anybody.  I'm making my objections for the
12  record.
13     MS. SCHUETZ:  Your objections are
14  disruptive, for the record, because they're
15  unfounded.
16     MR. HICKS:  I obviously disagree with that.
17     MS. SCHUETZ:  I'm sure you do.
18  BY MS. SCHUETZ:
19     Q.  You mentioned earlier a comment regarding
20  wishing that you were back in Mexico; is that
21  correct?
22     MR. HICKS:  Objection.  Leading.
23     THE WITNESS:  Yes.
24  BY MS. SCHUETZ:
25     Q.  Could you explain the context in which you

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

## Page 110

1 heard that comment?
2     A.  She mentioned that so many times that I
3 can't specify the one time she did because she will
4 always mention something to hurt me or something
5 racial just because I got to stay on the job, and not
6 her best friend.
7          She was making me feel like if I was less
8 than them, like I don't deserve the job just because
9 that I wasn't Caucasian; I wasn't born here, I didn't
10 deserve the same treatment.
11     Q.  Did --
12          MR. HICKS: I ask that that answer be
13 stricken as nonresponsive.
14          MS. SCHUETZ: I obviously do not agree.
15 BY MS. SCHUETZ:
16     Q.  Did Sharon Jones Ono make a comment about
17 wishing you were back in Mexico one time or more than
18 one time?
19          MR. HICKS: Objection. Leading.
20          THE WITNESS: More than one time.
21 BY MS. SCHUETZ:
22     Q.  Was it more than five times?
23          MR. HICKS: Objection. Leading.
24          THE WITNESS: Yes.
25

## Page 111

1 BY MS. SCHUETZ:
2     Q.  Was it more than ten times?
3          MR. HICKS: Objection. Leading.
4          THE WITNESS: Yes.
5 BY MS. SCHUETZ:
6     Q.  Did you ever complain to anyone about
7 Sharon Jones Ono's statements regarding you going
8 back to Mexico?
9     A.  Yes.
10     Q.  Who did you complain to?
11     A.  Most of my supervisors.
12     Q.  Okay. Did there come a time when you had
13 supervisors other than Bob Walker, who you mentioned
14 earlier?
15     A.  Yes.
16     Q.  What other supervisors did you have besides
17 Mr. Walker?
18     A.  Manny, Jennifer, Carol, Shana. There was
19 one more, but I can't remember.
20     Q.  Okay. So regarding --
21     A.  I'm sorry.
22     Q.  Go ahead.
23     A.  Isaac.
24     Q.  Isaac? Okay.
25     A.  And I can't remember if there's another

## Page 112

1 one.
2     Q.  Okay. So regarding the statement you
3 testified about a little bit ago regarding going back
4 to Mexico, which supervisors did you complain to
5 about that statement?
6     A.  I know I have complained about that, all of
7 the ones that I just mentioned.
8     Q.  Besides Sharon Jones Ono, did you ever hear
9 offensive racial remarks from any of the other ushers
10 you worked with?
11          MR. HICKS: Objection. Leading.
12 BY MS. SCHUETZ:
13     Q.  You can answer.
14     A.  Yes.
15     Q.  Could you give me an example of one?
16          I can strike my question and clarify.
17          Could you give me an example of an usher
18 who you heard offensive things from?
19          MR. HICKS: Objection. Leading.
20 BY MS. SCHUETZ:
21     Q.  You can answer.
22     A.  Gian Carlo.
23     Q.  Okay.
24     A.  He would say that he will wipe his behind
25 with the Mexican flag. And that he hated Mexicans.

## Page 113

1 and that he couldn't stand them because they took his
2 job where he used to work. That he hated his
3 neighbors because they were Mexican. They always
4 used to take his parking spots. They all live in the
5 same place.
6     Q.  Okay. Regarding the statement that you
7 just mentioned about hating his neighbors because
8 they were Mexicans, is that a statement that you
9 heard one time or more than one time from Gian Carlo?
10          MR. HICKS: Objection. Leading.
11 BY MS. SCHUETZ:
12     Q.  You can answer.
13     A.  More times than -- a lot more than one
14 time.
15     Q.  Can you estimate about how many times you
16 heard a statement to that effect from Gian Carlo?
17     A.  Based on a week or month?
18     Q.  However is easiest for you.
19     A.  Like almost every day. Every time he will
20 come from home, because of his neighbors. Or he will
21 be boring, he will just start talking about his older
22 job, how much he misses it. And that he hated that
23 he wasn't there anymore, and they hired someone else
24 cheaper because they work for cheaper.
25     Q.  Regarding the statement that you mentioned

Claudia Carlson    March 5, 2014
\* \* \*Videotaped Deposition\* \* \*

30 (Pages 114 to 117)

Page 114

1  a little bit ago about wiping his behind with the
2  Mexican flag, was anyone else present when you heard
3  that comment?
4      A.  Yes.
5      Q.  Who else was present?
6      A.  Joshua.
7      Q.  Did you ever report to anyone offensive
8  remarks that you had heard from Gian Carlo Gozzi?
9      A.  Yes.
10     Q.  Who did you report offensive remarks by
11 Gian Carlo Gozzi to?
12     A.  Also all of the managers I mentioned it.
13     Q.  Was one of those managers Bob Walker?
14     A.  Yes.
15         MR. HICKS:  Objection.  Leading.
16 BY MS. SCHUETZ:
17     Q.  Did Bob Walker reply to you when you
18 reported this to him?
19     A.  When I went and reported, he mentioned that
20 to let it go, to be the better person.  He always had
21 an excuse for any of them who would say something to
22 me.  He always tried to back them up.
23         MR. HICKS:  I ask that answer be stricken
24 as nonresponsive.
25         MS. SCHUETZ:  I disagree with that.

Page 115

1  BY MS. SCHUETZ:
2      Q.  Did Gian Carlo Gozzi ever do anything that
3  you perceived as physically threatening to you?
4          MR. HICKS:  Objection.  Leading.
5  BY MS. SCHUETZ:
6      Q.  You can answer.
7      A.  Yes.
8      Q.  Could you give me an example of that?
9      A.  On one occasion I was sitting in the
10 locker, and he came up to me and put a knife in my
11 neck saying if I ever get him mad -- I can't remember
12 exactly the words, but he said that he would use it
13 against me.
14         And another time later on, he came up to me
15 also.  I can't remember or recall what I was doing,
16 but I was sitting in the same locker, and he
17 assaulted me.  He punched me in my face.
18     Q.  Okay.  Regarding the incident you just
19 described where he came up to you and put a knife to
20 your neck, did you report that incident to anyone?
21     A.  Yes.
22     Q.  Who did you report that incident to?
23     A.  Bob Walker.
24     Q.  And did he reply to you when you made that
25 report?

Page 116

1      A.  Yes.  He said that I should have been the
2  biggest person again, like a better person.  And
3  then he started mentioning his life, his past life,
4  how he was -- what did he say?  An orphan, and that
5  he don't have no family.  Like for me to feel sorry
6  for him, like if it was right for him to do this to
7  me.
8          And that I had to take it because he was an
9  orphan or whatever he was.  And that he was -- he was
10 an older person, so I guess he wanted me to feel bad
11 for him because of that, too.
12     Q.  To your knowledge, did Bob Walker do
13 anything in response to your complaint?
14         MR. HICKS:  Objection.  Calls for
15 speculation.
16         MS. SCHUETZ:  It does not, because it asks
17 to her knowledge in the question.
18 BY MS. SCHUETZ:
19     Q.  But either way, you can answer the
20 question.
21     A.  I don't know if he did or not.
22     Q.  Regarding the incident you testified to a
23 little bit ago in which he -- Gian Carlo Gozzi came
24 up to you and he assaulted you, could you explain to
25 me what happened immediately after that?

Page 117

1      A.  After he hit me, I ran to the phone in the
2  theater, in the theater lobby.  I grabbed the phone,
3  and he pushed me away.  He took the phone and hang
4  up.
5          I ran to look for Jennifer.  I knocked on
6  the door to see if she was in her office.  I knocked
7  and knocked, and nobody answered the door.  So I saw
8  her walking towards the cashier cage, and they found
9  me there.
10         When she find me there, I can't remember if
11 she called or if I called the security.  And then I
12 think we took our statements there.  And they called
13 the police, and I can't remember after that.
14     Q.  Okay.  You mentioned someone a second ago
15 named Dawn Marie; is that correct?
16     A.  Yes.
17     Q.  Who is she?
18     A.  She was an usher also.
19     Q.  While you were employed at the Monte Carlo,
20 was there a human resources department at the Monte
21 Carlo?
22     A.  Yes.
23     Q.  And do you know who worked for human
24 resources?
25     A.  Yes.

Claudia Carlson    March 5, 2014
* * *Videotaped Deposition* * *

**Page 118**

1    Q. Could you tell me who worked for human
2  resources there?
3    A. Martha, Sherry Ohanian, LaDawndre. That's
4  the only ones I remember right now.
5    Q. Okay. Did you ever complain to the human
6  resources department concerning anything Gian Carlo
7  Gozzi had done?
8    MR. HICKS: Objection. Leading.
9  BY MS. SCHUETZ:
10    Q. You can answer.
11    A. Yes.
12    Q. What did you complain to the human
13  resources department about what Gian Carlo Gozzi had
14  done?
15    A. I have mentioned it to them that he have
16  told me those stuff that I had mentioned, and that he
17  wouldn't stop complaining about those neighbors he
18  had, but I can't remember who it was to. I know it
19  was someone from human resources.
20    MR. HICKS: Can you read that answer back?
21    (The record was read as requested.)
22  BY MS. SCHUETZ:
23    Q. So when you say you had mentioned to them
24  that he had told you the stuff that you had
25  mentioned, are you referring to the comments that you

**Page 119**

1  testified to earlier?
2    MR. HICKS: Objection. Leading.
3  BY MS. SCHUETZ:
4    Q. You can answer.
5    A. Yes.
6    Q. What, if anything, did the human resources
7  representative you spoke with say when you
8  complained?
9    A. That they will have an investigation.
10    Q. And did you hear from human resources about
11  that investigation following that conversation?
12    A. No.
13    Q. During the time that you were working at
14  the Monte Carlo, did you ever hear offensive remarks
15  from anyone other than the two ushers you've already
16  told me about?
17    MR. HICKS: Objection. Leading.
18  BY MS. SCHUETZ:
19    Q. You can answer.
20    A. Yes.
21    Q. Could you tell me who is another person who
22  you heard offensive statements from?
23    MR. HICKS: Objection. Leading.
24  BY MS. SCHUETZ:
25    Q. You can answer.

**Page 120**

1    A. MJ.
2    Q. And what did MJ say that you found
3  offensive?
4    A. When I was getting married, I had mentioned
5  to Joshua Hall that I was getting married. And
6  everybody knew that my husband is Caucasian. And she
7  just jumped into our conversation. I can't remember
8  exactly how it happened, but I remember her telling
9  me -- it hurt me, saying that she was against
10  interracial couples.
11    So instead of like congratulating me, like
12  Josh, she just made the comment like trying to ruin
13  the happiness I was having.
14    And then she would come up to me and say
15  that her daughter would always come up to her and
16  sing some song of Michael Jackson's, Black and White.
17  And she would get pissed at her because she knew that
18  she didn't like that; that each race should stay with
19  their own race.
20    Q. Okay. And when MJ told you she was against
21  interracial couples, was anyone else present?
22    A. Joshua.
23    Q. During the time you were working at the
24  Monte Carlo, did you ever hear offensive statements
25  from anyone other than the people who we have

**Page 121**

1  discussed so far?
2    MR. HICKS: Objection. Leading.
3  BY MS. SCHUETZ:
4    Q. You can answer.
5    A. What was that question again?
6    Q. Sure. I asked during the time you were
7  working at the Monte Carlo, did you ever hear
8  offensive statements from anyone other than the
9  people we've been talking about so far?
10    MR. HICKS: Same objection.
11    THE WITNESS: I have heard, yes.
12  BY MS. SCHUETZ:
13    Q. Okay. Could you give me an example?
14    MR. HICKS: I didn't hear the answer.
15    (The record was read as requested.)
16  BY MS. SCHUETZ:
17    Q. Could you give me an example of who you
18  heard offensive statements from other than the people
19  we've been talking about so far?
20    A. Yes. Patty.
21    Q. Who was Patty?
22    A. Patty is a bartender at the Monte Carlo.
23    Q. And what did Patty say that you found
24  offensive?
25    MR. HICKS: Leading.

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

32  (Pages 122 to 125)

Page 122

1  BY MS. SCHUETZ:
2      Q.  You can answer.
3      A.  She have mentioned once when we were coming
4  from lunch that Josh was too cute to be black.  I
5  can't remember the exactly words, but I find that
6  offensive because you don't have to -- like if you're
7  another race, just because you're black doesn't mean
8  you're ugly or you're cute.
9      Q.  When she made the comment regarding
10  Joshua Hall, was anyone else present?
11      A.  Yes.
12      Q.  Who else was present?
13      A.  Dawn Marie.
14      Q.  And who, if anyone, was she speaking to
15  when she made this comment?
16      A.  To Joshua Hall.
17      Q.  And did Josh reply to Patty when she made
18  this comment?
19      A.  Yes.  He told her that he was offended by
20  it.
21      Q.  Okay.  Is there anything else other than
22  this comment regarding Joshua Hall that Patty said
23  that you found offensive?
24      A.  She had mentioned in another occasion also
25  with Sharon that, I can't remember the exactly

Page 123

1  conversation or what it was about, but I was always
2  afraid to go to the rest room on my own.
3          So they were saying something about the "N"
4  word, nigger.  And he's the only one in the showroom.
5      Q.  Could you explain what you mean by he is
6  "the only one in the showroom"?
7      A.  He's the only African-American in the
8  showroom.
9      Q.  Where were you when you heard this
10  statement that you just described?
11      A.  I was passing to go to the toilet.
12      Q.  Other than the statements that you've just
13  testified to, is there anything else that Patty said
14  while you were working at the Monte Carlo that you
15  found offensive?
16          MR. HICKS:  Objection.  Leading.
17          THE WITNESS:  Yes.
18  BY MS. SCHUETZ:
19      Q.  What else did she say that you found
20  offensive?
21      A.  I remember when we were by the bar, her
22  saying loud the "N" word again, nigger, looking at
23  Josh.  She make sure that she was loud enough for him
24  to hear, and she was looking at him, referring to
25  him.

Page 124

1      Q.  And was anyone else present when you heard
2  her make that statement?
3      A.  Yes.  Joshua was present, and also
4  Shaldale.  She was telling Shaldale.
5      Q.  And who is Shaldale?
6      A.  That's another bartender.
7      Q.  Other than the statements that you've
8  testified to so far, did you, while you were working
9  at the Monte Carlo, hear Patty say anything else that
10  you found offensive?
11          MR. HICKS:  Objection.  Leading.
12  BY MS. SCHUETZ:
13      Q.  You can answer.
14      A.  I can't remember.
15      Q.  Okay.  Other than the people that we've
16  talked about so far, was there anyone else at the
17  Monte Carlo who said anything to you that you found
18  offensive?
19          MR. HICKS:  Objection.  Leading.
20  BY MS. SCHUETZ:
21      Q.  You can answer.
22      A.  Yes.
23      Q.  Okay.  Who else said something to you that
24  you found offensive?
25      A.  Joey.

Page 125

1      Q.  Okay.  Can we clarify that?  Can you say it
2  louder?
3      A.  Joey.
4      Q.  What did Joey say that you found
5  offensive?
6      A.  He have mentioned to me before he used to
7  see the South Park episodes where they were making
8  fun of Mexicans.  He would just like make an episode
9  up and put Mexicans down.  I can't remember exactly
10  what he used to tell me, but it was more than one
11  occasion.
12      Q.  Okay.  Was it more than five occasions?
13          MR. HICKS:  Objection.  Leading.
14  BY MS. SCHUETZ:
15      Q.  You can answer.
16      A.  Yes.
17      Q.  Was it more than ten occasions?
18          MR. HICKS:  Objection.  Leading.
19          THE WITNESS:  Yes.
20  BY MS. SCHUETZ:
21      Q.  Other than those statements you just
22  testified about, is there anything else Joey said
23  that you found offensive?
24      A.  Yes.
25      Q.  What else did Joey say that you found

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

33 (Pages 126 to 129)

Page 126

1  offensive?
2      MR. HICKS: Same objection. Objection
3  leading.
4  BY MS. SCHUETZ:
5      Q. You can answer.
6      A. Every time he will come to work, he will
7  always talk about his girlfriend. He was really
8  disgusting how he described in details what he ate
9  right before he came to work. And how he will
10 detail, say like how she was on her time of the
11 month.
12      And he was just -- I cannot describe all
13 the stuff he would say disgusting stuff about women.
14      Q. Can you estimate about how many times Joey
15 said things about his girlfriend like you have just
16 described?
17      A. More than ten.
18      Q. Can you describe how many times per week he
19 made comments like that?
20      MR. HICKS: Objection. Leading.
21      THE WITNESS: Like three or four times a
22 week.
23 BY MS. SCHUETZ:
24      Q. Other than the comments that we've been
25 talking about so far, would you hear Joey say

Page 127

1  anything else that you found offensive?
2      A. Yes.
3      Q. What else did Joey say that you found
4  offensive?
5      A. He have always say stuff to Josh because he
6  was light skinned.
7      MR. HICKS: Can the witness speak up? I
8  can't hear her.
9  BY MS. SCHUETZ:
10      Q. Sure. Can you talk a little louder,
11 Claudia.
12      A. Yes.
13      Q. Thank you.
14      A. He would say stuff to Josh because he was
15 light skinned. Saying that back in the day he will
16 be a hireable black; it's what they call house
17 nigger.
18      And he will always mention some comedian.
19 He will always, instead of calling Josh by his name,
20 he will call him the "N" word, or he will call him --
21 I can't remember the name of the comedian he will
22 call him. But he never called him Josh. Even though
23 Josh will tell him to stop, and that offended him, he
24 just kept going.
25      Q. How often did Joey make comments like the

Page 128

1  ones you've just described?
2      MR. HICKS: Objection. Calls for
3  speculation.
4  BY MS. SCHUETZ:
5      Q. That you observed.
6      A. Almost every day. That was like a daily
7  thing. Because he will not call him by his name. He
8  will always call him the "N" word, like if they were
9  buddies, or he will call him the comedian, Brady
10 something. Wayne Brady.
11      Q. Do you know what Joey's ancestry is?
12      A. I just know he don't like to be Spanish.
13 He said that he hated when the police will stop him
14 and call him Jose. That's why he preferred to be
15 called Joey.
16      MR. HICKS: I would ask the answer be
17 stricken as nonresponsive.
18      MS. SCHUETZ: I disagree.
19 BY MS. SCHUETZ:
20      Q. Other than the things that you have so far
21 described, did Joey say anything else that you found
22 offensive?
23      A. Yes.
24      Q. What else did Joey say that you found
25 offensive?

Page 129

1      A. He would say stuff about prostitutes,
2  talking to Dawn about cheap hos, and stuff like that,
3  like when I was around.
4      And also I remember him sitting down, and I
5  don't know what they call it, like some couches in
6  the lobby from the theater. And he said that he was
7  looking in the phone at his old neighborhood, and
8  then he mentioned different things, and then he
9  said -- I can't remember the specific words, but he
10 mentioned that Mexicans were dirty and ghetto.
11 That's where the Mexicans -- that's where he was
12 locating his iPhone, that's where the dirty and
13 ghetto Mexicans live.
14      And I remember that day. Josh was present.
15 Arianna was present. And also Isaac was present, so
16 he heard everything.
17      Q. You mentioned a moment ago Joey saying
18 stuff about prostitutes, talking to Dawn about cheap
19 hoes and stuff like that. Is that correct?
20      A. Yes.
21      MR. HICKS: Objection. Leading.
22 BY MS. SCHUETZ:
23      Q. Can you estimate how many times Joey made
24 comments such as that?
25      A. More than five. Every time he had a chance

Claudia Carlson    March 5, 2014
* * *Videotaped Deposition* * *

### Page 130

1  to talk to Dawn. Every time they had the chance,
2  that's all they will talk about.
3      Q.  Other than the comments you've testified to
4  so far, is there anything else Joey said that you
5  found offensive?
6      MR. HICKS: Objection. Leading.
7      THE WITNESS: I can't remember.
8  BY MS. SCHUETZ:
9      Q.  Okay. Other than the people that you have
10  testified about so far, was there anyone else at the
11  Monte Carlo who said anything that you found to be
12  offensive?
13      MR. HICKS: Objection. Leading.
14  BY MS. SCHUETZ:
15      Q.  You can answer.
16      A.  There was this other thing that I forgot to
17  mention about Sharon Ohanian. She had said that when
18  Arianna was picking something up from the locker -- I
19  remember being right next to her. She picked it up,
20  and I can't remember exactly how it happened, but she
21  had mentioned to Arianna to pick it up. And she was
22  like, "Oh, no, never mind, I forgot Cubans don't
23  clean, they hire Mexicans to do it for them."
24      But that was like, I feel a little
25  offensive, but it offended her, too, because she's

### Page 131

1  well known that she didn't really like to pick up
2  anything. Like she didn't really like to pick up
3  after herself in the locker room. So they will make
4  fun of her like that.
5      So that's why she said it, to hire Mexicans
6  to do it for her. And I was there, too, so I feel it
7  was offensive for telling that.
8      Q.  And can we clarify for the record who made
9  that comment that you're describing?
10      A.  Sharon.
11      Q.  Sharon? Is that Sharon Jones Ono?
12      A.  Yes.
13      Q.  Was anyone else present when she made that
14  comment?
15      A.  There was other people, but I can't
16  remember who they were.
17      MS. SCHUETZ: If we go off the record for a
18  second, perhaps we can take a break. The tape is
19  about to end, according to the sign, and I would like
20  to run to the rest room now.
21      MR. HICKS: Sure. As long as you're not
22  going to be conferring with the witness.
23      MS. SCHUETZ: We are not going to be
24  conferring with the witness. Thank you.
25      THE VIDEOGRAPHER: This marks the end of

### Page 132

1  media number three. We're going off the record at
2  2:11 p.m.
3      (A recess was taken from 2:11 p.m.
4      to 2:39 p.m.)
5      THE VIDEOGRAPHER: This marks the beginning
6  of media number four. We're back on the record at
7  2:39 p.m.
8      You may proceed.
9      MS. SCHUETZ: Thank you.
10  BY MS. SCHUETZ:
11      Q.  Ms. Carlson, you mentioned earlier an usher
12  named Don; is that correct?
13      A.  Yes.
14      Q.  Did Don ever say anything to you that you
15  found offensive?
16      MR. HICKS: Leading.
17  BY MS. SCHUETZ:
18      Q.  You can answer.
19      A.  Yes.
20      Q.  What did he say that you found offensive?
21      A.  He have asked me if I remember in the
22  showroom, I can't remember specific words, but he
23  have asked me if I was in some kind of diva squad.
24  And I didn't know what was a diva squad.
25      And I remember him like making like a funny

### Page 133

1  joke out of it. And he have probably heard that a
2  few years before they have asked me if I wanted to
3  try out for the divas in WWE.
4      So I asked him are you talking about that?
5  And I can't remember what he said, but he said
6  something about he didn't like those kind of women,
7  and he say with fake like implants. Meaning the -- I
8  can't remember if he said the front or the back, but
9  one of them.
10      And I tried to ignore it, but I felt like
11  if he said it just to offend me.
12      And there was another occasion also where
13  we were in the lobby, and this worker from a picture
14  company have passed by. And he had mentioned -- sh
15  was as tiny as his pinkie because she was slim. And
16  he had mentioned that he liked them with a behind,
17  and grabbed his behind.
18      Q.  When you say he had mentioned that he liked
19  them with a behind, can you explain what you're
20  referring to?
21      A.  He was referring to his ass, like his butt.
22  And he touched it. And that's the word that he said.
23  I don't remember exactly words, but I remember him
24  saying the butt, the back, and touch himself.
25      Q.  A moment ago you mentioned a comment Don

Claudia Carlson    March 5, 2014
* * *Videotaped Deposition* * *

Page 138

1 elsewhere. It's not here because I'm scared I'm
2 going to see one of them.
3        Even when I'm in the store, I always have
4 to see around to see if I'm probably going to see one
5 of them there. I try to avoid the places where I
6 think they're going to be there.
7        Most of my friends were from Monte Carlo.
8 I don't even talk to them anymore because of the same
9 reason. It brings me back to where I used to be and
10 it brings me more down.
11        Q. A moment ago when you testified "I'm scared
12 I'm going to see one of them," could you explain what
13 you mean by "one of them"?
14        A. The ushers who used to offend me or the
15 bartenders. Gian Carlo, the one who hit me. Even
16 any of the supervisors, or Sherry Ohanian, or any
17 of the directors, I don't want to see any of
18 them.
19        Q. You testified earlier, I believe, that
20 2011 was the last year you were employed at the
21 Monte Carlo; is that right?
22        A. Yes.
23        Q. During 2011, did you receive any
24 disciplines?
25        A. Can you repeat that again?

Page 139

1        Q. Sure. Strike the question.
2        During 2011 did you receive any
3 disciplinary write-ups?
4        A. I can't remember the dates.
5        Q. Okay. Did you receive disciplinary
6 write-ups at any time near the end of your
7 employment?
8        MR. HICKS: Objection. Asked and answered.
9        THE WITNESS: Yes.
10        MR. HICKS: I'm sorry, what was that last
11 answer?
12        MS. SCHUETZ: "Yes."
13 BY MS. SCHUETZ:
14        Q. Did you receive write-ups for being outside
15 of your work area during that period?
16        MR. HICKS: Objection. Leading.
17 BY MS. SCHUETZ:
18        Q. You can answer.
19        A. Yes.
20        Q. Why were you outside of your work area?
21        A. Because I didn't want to go to use the rest
22 room or drink the water where they have assigned me
23 to. It was inside the theater. And which there's no
24 cameras going through where I was going to. So I was
25 afraid the bartenders or one of my coworkers would

Page 140

1 attack me again.
2        Q. I'm sorry, what were the last couple of
3 words you said, I couldn't hear?
4        A. Attack me.
5        Q. Did you report to anyone at the Monte Carlo
6 your concern that one of the bartenders or one of the
7 coworkers would attack you?
8        A. Yes.
9        Q. Who did you report that to?
10        A. Manuel Quiroda.
11        Q. And what did Mr. Quiroda say, if anything,
12 when you reported that to him?
13        A. He said that I had to go to the post where
14 he assigned me to, because that was my post, and they
15 were not going to do nothing to me.
16        And I asked him several times, please send
17 me to another post so I can use the other rest room
18 and the water fountains that was there.
19        I explained to him why, but he seemed not
20 to care. It was as if like he wanted me there no
21 matter what. He didn't care if anyone was going to
22 do something to me or not.
23        Q. Besides yourself, were other ushers ever
24 outside of their work area during work hours?
25        MR. HICKS: Objection. Leading.

Page 141

1 BY MS. SCHUETZ:
2        Q. You can answer.
3        A. Yes. Every single one of them have either
4 walk a guest over or walk to the other rest room or
5 walk around. I wasn't the only one.
6        Q. Were those ushers disciplined each time
7 that they walked a guest over or walked to the other
8 rest room or walked around?
9        MR. HICKS: Objection. Leading. Calls for
10 speculation. Foundation.
11 BY MS. SCHUETZ:
12        Q. Go ahead, you can answer.
13        A. I believe they did, but I wouldn't know. I
14 don't know.
15        Q. Are you aware of occasions on which an
16 usher you worked with was outside of their station
17 and they were not disciplined?
18        MR. HICKS: Objection. Leading.
19 BY MS. SCHUETZ:
20        Q. You can answer.
21        MR. HICKS: Asked and answered.
22        THE WITNESS: Can you ask the question
23 again?
24 BY MS. SCHUETZ:
25        Q. Sure. Are you aware of occasions on which

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

### Page 142

1  an usher was outside of their station and they were
2  not disciplined for it?
3         MR. HICKS: Objection. Leading. Asked and
4  answered.
5  BY MS. SCHUETZ:
6     Q.  You can answer.
7         MR. HICKS: Calls for speculation. Lacks
8  foundation.
9         THE WITNESS: No.
10 BY MS. SCHUETZ:
11    Q.  You testified earlier that you reported to
12 Bob Walker a comment by Sharon Jones Ono about taking
13 your Green Card; is that correct?
14    A.  Yes.
15    Q.  Following that complaint, did Sharon Jones
16 Ono stop making racial comments?
17        MR. HICKS: Objection. Leading.
18 BY MS. SCHUETZ:
19    Q.  You can answer.
20    A.  No.
21    Q.  You testified earlier that you complained
22 to an employee in human resources about Gian Carlo
23 Gozzi's comments; is that correct?
24        MR. HICKS: Objection. Vague. Asked and
25 answered. Leading.

### Page 143

1  BY MS. SCHUETZ:
2     Q.  You can answer.
3     A.  No.
4     Q.  Following that complaint, did Gian Carlo
5  Gozzi stop making racial comments?
6         MR. HICKS: Objection. Leading.
7         THE WITNESS: No.
8  BY MS. SCHUETZ:
9     Q.  Did you ever submit complaints to the
10 Monte Carlo in writing?
11    A.  Yes.
12    Q.  Did those complaints concern racial
13 statements?
14        MR. HICKS: Objection. Leading.
15 BY MS. SCHUETZ:
16    Q.  You can answer.
17    A.  Yes.
18        MS. SCHUETZ: Okay, I think that's all the
19 questions I have for the moment.
20        After defendant's questions, we'll see if I
21 have some follow-up.
22        MR. HICKS: I've asked the court reporter
23 and videographer to let me know how much time I have.
24 And I have, according to the clock, five hours and
25 two minutes.

### Page 144

1         FURTHER EXAMINATION
2  BY MR. HICKS:
3     Q.  Ms. Carlson, we took lunch at your
4  counsel's request and we were at lunch for
5  approximately an hour to an hour and 15 minutes.
6         Did you leave the building for lunch?
7     A.  Yes.
8     Q.  Where did you go?
9     A.  To a restaurant.
10    Q.  What restaurant did you go to?
11    A.  I don't know the name of it.
12    Q.  Was it close by?
13    A.  Yes.
14    Q.  Did you walk there?
15    A.  Yes.
16    Q.  Did you walk across the parking lot?
17    A.  Yes.
18    Q.  Was it Gordon Biersch?
19    A.  I don't know.
20    Q.  Who did you go to lunch with?
21    A.  Giselle, Max, Joshua, and my husband and
22 myself.
23    Q.  So both of your attorneys, your
24 co-plaintiff and your husband?
25    A.  Yes.

### Page 145

1     Q.  And during the lunch, did you talk about
2  the case?
3     A.  Yes.
4     Q.  And where did you sit during lunch?
5     A.  In a chair.
6     Q.  Inside or outside?
7     A.  Outside.
8     Q.  And as I understand it, you were sitting
9  with Giselle, your attorney. I don't want to know
10 what you talked about, but during the lunch you spoke
11 with your attorney Giselle, correct?
12    A.  Yes.
13    Q.  And did those conversations help refresh
14 your recollection as to events in this case?
15    A.  Not really.
16    Q.  Did anything during the lunch hour help
17 refresh your recollection about events in this case?
18    A.  What do you mean by that?
19    Q.  Well, you've already indicated that your
20 conversations during lunch didn't help refresh your
21 recollection. Did you review any documents that
22 helped refresh your recollection?
23    A.  No.
24    Q.  Did you listen to any tapes that helped
25 refresh your recollection?

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

Page 146

1    A.  No.
2    Q.  Did you speak to Mr. Hall to help refresh
3  your recollection?
4    A.  No.
5    Q.  So do you know what refreshed your
6  recollection when you came back today?
7         MS. SCHUETZ: Objection to the form of the
8  question.
9         You can answer.
10        THE WITNESS: Can you repeat that again?
11 BY MR. HICKS:
12   Q.  Sure.  Do you know what it is that helped
13 you refresh your recollection over the lunch hour if
14 it wasn't speaking with your attorney or your
15 co-plaintiff or your husband?
16        MS. SCHUETZ: Objection to form.
17        You can answer.
18        THE WITNESS: The way she was asking me the
19 questions wasn't as rude as they were yours.
20 BY MR. HICKS:
21   Q.  Referring to your counsel?
22   A.  Yes.  Right now.
23   Q.  And, in fact, you spent the whole hour at
24 lunch on the patio with Giselle talking with her
25 specifically, correct?

Page 147

1    A.  I wasn't just talking to her.
2    Q.  And the pill that you took before the lunch
3  break, that was an Advil?
4    A.  Yes, it was.
5    Q.  Let's go through the testimony that you've
6  given in response to your attorney's questions.  I'll
7  ask you some follow-up questions about those.
8         You identified Sharon Jones Ono as somebody
9  who made offensive remarks, correct?
10   A.  Yes.
11   Q.  And Sharon Jones Ono was a fellow usher?
12   A.  Yes.
13   Q.  You indicated that Ms. Jones Ono made a
14 comment about taking away your Green Card?
15   A.  Yes.
16   Q.  And is that a statement she just made on
17 one occasion?
18   A.  About the Green Card?  Yes.
19   Q.  And what year was that comment allegedly
20 made?
21   A.  There was so many that I can't remember.
22   Q.  Was it in August of 2008?
23   A.  I can't remember.
24   Q.  Was it in 2007?
25        MS. SCHUETZ: Objection.  Asked and

Page 148

1  answered.
2         You can answer.
3         THE WITNESS: I can't remember.
4  BY MR. HICKS:
5    Q.  And do you know Martha Pearson?
6    A.  Yes.
7    Q.  She interviewed you in 2008 about that
8  alleged comment, correct?
9    A.  I can't remember the year, but I had a
10 meeting with her, yes.
11   Q.  And she asked you to identify who the usher
12 was that allegedly made this comment, didn't she?
13   A.  She was asking differently, though.  She
14 was trying to ask me if what I said, if it was my
15 fault.
16   Q.  Ms. Pearson specifically asked you who
17 allegedly made the comment about the Green Card,
18 correct?
19   A.  Yes.
20   Q.  And you refused to tell her, didn't you?
21   A.  Well, I did tell her.
22   Q.  Say that again.
23   A.  I did tell her after.
24   Q.  What do you mean "after"?
25   A.  After I was calm.

Page 149

1    Q.  When Ms. Pearson specifically met with you
2  to investigate this, she asked you who it was that
3  made the comment, and you refused to tell her during
4  that meeting, correct?
5         MS. SCHUETZ: Objection.  Asked and
6  answered.
7         You can answer.
8         THE WITNESS: I was scared to say in the
9  beginning of the meeting, but at the end I told her
10 who it was, and she said she didn't care.
11 BY MR. HICKS:
12   Q.  So it's your testimony that at the
13 beginning of the meeting you refused to tell her, but
14 by the end --
15   A.  I was scared.
16   Q.  Let me finish.
17        It's your testimony that at the beginning
18 of the meeting you refused to tell her, but by the
19 end of the meeting you did tell her who it was that
20 allegedly made this comment?
21   A.  Yes.
22   Q.  And it's your testimony that when you told
23 her who allegedly made the comment, Ms. Pearson, the
24 employee relations specialist, told you she didn't
25 care; is that your testimony?

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

44 (Pages 170 to 173)

## Page 170

1   Q.  Sure.  You understand how it looks kind of
2   funny that your only witness to this is also a
3   plaintiff in this case, right?
4        MS. SCHUETZ: Objection to form.
5        THE WITNESS: It's not funny because it was
6   a coworker, and we sit in the same lunchroom, but he
7   was there.
8   BY MR. HICKS:
9        Q.  With regard to the alleged comment about
10  not liking Mexicans, who is it that you claim
11  witnessed that?
12       MS. SCHUETZ: Objection to form.
13       You can answer.
14       THE WITNESS: Can you repeat it?
15  BY MR. HICKS:
16       Q.  Sure.  Other than you, who is it that you
17  allege overheard Gian Carlo make comments that he
18  doesn't like Mexicans?
19       A.  There were more ushers when he would
20  mention it.
21       Q.  Can you name any --
22       A.  But they're scared to probably come
23  forward, and I can't name any of them because I don't
24  remember who they were.  But I know he would say it
25  right in front of anybody.

## Page 171

1        Q.  But you can't remember who they were?
2        A.  No.
3        Q.  And when did these comments take place?
4        A.  In the locker room we have, which is a
5   small lunch -- not lunch, but like where we have our
6   locker.
7        Q.  My question was not where, but when?  Like
8   what year?
9        MS. SCHUETZ: I think you actually did ask
10  where.
11       THE WITNESS: You did.
12       Will you repeat the question?
13  BY MR. HICKS:
14       Q.  Sure.  When did these comments allegedly
15  take place?  What year?
16       A.  I wouldn't know.
17       Q.  You don't have any idea?
18       A.  I can't remember.
19       Q.  And you testified, in response to your
20  attorney's questions, that you complained about
21  Gian Carlo's comments to Mr. Walker.
22       A.  Yes.
23       Q.  Did you complain to anybody else?
24       A.  I believe I did, too.
25       Q.  Who?

## Page 172

1        A.  Jennifer, and I can't remember who else.
2        Q.  What's Jennifer's last name?
3        A.  I can't remember.
4        Q.  And do you recall what Jennifer's response
5   was?
6        A.  I can't remember.
7        Q.  Do you recall when you allegedly complained
8   to Jennifer?
9        A.  I can't remember.
10       Q.  How many times did you complain to
11  Jennifer?
12       A.  I know it was several times, and I remember
13  calling her also about Gian Carlo telling me he was
14  going to hurt me.
15       Q.  We'll get to that in a minute.  Right now
16  I'm just talking about his alleged racial comments.
17       How many times did you complain to Jennifer
18  about Mr. Gian Carlo's alleged racial comments?
19       A.  I can't remember how many times.
20       Q.  And do you remember what her response was?
21       MS. SCHUETZ: Objection.  Asked and
22  answered.
23       You can answer.
24       THE WITNESS: I can't remember.
25

## Page 173

1   BY MR. HICKS:
2        Q.  The other person you said you complained to
3   was Mr. Walker.
4        A.  Yes.
5        Q.  How many times did you complain to
6   Mr. Walker about Gian Carlo's alleged racial
7   comments?
8        A.  Severely times, too.
9        Q.  Is that more or less than twelve?
10       A.  I can't remember.
11       Q.  More or less than six?
12       A.  I can't remember.
13       Q.  And what was Mr. Walker's response?
14       MS. SCHUETZ: Objection.  Asked and
15  answered.
16       You can answer.
17       MR. HICKS: When did I ask that question?
18       MS. SCHUETZ: The question has been asked
19  on the record.
20       MR. HICKS: Did I ask it?
21       MS. SCHUETZ: It's irrelevant.  She can
22  answer.
23       MR. HICKS: No, it's not irrelevant.
24       MS. SCHUETZ: It doesn't matter.  She can
25  answer the question.

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

### Page 174

1    THE WITNESS: I can't remember.
2  BY MR. HICKS:
3    Q.  Because there was a dialogue between
4  counsel, I'm going to ask the question again, just so
5  there's a question and an answer without a lot of
6  banter going on.
7    When you complained to Mr. Walker about
8  Gian Carlo allegedly making comments about Mexicans
9  what was Mr. Walker's reaction?  What did he say?
10    MS. SCHUETZ: Same objection.
11    Go ahead.
12    THE WITNESS: I can't remember.
13  BY MR. HICKS:
14    Q.  Now, you testified that Gian Carlo waved a
15  knife near your neck in a threatening manner.
16    MS. SCHUETZ: Objection. That
17  mischaracterizes the witness' testimony.
18    You can answer.
19  BY MR. HICKS:
20    Q.  Did Mr. Gian Carlo pull out a knife?
21    A.  It was a little knife that you opened it.
22  Yes, he did.
23    Q.  Did he just open the knife?  Is that all he
24  did?
25    A.  He put it to my neck.

### Page 175

1    Q.  And did he say anything when he did that?
2    A.  Yes.
3    Q.  And what did he say?
4    A.  I can't remember his specific words because
5  it's been so long, but I remember him saying
6  something about if I ever get him mad he was going to
7  use that against me.
8    Q.  And this was just -- this happened on just
9  one occasion?
10    A.  The knife thing?  Yes.
11    Q.  And did you report -- immediately report
12  that to anybody?
13    A.  Yes.
14    Q.  Who?
15    A.  Bob Walker.
16    Q.  And what did Mr. Walker say when you
17  reported that to him?
18    A.  He tried to make me feel bad for him.
19  Saying what he went through, and that he was an
20  orphan and everything, and to let it go.  That to be
21  a better person.
22    Q.  How old was Mr. Gian Carlo at the time of
23  this incident?
24    A.  I don't know.
25    Q.  You testified earlier that Mr. Walker noted

### Page 176

1  that he was very old.  Was he an old man?
2    A.  He said that he was an older man.
3    Q.  I'm asking you.  Was Mr. Gian Carlo an
4  older man?
5    A.  Yes.
6    Q.  Do you know if he was an orphan?
7    A.  I don't know.
8    Q.  Do you recall referring to Gian Carlo as "a
9  fat boy"?
10    A.  No.
11    Q.  Mr. Gian Carlo walked with a cane, correct?
12    A.  Yes.
13    Q.  Did you ever kick his cane out from under
14  him?
15    A.  No.
16    Q.  Do you know that some of your coworkers
17  accused you of doing that?
18    A.  I didn't know.  Nobody even told me.
19    THE VIDEOGRAPHER: Counselor?
20    MR. HICKS: We're just about at the end of
21  the tape.  We don't need to take a break, but let's
22  just take a second so that we can change the tape.
23    THE VIDEOGRAPHER: This marks the end of
24  media number four.  We're going off the record at
25  3:39 p.m.

### Page 177

1    (A discussion was held off the record.)
2    THE VIDEOGRAPHER: We're back on the record
3  at 3:40 p.m.  This marks the beginning of media
4  number five.
5    You may proceed.
6  BY MR. HICKS:
7    Q.  Do you know what Mr. Walker did after you
8  told him that Gian Carlo pulled out a knife?
9    A.  What he did?
10    Q.  Yeah.  Do you know if he talked -- do you
11  know if Mr. Walker spoke with Gian Carlo about the
12  incident?
13    A.  No.
14    Q.  You don't know one way or the other?
15    A.  No.
16    Q.  You also testified that Gian Carlo hit you,
17  correct?
18    A.  Yes.
19    Q.  And he was fired after that, correct?
20    A.  Yes.
21    Q.  Is it your contention in this lawsuit that
22  Gian Carlo hit you because of your sex or your race?
23    MS. SCHUETZ: Objection to the form of the
24  question.
25    You can answer if you understand.

Claudia Carlson    March 5, 2014
* * *Videotaped Deposition* * *

46 (Pages 178 to 181)

Page 178

1    THE WITNESS: I don't understand, and I
2 don't know.
3 BY MR. HICKS:
4    Q.  Do you have any evidence that Gian Carlo
5 hit you because you're Hispanic?
6    A.  I don't know.
7    Q.  Are you contending that Gian Carlo
8 threatened you with a knife because you're Hispanic?
9    A.  I don't know.
10    Q.  Are you contending that Gian Carlo
11 threatened you with a knife because you're female?
12    A.  I don't know.
13    Q.  Are you contending that Gian Carlo hit you
14 because you're female?
15    A.  I don't know.
16    Q.  You identified, or your attorney identified
17 MJ and asked you some questions about MJ.
18    First of all, who is MJ?
19    A.  Another usher.
20    Q.  Do you know what MJ's name is?
21    A.  I believe Mary Jane, but I'm not sure.
22    Q.  And MJ is a woman?
23    A.  Yes.
24    Q.  Do you know how old MJ is?
25    A.  No.

Page 179

1    Q.  Would you describe her as an older woman?
2    A.  No.
3    Q.  You testified, in response to your
4 attorney's questions, that you can't be around older
5 Caucasian women now without feeling uncomfortable; i
6 that right?
7    A.  Yes.
8    Q.  What do you mean by "older women"?
9    A.  The ones that remind me about Sharon.
10    Q.  What do you mean age-wise by old?  To some
11 people 20 is old.  To some people 30 is old.  I'm
12 asking you what do you mean by older women?
13    A.  60 and up.
14    Q.  60 and up?
15    A.  Yes.
16    Q.  Now, MJ wasn't 60 or over, was she?
17    A.  I remember her saying her age, but I can't
18 remember how old.
19    Q.  Now, you testified that MJ allegedly told
20 you and Mr. Hall that she was against interracial
21 couples.  Did I get that right?
22    A.  She told me.
23    Q.  Was Mr. Hall present when that comment was
24 made?
25    A.  Yes.

Page 180

1    Q.  Did he overhear the comment?
2    A.  Yes.
3    Q.  When did this allegedly take place?
4    A.  Before I got married.
5    Q.  What year?
6    A.  I can't remember.
7    Q.  Was it in 2007?
8    A.  I can't remember.
9    Q.  Was it in 2008?
10    MS. SCHUETZ: Objection.  Asked and
11 answered.
12    THE WITNESS: I can't remember.
13 BY MR. HICKS:
14    Q.  Was it in 2009?
15    A.  I can't remember.
16    THE WITNESS: Objection.  Asked and
17 answered.
18 BY MR. HICKS:
19    Q.  Was it in 2010?
20    MS. SCHUETZ: Objection.  Asked and
21 answered.
22    THE WITNESS: I can't remember.
23 BY MR. HICKS:
24    Q.  Was it in 2011?
25    MS. SCHUETZ: Objection.  Asked and

Page 181

1 answered.
2    THE WITNESS: I can't remember.
3 BY MR. HICKS:
4    Q.  And was it just you and Mr. Hall that were
5 allegedly present?
6    A.  Yes.
7    Q.  No other witnesses?
8    A.  There might have been more, but I can't
9 remember.
10    Q.  And did you tape record this conversation?
11    A.  No.
12    Q.  Did Mr. Hall tape record the conversation?
13    A.  I don't know.
14    Q.  Have you ever met MJ's son?
15    A.  No.
16    Q.  Have you ever met her daughter-in-law?
17    A.  No.
18    Q.  Do you know anything about her
19 daughter-in-law?
20    A.  No.
21    Q.  Do you know if her daughter-in-law is a
22 racial minority?
23    A.  No.
24    Q.  Do you know if she has two biracial
25 grandchildren?

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

47 (Pages 182 to 185)

| Page 182 | Page 184 |
|---|---|
| 1     A. No. | 1     A. I don't know. |
| 2     Q. Did you ever tell MJ, "I had to marry a | 2     Q. You testified that bartender Patty one time |
| 3  white guy because no Mexican would have me"? | 3  stated that Josh was too cute to be black, or words |
| 4     A. What? | 4  to that effect? |
| 5     Q. Did you ever jokingly tell MJ, "I had to | 5     A. Yes. |
| 6  marry a white guy because no Mexican would have me" | 6     Q. And that that comment was made in your |
| 7     A. No. Because I would have never talked to | 7  presence? |
| 8  her like that. | 8     A. Yes. |
| 9     Q. So if she says you said that, would she be | 9     Q. Did she laugh when she said that? |
| 10  lying? | 10     A. I can't remember. |
| 11     A. Yes. | 11     Q. Was there anybody else who was present to |
| 12     Q. And are you claiming in this case that MJ | 12  witness that alleged statement? |
| 13  discriminated against you because of your race? | 13     A. Yes. |
| 14     A. Yes. | 14     Q. Who? |
| 15     Q. And MJ was an usher? | 15     A. Dawn Marie. |
| 16     A. Yes. | 16     Q. Anyone else? |
| 17     Q. You testified, in response to your | 17     A. It was just Dawn Marie, Josh and myself. |
| 18  attorney's question, that MJ allegedly said she | 18     Q. And do you recall Mr. Hall responding, "and |
| 19  didn't like her daughter singing the Michael Jackson | 19  you're cute for an old lady"? |
| 20  song, which has lyrics about black and white, | 20     A. No. |
| 21  correct? | 21     Q. Are you denying he said that, or just don't |
| 22     A. Yes. | 22  remember? |
| 23     Q. And that she allegedly said she thinks that | 23     A. He didn't say that. I remember he said -- |
| 24  races should stay with their own? | 24  well, I don't know the specific words, but I remember |
| 25     A. Yes. | 25  him saying that that did offended him, why would she |

| Page 183 | Page 185 |
|---|---|
| 1     Q. Were there any witnesses to that alleged | 1  say something like that? |
| 2  statement? | 2     Q. And who is Dawn Marie? |
| 3     A. Yes. | 3     A. Another usher. |
| 4     Q. Who? | 4     Q. And is that a man or a woman? |
| 5     A. Josh. | 5     A. Woman. |
| 6     Q. Referring to Mr. Hall? | 6     Q. And how old is Dawn Marie? |
| 7     A. Yes. | 7     A. I don't know. |
| 8     Q. And Mr. Hall was the only person that | 8     Q. How old did you think Dawn Marie was? |
| 9  allegedly heard this? | 9     A. I don't know. |
| 10     A. I don't know if there were more there, I | 10     Q. Would she fall into the category of old |
| 11  don't remember. But I remember he was right next to | 11  Caucasian -- older Caucasian woman? In other words, |
| 12  me. | 12  60 or over, in your opinion? |
| 13     Q. So he's the only person that you can | 13     A. What do you mean? |
| 14  remember that allegedly heard this? | 14     Q. You testified earlier that you can't be |
| 15     A. Yes. | 15  around -- you can't be alone with older Caucasian |
| 16     Q. Did you tape record this conversation? | 16  women. You also testified that your definition of |
| 17     A. No. | 17  older was 60 or older, correct? |
| 18     Q. You referred to Patty as allegedly making | 18         MS. SCHUETZ: Objection. Mischaracterizes |
| 19  offensive racial remarks, correct? | 19  the witness' testimony. |
| 20     A. Yes. | 20         You can answer. |
| 21     Q. What's Patty's last name? | 21  BY MR. HICKS: |
| 22     A. I don't know. | 22     Q. Correct? |
| 23     Q. And what position did Patty hold? | 23     A. Maybe. |
| 24     A. Bartender. | 24     Q. What do you mean "maybe"? |
| 25     Q. Is it Patty Perry? | 25     A. What do you mean by the question? |

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

Page 186

1    Q.  Is it your testimony that you cannot be
2  alone with older Caucasian women?
3        MS. SCHUETZ: Objection. Vague.
4        You can answer.
5        THE WITNESS: Yes.
6  BY MR. HICKS:
7    Q.  And when you say older, you're referring to
8  women 60 or older?
9    A.  Like Sharon.
10   Q.  Like Sharon Ono?
11   A.  Yes.
12   Q.  And was Dawn Marie 60 or over, in your
13 opinion?
14       MS. SCHUETZ: Objection. Asked and
15 answered.
16       You can answer.
17       THE WITNESS: I don't think so.
18 BY MR. HICKS:
19   Q.  And what's Dawn Marie's race?
20   A.  I don't know.
21   Q.  You testified that you don't recall the
22 exact conversation, but you do recall Patty allegedly
23 using the "N" word?
24   A.  Can you repeat that again, please?
25   Q.  Sure. You testified that you overheard

Page 187

1  Patty using the "N" word when she was speaking with
2  somebody else.
3    A.  With Sharon.
4    Q.  And was this in the bathroom?
5    A.  Yes.
6    Q.  So is it your testimony that you overheard
7  Patty and Sharon talking, and that Patty used the "N"
8  word?
9    A.  Say it again.
10   Q.  Is it your testimony that you overheard
11 Patty and Sharon talking in the rest room and that
12 Patty used the "N" word?
13   A.  Yes.
14   Q.  And you testified that you assume she was
15 talking about Mr. Hall, correct?
16   A.  Well, I kind of knew because he's the only
17 African-American there.
18   Q.  Well you didn't hear her specifically refer
19 to Mr. Hall, did you?
20   A.  She didn't say the name, but she said the
21 "N" word.
22   Q.  Well, there are a lot of African-Americans
23 in the world, in Las Vegas and at the Monte Carlo; a
24 lot of individuals who are African-American, correct?
25   A.  They could have say African-American

Page 188

1  instead of the "N" word.
2    Q.  Why did you assume she was talking about
3  Mr. Hall?
4        MS. SCHUETZ: Objection. Asked and
5  answered.
6        You can answer.
7        THE WITNESS: I just knew.
8  BY MR. HICKS:
9    Q.  What do you mean you just knew?
10   A.  I can't remember the specific conversation.
11 Even though it's in the recording, I don't even want
12 to hear it, because it reminds me of everything
13 again.
14   Q.  You understand that the use of the "N" word
15 is -- or an allegation that somebody used the "N"
16 word, that's a serious allegation. You understand
17 that, right?
18   A.  Oh, yes, I understand. And I understand
19 that it's offensive.
20   Q.  And you would agree with me that the use of
21 the "N" word in any context is inappropriate, right?
22   A.  Uh-huh, yes.
23   Q.  And that the use of the "N" word in any
24 context is offensive, correct?
25   A.  Yes.

Page 189

1    Q.  Did you get on tape Patty allegedly using
2  the "N" word?
3    A.  Yes.
4    Q.  I've listened to every tape that has been
5  delivered to us, and I didn't hear Patty using the
6  "N" word.
7        Do you know if the tape that you allegedly
8  have where Patty used the "N" word has been delivered
9  to us?
10   A.  I believe it did, but I'm not sure. But I
11 know it was there, and I know it was her because I
12 was there.
13   Q.  Do you believe it is in the most -- do you
14 know whether it's in the most recent tapes, the 31
15 tapes that were produced to us last night?
16   A.  It was in one of those tapes.
17   Q.  So it was in one of the 31 tapes that were
18 produced to us last night?
19   A.  I don't know how many are they.
20   Q.  There were 31, I'll tell you that.
21   A.  You told me earlier there were 80.
22   Q.  No, I said 31. And your attorneys can
23 confirm there were 31 tapes delivered to us last
24 night.
25       MS. SCHUETZ: I'm happy to represent this

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

50 (Pages 194 to 197)

Page 194

1  BY MR. HICKS:
2      Q.  And you said he made those comments on
3  several occasions?
4      A.  Yes.
5      Q.  In the many secretly tape recorded
6  conversations you obtained, do you have any where
7  Jose Guzman is making inappropriate racial remarks?
8      A.  I don't know.  I don't remember.
9      Q.  That would be something that would be
10 pretty important, don't you think?
11     A.  Yes.  But I don't remember.
12     Q.  Are you accusing Jose Guzman of
13 discriminating against you or harassing you because
14 of your gender?
15     A.  Can you say it in a different way?
16     Q.  Are you accusing Jose Guzman of harassing
17 you or discriminating against you because of your
18 gender or your sex?
19     A.  I reported him for calling me racial stuff.
20     Q.  I'm not talking about race right now.  I'm
21 talking about sex or gender.
22     A.  Making sexual comments in front of me.  But
23 I don't understand your question.
24     Q.  Are you claiming that you were
25 discriminated against because of your gender or

Page 195

1  harassed because of your gender by Jose Guzman?
2      MS. SCHUETZ:  Objection.  Asked and
3  answered.
4      You can answer.
5      THE WITNESS:  I can't remember.
6  BY MR. HICKS:
7      Q.  You commented that he had made sexual
8  comments, and you testified to those earlier.
9      Did you ever tape record any of those
10 sexual comments, alleged sexual comments?
11     A.  I can't remember.
12     Q.  You testified, in response to your
13 attorney's question, that Jose Guzman would always
14 call Josh the "N" word, and would do it like they
15 were buddies or words to that effect.  Do you recall
16 that testimony?
17     MS. SCHUETZ:  Objection.  That
18 mischaracterizes the witness' testimony.
19 BY MR. HICKS:
20     Q.  Do you recall that testimony?
21     MS. SCHUETZ:  You can answer.
22     Please don't speak over my objection,
23 Counsel.  I'm entitled to get it on the record.
24 BY MR. HICKS:
25     Q.  Do you recall that testimony?

Page 196

1      A.  Can you repeat that again?
2      Q.  Sure.  You testified -- and if you want to
3  change it, that's fine.  I just want to verify what
4  you testified to first.
5      Is it your testimony that Jose Guzman used
6  the "N" word in Josh Hall's presence?
7      A.  He will call him the "N" word instead of
8  his name.
9      Q.  And do you recall exactly what he said in
10 that regard?
11     A.  Can you...
12     Q.  Sure.  For example, did he use the word
13 "nigga"?  Is that what your testimony is?  N-i-g-g-a?
14     A.  I know he will call him like a buddy "N"
15 word.
16     Q.  In other words, like if they would see each
17 other?
18     A.  Uh-huh.  And also Wayne Brady.
19     Q.  We'll get to Wayne Brady in a minute.
20     And were you offended when you heard him
21 use that phrase?
22     A.  Yes.  Because I know it hurt Josh.
23     Q.  And you would agree that no matter what
24 context -- strike that.
25     Is it your testimony that no matter what

Page 197

1  context, that word is inappropriate to use?
2      A.  Yes.
3      Q.  Whether or not you're at work or away from
4  work, correct?
5      A.  What do you mean?
6      Q.  Well, do you think it's okay to use that
7  language away from work?
8      A.  Maybe to some people it's okay away from
9  work, but not during work or to a coworker.
10     Q.  Okay.  Did you ever catch Jose Guzman
11 referring to Mr. Hall by using the "N" word?  Did you
12 ever catch that on tape?
13     A.  Can you repeat that?
14     Q.  Do you have Mr. Jose Guzman on tape
15 referring to Mr. Hall with reference to the "N" word?
16     A.  I can't remember.
17     Q.  Or with reference to Wayne Brady?
18     A.  I can't remember.
19     Q.  You testified that Jose Guzman said
20 something to Dawn about being a ho.  Did I get that
21 right?
22     A.  Talking about cheap hos.
23     Q.  I'm sorry?
24     A.  Talking about cheap hos.
25     Q.  And when you say Don, who are you referring

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

51 (Pages 198 to 201)

Page 198

1   to?
2       A.  An usher that used to work there.
3       Q.  And what's his or her name?
4       A.  I just know him by Don.
5       Q.  So we're not talking about Dawn Marie,
6   we're talking about somebody else?
7       A.  Yes.
8       Q.  And you said that he would use that phrase
9   every time he had a chance to talk to Don?
10      A.  Huh?
11      Q.  You testified, in response to your
12  attorney's question, that Jose Guzman used the phrase
13  "ho" every time he had a chance to talk to Don?
14          MS. SCHUETZ: Objection. Mischaracterizes
15  the witness' testimony.
16          You can answer.
17          THE WITNESS: I didn't say that. I said
18  that he will talk about women every time he has a
19  chance, like about sexual stuff.
20  BY MR. HICKS:
21      Q.  It's your testimony that Jose Guzman would
22  talk about women every time he had a chance?
23          MS. SCHUETZ: Objection.
24  BY MR. HICKS:
25      Q.  About sexual stuff in women every time he

Page 199

1   had a chance?  What do you mean "every time he had a
2   chance"?
3       A.  Every time he had a chance.
4       Q.  So approximately how many times do you
5   claim that Jose Guzman talked about women and sex?
6       A.  Pretty often.
7       Q.  I don't know what that means.  More or less
8   than 100 times?
9       A.  Like four times a week.
10      Q.  So four times a week?
11      A.  (Nodded.)
12      Q.  So regularly?
13      A.  Yes.
14      Q.  And did you ever get any of that on tape?
15      A.  No.
16      Q.  Why not?
17      A.  Let me rephrase that.  I don't know.  I
18  don't remember.
19      Q.  I've listened to the tapes.  And none of
20  the tapes I've listened to have this on it.  Do you
21  know why?
22      A.  I don't remember.
23      Q.  Now, you testified that Jose Guzman made a
24  comment about Mexicans being dirty and ghetto,
25  correct?

Page 200

1       A.  Yes.
2       Q.  Do you know when that comment was allegedly
3   made?
4       A.  No, I don't remember.
5       Q.  And that was on one occasion?
6       A.  It had happen more times also, but I can't
7   remember the specific dates.  There was another time
8   also when one of the picture camera ladies was going
9   to go to Mexico, and he started saying bad stuff
10  about Mexico, that it's dirty and that you will get
11  sick over there.
12      Q.  So on the one occasion that you complained
13  about it after that, it stopped, correct?
14      A.  No.
15      Q.  It's your testimony that it continued?
16      A.  What do you mean "stopped"?
17      Q.  He didn't make any further comments
18  referencing Hispanics being ghetto?
19      A.  I can't remember the specific timings.  I
20  just know he made several times comments about
21  Mexicans and dirty.
22      Q.  Who did you complain to?
23      A.  I believe it was the one that Isaac was
24  there.  I complained to him.  And the other one, I
25  believe I complained to Manny, and the other ones I

Page 201

1   can't remember.
2       Q.  So wait a minute.  Was there two or more
3   such comments?
4       A.  I believe there was more.  I just don't
5   remember.  It was so many that I can't remember.  I
6   just remember those right now.
7       Q.  So you remember two?
8       A.  Yes.  Right now.
9       Q.  And when Mr. Guzman made the first such
10  alleged comment, who did you complain to?
11      A.  I can't remember if it was first or if it
12  was the next one or the next one or the last, or I
13  can't remember.  It was so many of them.  But I know
14  I complained, and they're on papers.
15      Q.  And who did you complain to any time?
16      A.  I told you the ones that I remember right
17  now was Manny and Isaac.  I can't remember the other
18  ones.  I can't remember.
19      Q.  And what was Manny's response when you
20  complained?
21      A.  I can't remember.
22      Q.  What was Isaac's response when you
23  complained?
24      A.  The only thing I remember him saying was
25  that he heard it, and that it was zero tolerance and

## Claudia Carlson   March 5, 2014
## * * *Videotaped Deposition* * *

52 (Pages 202 to 205)

### Page 202

1   that's it. I don't remember anything else.
2      Q. So when you complained to Isaac, Isaac said
3   I had heard it, we have zero tolerance for this, and
4   that's all you remember being said?
5      A. I don't know if he said something else, but
6   I know he said those words.
7      Q. Do you know where Jose Guzman grew up?
8      A. I don't remember.
9      Q. Have you ever been to his neighborhood
10  where he grew up?
11     A. How will I know? I don't remember. I
12  don't know.
13     Q. Isn't it true that Jose Guzman referred to
14  his old neighborhood as ghetto?
15     A. I don't remember him saying that.
16     Q. Do you deny it, or just don't remember?
17     A. I don't remember.
18     MR. HICKS: Now is probably a good time to
19  take a short break.
20     MS. SCHUETZ: Sure.
21     THE VIDEOGRAPHER: We're going off the
22  record at 4:11 p.m.
23         (A recess was taken from 4:11 p.m.
24         to 4:26 p.m.)
25     THE VIDEOGRAPHER: We're back on the record

### Page 203

1   at 4:26 p.m., and this marks the beginning of media
2   number six.
3      You may proceed.
4   BY MR. HICKS:
5      Q. You testified in response to one of -- you
6   testified in response to one of your attorney's
7   questions that Sharon Ono had allegedly made a remark
8   to a coworker, "Never mind, I remember Cubans don't
9   clean, they have Mexicans do it," or words to that
10  effect. Do you recall that testimony?
11     A. It wasn't those specific words, but yeah.
12     Q. Who is it that she allegedly made that
13  comment to?
14     A. Arianna.
15     Q. What's Arianna's last name?
16     A. I can't remember.
17     Q. And other than you and Arianna, was anybody
18  else present?
19     A. I remember there was more people, but I
20  can't remember who they were.
21     Q. You can't name any of them?
22     A. I can't remember.
23     Q. Did you tape record that conversation?
24     A. I can't remember.
25     Q. When did that conversation allegedly take

### Page 204

1   place?
2      A. I can't remember.
3      Q. The next person you identified as allegedly
4   making inappropriate comments was Don Hansill. You
5   indicated that he made a comment about doing a diva
6   squad, correct?
7      MS. SCHUETZ: Object to the form. I mean,
8   it mischaracterizes the testimony, but it's fine, you
9   can answer.
10  BY MR. HICKS:
11     Q. I may have misunderstood you. And by the
12  way, I have a bit of a hearing problem. So if you
13  say something and I miss it, and I ask you, I'm not
14  needling you. I just have a hearing loss.
15     Did you use the phrase "diva squad"?
16     A. He used the phrase diva squad.
17     Q. I'm sorry, diva squad, s-q-u-a-d.
18     A. I don't know what he meant by that. I just
19  remember he said that.
20     Q. Okay. And you're not claiming that there
21  was anything offensive or inappropriate about the
22  term "diva squad," are you?
23     A. I don't understand the word.
24     Q. Are you complaining in this lawsuit about
25  Don Hansill's use of the phrase "diva squad"?

### Page 205

1      A. I'm complaining that he made those
2   comments. It wasn't just that.
3      Q. What you're complaining about in this case,
4   or what you're alleging was inappropriate in this
5   case is that he said he liked his women -- he did not
6   like his women with implants, correct?
7      A. I didn't say that.
8      Q. What was it that Don Hansill allegedly said
9   that you found offensive?
10     A. Naming the woman's parts.
11     Q. You need to be --
12     A. Holding himself.
13     Q. Be explicit. What is it that Mr. Hansill
14  said or did that you found offensive?
15     A. Naming the woman's parts and holding
16  himself.
17     Q. And when you say "naming the woman's
18  parts," what are you referring to?
19     A. The chest and the behind.
20     Q. And he said what about that?
21     A. That he didn't like women with fake
22  implants. Meaning that, and then grab himself and
23  say those words.
24     Q. I thought that's what I just asked you.
25     So it's your testimony that Mr. Hansill

## Page 206

1  said, "I don't like women with fake implants," and he
2  gestured to his chest and his rear end, correct?
3      A.  Well, he said the names, but I don't want
4  to make up a name if I don't have to because I don't
5  want to lie.  He did mention the breast and the
6  behind.  I just can't remember what words he used for
7  them.
8      Q.  And you were offended by that?
9      A.  Yes.
10     Q.  And is it your contention that that
11 constituted sexual harassment or sexual
12 discrimination of you?
13     A.  What do you mean?
14     Q.  Are you claiming that Don Hansill
15 discriminated against you or harassed you because of
16 your gender?
17     A.  I can't remember.
18     Q.  Did you complain about those comments?
19     A.  Yes.
20     Q.  And you said that you complained to Ms.--
21 well, who did you complain to?
22     A.  Nivea and Sherry Ohanian.
23     Q.  In human resources?
24     A.  Yes.
25     Q.  And do you know if they did an

## Page 207

1  investigation?
2      A.  She said she was going to, but they never
3  followed up with me.
4      Q.  And you understand that Don died at about
5  this time, correct?
6      A.  What are you talking about?
7      Q.  Well, are you aware of the fact that
8  Don Hansill is dead?
9      A.  He passed away, yes.
10     Q.  And he passed away after you made --
11 allegedly made these complaints, correct?
12     A.  No.
13     Q.  Well, we know he didn't pass away before --
14 well, did he pass away before you made these
15 complaints?
16     A.  He was still alive when I made those
17 complaints.
18     Q.  And do you know how long after you made the
19 complaints that he passed away?
20     A.  What are you talking about?
21     Q.  What's that?
22     A.  I don't understand you.
23     Q.  I'm not sure why you don't.  I don't know
24 how to rephrase the --
25     A.  I complained when he was alive.

## Page 208

1      Q.  And then he died shortly thereafter,
2  correct?
3      A.  What does that have to do with anything?
4      Q.  Well, don't you think it would be kind of
5  difficult to talk to Don Hansill and discipline him
6  if he had passed away?
7      A.  They could still follow up with me.  They
8  never told me anything.
9      Q.  Okay.
10     A.  I don't remember what was the timing or
11 anything, but he was still alive.
12     Q.  So your complaint is that they didn't come
13 back to you and tell you that they talked to Don or
14 didn't talk to Don, correct?
15         MS. SCHUETZ:  Objection.  Mischaracterizes
16 the witness' testimony.
17         You can answer.
18         THE WITNESS:  I don't know.
19 BY MR. HICKS:
20     Q.  I understand you're that not concerned
21 about Mr. Hansill, the fact that he passed away.
22     A.  That doesn't mean I'm not concerned.
23     Q.  Well, your complaint is that they didn't
24 come back to you, correct?
25         MS. SCHUETZ:  Objection.  Mischaracterizes

## Page 209

1  the witness' testimony.
2          You can answer.
3          MR. HICKS:  You're bordering on coaching
4  the witness, Counsel.
5          MS. SCHUETZ:  I disagree.
6  BY MR. HICKS:
7      Q.  Can you answer my question?
8      A.  Say it again, please.
9      Q.  What is it that you're complaining about as
10 it relates to how the company handled your allegation
11 that Don Hansill had made reference to breasts and
12 behind?
13     A.  I still don't get it, because I can't
14 remember the exact dates or timing or anything like
15 that.
16     Q.  I'm not asking you exact dates and I'm not
17 asking you timing.  All I'm asking you is, what are
18 you complaining about?  What is it that you contend
19 that the company did --
20     A.  I told them and they didn't do nothing.
21     Q.  Let me finish so the court reporter can get
22 us down.
23         What is it that you claim the company did
24 or didn't do as it relates to Don Hansill?
25     A.  I reported it in time.

Claudia Carlson    March 5, 2014
* * *Videotaped Deposition* * *

54 (Pages 210 to 213)

Page 210

1    Q.  What do you mean "in time"?
2    A.  When it first happened.
3    Q.  Okay.
4    A.  Which I can't recall the dates, and I can't
5    recall when he passed away.
6    Q.  So what is it that you're complaining
7    about -- are you satisfied with what the company did
8    in response to your complaint regarding Mr. Hansill?
9    A.  To be honest, I can't remember.
10   Q.  I'm going to identify the people that I
11   think you just identified as having discriminated
12   against you because of your race, and I want you to
13   tell me if there's anybody who's not on this list
14   that I missed that you're claiming discriminated
15   against you because of your race.  Do you understand?
16   A.  Yes.
17   Q.  You contend that Bob Walker discriminated
18   against you because of your race?
19   A.  What do you mean again?  Can you please
20   repeat that again?
21   Q.  Do you contend that Bob Walker
22   discriminated against you because of your race?
23   A.  Yes.
24   Q.  Do you contend that Martha Pearson
25   discriminated against you because of your race?

Page 211

1    A.  Yes.
2    Q.  Do you contend that Sharon Jones Ono
3    discriminated against you because of your race?
4    A.  Yes.
5    Q.  Do you contend that Jose Guzman
6    discriminated against you because of your race?
7    A.  Yes.
8    Q.  Do you contend that Gian Carlo Gozzi
9    discriminated against you because of your race?
10   A.  Yes.
11   Q.  Do you contend that Patty Perry
12   discriminated against you because of your race?
13   A.  Yes.
14   Q.  Do you contend that MJ discriminated
15   against you because of your race?
16   A.  Yes.
17   Q.  Do you contend that Manny discriminated
18   against you because of your race?
19   A.  Yes.
20   Q.  Do you contend that Don Hansill
21   discriminated against you because of your race?
22   A.  I don't remember.
23   Q.  Is there anyone else that worked for the
24   Monte Carlo that you claim discriminated against you
25   because of your race, other than those people that

Page 212

1    we've just identified?
2    A.  LaDawndre.
3    Q.  How do you spell her name?
4    A.  I don't know.
5    Q.  What's her last name?
6    A.  I don't know.
7    Q.  What position did she hold?
8    A.  I believe either she was -- I don't really
9    know, but she was in human resources.
10   Q.  And how do you pronounce her name?
11   A.  LaDawndre.
12   Q.  LaDawndre?  And I know I've seen documents
13   with her name on it.
14        And what is it that you believe LaDawndre
15   did that constituted race discrimination?
16   A.  I complained several times to her about the
17   incidents that happened.  Nothing was done.
18   Q.  What's LaDawndre's race?
19   A.  I don't know.
20   Q.  Is she African-American?
21   A.  I believe so.
22   Q.  So why are you saying you don't know?
23   A.  I don't like to guess.
24   Q.  Is there some doubt in your mind?
25   A.  Well, you can't judge anybody by their

Page 213

1    color.
2    Q.  I'm not asking you to judge her.  I was
3    simply asking you what her race was, just like I've
4    asked you about everybody else.
5        MS. SCHUETZ:  Objection.  That's not a
6    question.
7    BY MR. HICKS:
8    Q.  So what specifically did LaDawndre do that
9    you believe constituted race discrimination against
10   you?
11       MS. SCHUETZ:  Objection.  Asked and
12   answered.
13       You can answer.
14       THE WITNESS:  Same question that I answered
15   earlier.
16   BY MR. HICKS:
17   Q.  All you told me was she allegedly did not
18   investigate complaints that you made; is that right?
19   A.  Yes.
20   Q.  Anything else that you claim she did that
21   constituted race discrimination against you?
22   A.  When I made several comments, statements
23   and everything, she didn't do anything about it; that
24   I believe she didn't do.  But as soon as someone else
25   complained about me, she right away acted on it.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

## Page 222

1  complaining about you creating a hostile work
2  environment when you were filling something out with
3  the union?
4     A.  About this you said?
5     Q.  Yes. Referring to Exhibit 11.
6     A.  I find out about this when Floyd told me
7  about this.
8     Q.  And Floyd is who?
9     A.  The union.
10    Q.  The union? Floyd worked for the union?
11    A.  Yes.
12    Q.  And is Floyd the same person that told you
13  to start secretly tape recording conversations?
14    A.  Yes.
15    Q.  And when was it that Floyd told you that
16 your coworkers were accusing you and Mr. Hall of
17 creating a hostile work environment?
18    A.  When I was already fired in those meetings
19 we had to -- when they had their deposition for the
20 union.
21    Q.  So you're claiming the first you learned
22 about this was after your employment ended?
23    A.  That I remember, yes.
24    Q.  So how is it that that came up after your
25 employment ended?

## Page 223

1     A.  How would I know?
2     Q.  Well, you said Floyd brought it up. You
3  tell me. How did he bring it up?
4     A.  From the depositions.
5     Q.  From what positions?
6     A.  From the depositions he did to the other
7  ones.
8        MS. SCHUETZ:  She's saying depositions, if
9  it helps.
10 BY MR. HICKS:
11    Q.  Depositions?
12    A.  Yes. When I lost my job.
13    Q.  Yes. I thought you said today was the
14 first time you've ever had a deposition.
15    A.  No. Their depositions. These people.
16    Q.  These people haven't been deposed.
17    A.  Yes, they have. Jose Guzman.
18       MS. SCHUETZ:  I think she may be confused
19 about the difference between the union proceedings
20 and a deposition in a court of law. So you might
21 consider asking her about the union proceedings.
22 BY MR. HICKS:
23    Q.  I will tell you these people have not been
24 deposed in this lawsuit. So you're talking about --
25 obviously talking about some other process or

## Page 224

1  proceeding.
2     A.  Yes, the union one.
3     Q.  Okay. So whatever it was that the union --
4  did the union ask them questions?
5     A.  Yes.
6     Q.  And were you still working for the company
7  when that took place?
8     A.  No.
9     Q.  And that was when you first learned that
10 they had actually complained about you?
11    A.  That I remember.
12    Q.  So are you suggesting you may have heard
13 about it earlier, you just don't remember?
14    A.  I don't remember.
15    Q.  Let me have marked as next in order an
16 acknowledgment dated March of 2011.
17       (Exhibit 12 was marked for
18        identification.)
19 BY MR. HICKS:
20    Q.  Ms. Carlson, Exhibit 12 is an employee
21 handbook receipt dated March 14th, 2011.
22       Do you recognize your handwriting on that
23 document where it says "name, please print"?
24    A.  Did you say it was 2011?
25    Q.  Do you see where it says date?

## Page 225

1     A.  It looks like my writing, but why would I
2  be signing as Arenas if I was already married?
3     Q.  I can't answer the question for you.
4        Do you recognize your handwriting where it
5  says 3/14/11?
6     A.  It looks like mine, but I don't know if
7  it's mine or not.
8     Q.  Do you have any reason to believe it's not
9  yours?
10    A.  The last name.
11    Q.  So you think -- do you think maybe you
12 could have misdated it? Do you think maybe --
13    A.  I don't know if I did or someone else did.
14    Q.  Is there any handwriting on this document
15 that you believe is somebody's other than yours?
16    A.  I don't know.
17    Q.  I'm done with that.
18       MR. HICKS:  I want to have marked as next
19 in order a counseling notice. It's three pages,
20 Bates stamped 639 through 641, and the incident date
21 is September 19th, 2011.
22       (Exhibit 13 was marked for
23        identification.)
24 BY MR. HICKS:
25    Q.  Ms. Carlson, do you recognize your

## Claudia Carlson   March 5, 2014
### * * *Videotaped Deposition* * *

### Page 226

1  handwriting on the second page of this document? And
2  for the record, the handwriting is in Spanish.  Is
3  that your handwriting?
4      A.  Yes.
5      Q.  If you go to the first page of this
6  document, there is a section in all bold letters that
7  says Signatures, and there's one that says Employee
8  Signature.  Do you see where that is?
9      A.  Yes.
10     Q.  And that's your signature?
11     A.  Yes.
12     Q.  And if you go to the top of this document,
13  where it says Incident Date, September 19th, 2011, do
14  you see that?
15     A.  Where?
16         MR. HICKS:  Counsel, feel free to point it
17  out to her.
18         MS. SCHUETZ:  Sure.  Right here.
19  BY MR. HICKS:
20     Q.  And then do you see where it says Incident
21  Details?
22         MR. HICKS:  And again, Counsel, feel free.
23         MS. SCHUETZ:  There you go.
24  BY MR. HICKS:
25     Q.  Under Incident Details, it says, "Failure

### Page 227

1  to follow instructions by a supervisor.  Claudia was
2  asked to go back to her station and refused."
3         Do you see that?
4      A.  Yes.
5      Q.  So you were counseled in September of 2011
6  for refusing to return to your station?
7         MS. SCHUETZ:  I'm going to object to the
8  that question again because it goes outside the scope
9  of what was covered on direct.  But she can answer.
10         MR. HICKS:  It actually doesn't.  I mean,
11  you asked her if she received any discipline.
12         MS. SCHUETZ:  Incorrect.  That's not what I
13  asked her, actually.
14  BY MR. HICKS:
15     Q.  Go ahead.
16     A.  To be honest, I can't remember, because I
17  don't remember those dates either.
18     Q.  So do you have any reason to believe you
19  were not disciplined in September of 2011 for
20  refusing to return to your station?
21         MS. SCHUETZ:  Same objection.
22         THE WITNESS:  Say it again, please.
23  BY MR. HICKS:
24     Q.  Do you have any reason to believe that you
25  were not disciplined as reflected in this document?

### Page 228

1      A.  I know I was disciplined, but I don't know
2  which days were they.
3         MR. HICKS:  Let's have marked as next in
4  order a voluntary statement by Jose Guzman.
5         I take that back, it is -- the document
6  exists of four pages, and it consists of statements
7  by Jose Guzman, Arianna Basulto, Dawn Marie Spain
8  and Manny Quiroga.
9            (Exhibit 14 was marked for
10           identification.)
11         MS. SCHUETZ:  Again, I'm going to object to
12  the use of these documents because they go outside
13  the scope of what was covered on direct.
14  BY MR. HICKS:
15     Q.  Ms. Carlson, these documents were produced
16  in this case, and there's little Bates stamped
17  numbers at the bottom that reflect what numbers they
18  are.  They have to do with this incident in September
19  of 2011.
20         Have you seen these before?
21     A.  I remember Floyd questioning them about it.
22     Q.  Questioning the individuals who signed
23  these statements?
24     A.  Yes.
25     Q.  And that was at this union event that you

### Page 229

1  referred to earlier?
2      A.  Yes.
3      Q.  And were you present while they were being
4  questioned?
5      A.  Yes.
6      Q.  By the way, Manny, his formal name is
7  Manuel Quiroga, Q-u-i-r-o-g-a.
8         In these statements, each of the witnesses
9  indicate that you told your boss, no, I'm going to do
10  it the new way -- actually, let me rephrase the
11  question.
12         In each of these statements, and feel free
13  to read them, the witnesses represent that you told
14  Manuel Quiroga, when asked to seat the guests in a
15  certain way, you told him no, you were going to do it
16  a different way.
17         MS. SCHUETZ:  Again, to make the record
18  clear, I'm objecting to the question and the use of
19  this document.
20         But you can answer the question.
21  BY MR. HICKS:
22     Q.  Did you do that?
23     A.  Can you repeat the question?
24     Q.  Sure.  Mr. Quiroga asked you to seat the
25  guests in a specific manner, correct?

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

59 (Pages 230 to 233)

Page 230

1    A.  To be honest with you, I don't remember
2  anymore.
3    Q.  Do you recall that you were assigned to
4  work on the main floor tunnel on the day of
5  September 29th, 2011?
6    A.  The only thing I remember is doing what he
7  told me to do.  What I was asked to do, I did the
8  job.
9    Q.  So each of these witnesses testified that
10  you specifically refused to do it the way he asked
11  you to do it.
12    Did you refuse to do it the way he asked
13  you to do it?
14    A.  I didn't refuse.  I did the job how he told
15  me to do.
16    Q.  So -- and let's go to Exhibit 14.
17    Jose Guzman, is he lying when he says that
18  you refused to follow instructions?
19    A.  Yes.
20    Q.  Arianna Basulto, do you know who that is?
21    A.  Arianna, yes.
22    Q.  Do you know -- that's a woman, correct?
23    A.  Yes.
24    Q.  Do you know how old she is or was?
25    A.  No.

Page 231

1    Q.  Was she over or under 40, in your opinion?
2    A.  Under 40.
3    Q.  Do you know what her race was?
4    A.  I don't remember.
5    Q.  And is she lying when she says you refused
6  to follow the instruction?
7    A.  Yes, she's lying.
8    Q.  And if we go to the next one, Dawn Marie
9  Spain.
10    Dawn Mary Spain in her statement says that
11  you refused to follow instructions.  Is she lying?
12    A.  Yes.
13    Q.  And then the last one, Manuel Quiroga says
14  that you told him no, and refused to follow his
15  instruction.  Is he lying?
16    A.  Yes, because I did do the job how he told
17  me.  And by the way, he stated that I did.
18    Q.  Why would all of these people lie about
19  you?
20    A.  Something that I really want to know.
21    Q.  What's the answer to my question?  Why
22  would all these people lie about you?
23    MS. SCHUETZ: Objection.  Asked and
24  answered.
25

Page 232

1  BY MR. HICKS:
2    Q.  Do you know?
3    A.  I just said I just want to know.  I would
4  love to know.
5    MR. HICKS:  Let's have marked as next in
6  order a counseling notice dated September 29th, 2011
7    (Exhibit 15 was marked for
8    identification.)
9  BY MR. HICKS:
10    Q.  Do you recognize this document?
11    MS. SCHUETZ:  Again, I'm going to object to
12  the use of this document --
13    MR. HICKS:  Objection noted.
14    MS. SCHUETZ:  -- because we have gone
15  outside of the scope of the direct.
16  BY MR. HICKS:
17    Q.  Do you recognize Exhibit 15?
18    A.  Is it the same thing?
19    Q.  Yeah, it's referring to the same incident.
20    A.  I can't remember the dates, but if it's the
21  same thing...
22    Q.  It's dated September 29th.  Do you see
23  where it says Incident Date?
24    A.  Yes.
25    Q.  And the second page, that's your

Page 233

1  handwriting?
2    A.  Yes.
3    Q.  So you were disciplined for refusing to
4  follow instructions, correct?
5    A.  For not doing my job.
6    Q.  And you were suspended for two days without
7  pay?
8    A.  If that says it there, I guess it was.  I
9  can't remember.
10    Q.  And this was in September of 2011?
11    A.  I can't remember.
12    MR. HICKS:  Let's have marked as next in
13  order a counseling notice dated October 14th -- the
14  incident dated is October 14th, 2011.
15    (Exhibit 16 was marked for
16    identification.)
17  BY MR. HICKS:
18    Q.  If you could go to the bottom of this
19  document, where it says Employee Signature.  Do you
20  recognize your handwriting there?
21    MS. SCHUETZ:  Same objection as I've been
22  making with regard to use of the document.
23    Go ahead and answer.
24    THE WITNESS:  It looks like mine, but I
25  don't know.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Claudia Carlson    March 5, 2014
* * *Videotaped Deposition* * *

60 (Pages 234 to 237)

### Page 234

1  BY MR. HICKS:
2      Q.  Let's go to the second page.  Do you
3  recognize your handwriting on the document?
4      A.  Yes.
5      Q.  If you go to the first page, the incident
6  date is October 14th, 2011.  Do you see that?
7      A.  Yes.
8      Q.  And if you go down to the incident details,
9  it reads: "Unsatisfactory job performance.  Claudia
10  was scheduled to be at Diablo's for brochures.  She
11  was reminded prior to doing brochures to use the rest
12  room/drinking fountain in the theater, and 40 minutes
13  after she was reminded she was seen in the Street of
14  Dreams.  She claimed her reason for being there was
15  to get a drink of water."
16          Do you see that?
17      A.  Yes.
18      Q.  Does that accurately reflect what happened?
19      A.  I can't remember.
20      Q.  Whether you can remember the details or
21  not, do you see where it says, "Disciplinary Action,
22  three days suspension without pay"?
23      A.  Yes.
24      Q.  And you were suspended for three days
25  without pay as a result of this incident?

### Page 235

1      A.  I don't remember.
2          MR. HICKS:  Let's have marked next in order
3  a counseling notice with an incident date of
4  October 18th, 2011.
5          (Exhibit 17 was marked for
6              identification.)
7  BY MR. HICKS:
8      Q.  Ms. Carlson, do you recognize your
9  handwriting on the second page of this document?
10          MS. SCHUETZ:  Same objection with regard to
11  the use of this document, because it's gone outside
12  the scope of direct.
13          You can answer the question.
14          THE WITNESS:  It looks like mine, but I'm
15  not sure.
16  BY MR. HICKS:
17      Q.  If you go to the first page of this
18  document where it says Employee Signature, do you
19  recognize your handwriting there?
20      A.  Yes.
21      Q.  And if you go to the Incident Date, it says
22  October 18th, 2011.  Do you see that?
23      A.  Yes.
24      Q.  If you go to Incident Details, it says:
25  "Claudia called out on October 18th, 2011, which is

### Page 236

1  the date she had requested as a vacation day and had
2  been denied.  The vacation day was denied due to
3  staff levels."
4          Do you see that?
5      A.  Yes.
6      Q.  Did you, in fact, call out on October 18th,
7  2011, requesting a vacation day?
8      A.  I can't remember.
9      Q.  Was your vacation day denied?
10      A.  I can't remember.
11      Q.  You were disciplined and given a one-day
12  suspension without pay, correct?
13      A.  I can't remember.
14          MR. HICKS:  Let me have marked as next in
15  order a suspension pending investigation notice
16  dated, a date issued of November 4th, 2011, and with an
17  incident date of October 28th, 2011.
18          (Exhibit 18 was marked for
19              identification.)
20  BY MR. HICKS:
21      Q.  Ms. Carlson, do you recognize your
22  signature dated October 4, 2011, at the bottom of
23  that document?
24          MS. SCHUETZ:  Same objection with regard to
25  use of this document.

### Page 237

1          THE WITNESS:  Yes.
2  BY MR. HICKS:
3      Q.  And do you recognize your handwriting on
4  the second page of that document?
5      A.  Yes.
6      Q.  And if you go to the first sentence of that
7  document, it says:  "You're being placed on
8  suspension pending investigation effective
9  November 4, 2011."
10          Do you see that?
11      A.  Yes.
12      Q.  And were you placed on -- well, first of
13  all, do you recall what you were placed on suspension
14  pending investigation for?
15      A.  I can't remember.
16      Q.  Were you placed on suspension pending
17  investigation?
18      A.  Yes.
19      Q.  I'm done with that document.
20          Your employment at the Monte Carlo was
21  terminated on November 7th, 2011, correct?
22      A.  I believe so.
23      Q.  And did you file a grievance with your
24  union as a result of this termination?
25          MS. SCHUETZ:  Objection.  That question

Claudia Carlson   March 5, 2014
* * *Videotaped Deposition* * *

Page 243

```
 1              CERTIFICATE OF REPORTER
 2         I, the undersigned, a Certified Shorthand
 3    Reporter of the State of Nevada, do hereby certify:
 4         That the foregoing proceedings were taken
 5    before me at the time and place herein set forth;
 6    that any witnesses in the foregoing proceedings,
 7    prior to testifying, were duly sworn; that a record
 8    of the proceedings was made by me using machine
 9    shorthand which was thereafter transcribed under my
10    direction; that the foregoing transcript is a true
11    record of the testimony given to the best of my
12    ability.
13         Further, that before completion of the
14    proceedings, review of the transcript [X] was
15    [  ] was not requested pursuant to NRCP 30(e).
16         I further certify I am neither financially
17    interested in the action, nor a relative or employee
18    of any attorney or party to this action.
19         IN WITNESS WHEREOF, I have this date
20    subscribed my name.
21
22    Dated: March 13, 2014
23
24                       _____
25                       GALE SALERNO, RMR, CCR #542
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

**"EXHIBIT 3"**

**"EXHIBIT 3"**

Joshua Hall    March 6, 2014
***Videotaped Deposition***

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEVADA

3

4

5

6    CLAUDIA CARLSON and JOSHUA      )
     HALL,                           )
7                                    )
           Plaintiffs,               )
8                                    ) Case No.
              vs.                    ) 2:13-cv-00378-JCM-PAL
9                                    )
     VICTORIA PARTNERS d/b/a MONTE   )
10   CARLO RESORT AND CASINO,        )
                                     )
11         Defendant.                )
                                     )
12   _____)

13

14        VIDEOTAPED DEPOSITION OF JOSHUA HALL

15        Taken on Thursday, March 6, 2014

16                At 9:02 a.m.

17             Taken at the Office of:

18             Littler Mendelson, P.C.

19        3960 Howard Hughes Parkway, Suite 300

20                Las Vegas, Nevada

21

22

23

24

25   Reported By: Gale Salerno, RMR, CCR No. 542

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Joshua Hall   March 6, 2014
***Videotaped Deposition***

```
 1    APPEARANCES:

 2    For the Plaintiffs:

 3            GISELLE SCHUETZ, ESQUIRE
              MAX BARACK, ESQUIRE
 4            Law Offices of Joshua Friedman
              1050 Seven Oaks Lane
 5            Mamaroneck, New York  10543
              (212) 308-4338
 6            giselle@joshuafriedmanesq.com

 7
      For the Defendant:
 8
              PATRICK H. HICKS, ESQUIRE
 9            Littler Mendelson, P.C.
              3960 Howard Hughes Parkway, Suite 300
10            Las Vegas, Nevada  89169
              (702) 862-8800
11            phicks@littler.com

12

13    Also Present:

14            MR. TIM HARTMANSZERBIEC, Videographer

15            HILARY MUCKLEROY, ESQUIRE, MGM Resorts

16            NATHAN T.H. LLOYD, ESQUIRE, MGM Resorts

17            MS. CLAUDIA CARLSON

18            MR. JOHN STAFFORD, Paralegal

19

20

21

22

23

24

25
```

Joshua Hall   March 6, 2014
***Videotaped Deposition***

**Page 30**

1      Q. And while you were at Albertson's for that
2 one-month period, did you receive any discipline?
3      A. No, sir.
4      Q. And you left Albertson's on good terms?
5      A. Yes, sir. They actually wanted me to stay,
6 but they could not compare -- they couldn't meet what
7 Monte Carlo started me at, so that was why it was an
8 easy choice.
9      Q. And so then you went to work for Monte
10 Carlo as an usher?
11      A. Yes, sir.
12      Q. And my understanding is you were hired as
13 an usher in the Lance Burton Theater, and your first
14 day of employment was on or about May 10th, 2005?
15      A. Correct.
16      Q. And who hired you at Monte Carlo?
17      A. Bob Walker.
18      Q. And what was Mr. Walker's position at the
19 time?
20      A. I don't recall his exact position. I know
21 he was my supervisor.
22      Q. Who interviewed you?
23      A. Bob Walker.
24      Q. So as far as you know, Bob Walker made the
25 decision to hire you?

**Page 31**

1      A. Yes, sir.
2      Q. And what position were you hired into? Was
3 that an usher position?
4      A. Yes, sir.
5      Q. And you resigned your employment at the
6 Monte Carlo on March 26th, 2012?
7      A. Yes, sir.
8      Q. And were you an usher during the entire
9 time that you were at the Monte Carlo?
10      A. Yes, sir.
11      Q. And was Mr. Walker your boss the entire
12 time you were there?
13      A. No, sir.
14      Q. At what point did that change? He was your
15 boss when you were hired in 2005?
16      A. Correct.
17      Q. And when did that change?
18      A. I would say Lance Burton left, I believe it
19 was September of 2010, like September 4th, I believe.
20 It was some time around then.
21      Q. So then what happened?
22      A. Then the box office supervisors took over
23 the theater.
24      Q. What happened to Mr. Walker?
25      A. He was actually employed by Lance Burton.

**Page 32**

1 And Lance Burton retired, and so I don't know --
2 well, as far as -- I guess he left with him.
3      Q. Sure. And that answers my question.
4      A. Okay.
5      Q. Then a new show came in?
6      A. Yes, sir.
7      Q. And what show was that?
8      A. I believe it was -- I know Frank Caliendo
9 came. I'm not sure if he came first, or if it was
10 the Jabberwockies. I can't remember.
11      Q. One or the other?
12      A. Yes, sir.
13      Q. Who -- after Bob Walker left with Lance
14 Burton, who became your supervisor?
15      A. I believe it was a young lady by the name
16 of Jennifer Klinefelter, Shana Rodero.
17      Q. So you had more than one supervisor?
18      A. Yes, sir.
19      Q. I'm sorry, what was the second person?
20      A. Shana Rodero.
21      Q. How do you spell that last name?
22      A. I believe it's R-o-d-e-r-o.
23      Isaac -- I don't believe Isaac was there
24 yet.
25      Carol Wasson. I believe that was it at

**Page 33**

1 that point.
2      Q. So it sounds like, depending on the
3 shift -- not depending upon the shift, depending upon
4 the day, you might have one of these three
5 individuals supervising you?
6      A. Yes, sir.
7      Q. At some point did you -- and when I say at
8 some point, I mean at some point between September of
9 2010 and when you left the employ of the Monte Carlo
10 did you have additional individuals who were your
11 supervisor?
12      A. I'm sorry, can you repeat the question?
13      Q. Sure. It was kind of rambling.
14      You just identified for us the three
15 individuals who were your supervisors after the
16 Lance Burton show left.
17      A. Yes.
18      Q. Between that time and the time your
19 employment at the Monte Carlo ended, were there other
20 individuals that supervised you?
21      A. Yes.
22      Q. Who are those folks?
23      A. I believe -- wait, I'm sorry. Can you
24 repeat it one more time?
25      Q. Sure. That's okay.

Joshua Hall   March 6, 2014
***Videotaped Deposition***

Page 58

1    Q. -- drop? To what?
2    A. 8.55.
3    Q. But you were now receiving tips?
4    A. Yes, sir.
5    Q. Did you have to split those tips with
6  anybody?
7    A. No, sir.
8    Q. And do you know on an annual basis how much
9  your take home increased as a result of now getting
10  tips?
11    A. Probably, I don't know, roughly, like
12  probably -- I couldn't tell you.
13    Q. Did your benefits change at all when you
14  went from a night auditor to a driver?
15    A. No, sir.
16    Q. And are you still a driver?
17    A. Yes, sir.
18    Q. And have you held that position
19  consistently since May of 2013?
20    A. Yes, sir. Actually, I take that back.
21  They -- there was a -- there was a night auditor that
22  quit, and she didn't give a two-week notice, and so
23  my supervisor asked me if I minded going back until
24  they could hire somebody else.
25    And at that point, I mean, I couldn't say

Page 59

1  no. I mean, they promoted me before I actually was
2  supposed to. Because you're supposed to be at the
3  company for three months before you can transfer.
4  But they did that for me, so I said no problem.
5    Q. So how long did you go back to the night
6  auditor position for?
7    A. Maybe about two months.
8    Q. And then they hired somebody, and then you
9  returned to your driver position?
10    A. Yes, sir.
11    Q. And you're still located at the Warm
12  Springs and 215 location?
13    A. Yes, sir.
14    Q. Bear with me. I'm just marking off
15  questions.
16    A. Okay.
17    Q. That's a good thing.
18    While you were working at the Monte Carlo,
19  is it your contention that you were discriminated
20  against on the basis of your race?
21    A. Yes, sir.
22    Q. And your -- is it your contention that you
23  were discriminated against on the basis of your sex?
24    A. I'm not sure of that.
25    Q. So it's simply -- not simply. It's your

Page 60

1  contention that you were discriminated on the basis
2  of your race.
3    Any other based upon which you believe you
4  were discriminated while at the Monte Carlo, other
5  than race?
6    A. I'm not sure.
7    Q. So let's focus on what you believe to be
8  discrimination against you based on your race while
9  you were working at the Monte Carlo.
10    You were here yesterday while we were
11  questioning Ms. Carlson. What I want to do is just
12  walk you through who you believe discriminated
13  against you, and then you can tell me what it is they
14  did that you believe constituted race discrimination.
15  Fair enough?
16    A. Yes, sir.
17    Q. So let's start, first of all, with who you
18  believe discriminated against you, or who you're
19  alleging discriminated against you while at the Monte
20  Carlo based on your race.
21    A. We can start off with Sharon Jones Ono.
22    Q. And what I would like to do, Mr. Hall, is
23  to the best of your ability, I want you to give me
24  the list of all the people that you are accusing of
25  discriminating against you based on your race, and

Page 61

1  then we'll go back, and I'll let you explain to me
2  what it is each of them did. And then when we're
3  done with that, if somebody else comes to mind, of
4  course I want you to tell me about that, too.
5    A. All right.
6    Q. So we start with Sharon Jones Ono. Who
7  else?
8    A. Don Hansill, Patty Perry, Shaldale Diamond,
9  Jose Guzman.
10    Q. Take your time.
11    A. Right now can we start with those?
12    Q. Sure.
13    A. If I remember, because...
14    Q. You identified Sharon Jones Ono.
15    A. Yes, sir.
16    Q. What is it that you believe Ms. Ono said or
17  did to discriminate against you based on your race?
18    A. I don't remember the year, but I do
19  remember there was a layoff. I got laid off in 2009,
20  along with a few other ushers.
21    Q. You said in 2009?
22    A. I believe so. I believe it was in 2009.
23  Got laid off. And once I was laid off, apparently
24  there was some type of mix up.
25    After I got laid off, I did go down to the

Joshua Hall   March 6, 2014
***Videotaped Deposition***

18  (Pages 66 to 69)

Page 66

1 result of an usher named Sherry bringing the issue to
2 the union, that's when you and who else were brought
3 back?
4   A.  I believe it was myself, Claudia.  Don was
5 laid off and Mary Jane, I believe.  It went by
6 seniority.  So it was, you know, the last hires.
7   Q.  So at the time you were laid off in 2009,
8 prior to being brought back, Claudia was also laid
9 off?
10   A.  Yes, sir.
11   Q.  And what's Claudia's last name?
12   A.  Carlson.
13   Q.  So you're referring to your co-plaintiff?
14   A.  Yes, sir.
15   Q.  And Don was also laid off?
16   A.  Yes, sir.
17   Q.  And what's Don's last name?
18   A.  Hansill.
19   Q.  And MJ was laid off?
20   A.  Yes, sir.
21   Q.  Do you know MJ's name?
22   A.  I do.
23   Q.  What is it?
24   A.  Mary Jane.
25   Q.  So there was you, Claudia Carlson,

Page 67

1 Don Hansill and Mary Jane who were initially laid
2 off?
3   A.  Correct.  And her last name is Richardson.
4   Q.  And Don Hansill, what is his race?
5   A.  I don't know, to be honest with you.  I
6 couldn't tell you.
7   Q.  Is he African-American?
8   A.  No, sir.
9   Q.  Is he Hispanic?
10   A.  That's what I'm confused about.  I don't
11 know what race he is.
12   Q.  I mean, did he appear to you to be
13 Hispanic?
14   A.  I couldn't tell.
15   Q.  Did he appear to you to be Caucasian?
16   A.  I couldn't tell.
17   Q.  How about Mary Jane Richardson, what race
18 is she?
19   A.  Caucasian.
20   Q.  And Nivea Santiago is Hispanic?
21   A.  Yes, sir.  Puerto Rican to be exact.
22   Q.  In any event, when you were rehired, who
23 else was rehired with you?
24   A.  There were a few people that were working,
25 because the way it works is you get called in based

Page 68

1 upon seniority if they needed extra help.
2     A few times -- now Don was behind me
3 seniority-wise, and a few times he was called in
4 before myself, which was not supposed to happen.
5   Q.  We'll get to that in a minute.
6   A.  Okay.
7   Q.  If you're claiming that was because of your
8 race.
9   A.  Can I respond to that?
10   Q.  Sure, but let's do this:  Let's stick with
11 the comment that you're contributing to Ms. Ono
12 first.
13   A.  Okay.
14   Q.  So do you have any evidence or do you even
15 believe -- let me withdraw that.
16     Are you accusing anybody at the Monte Carlo
17 of laying you off at the time Claudia Carlson,
18 Don Hansill and Mary Jane Richardson were laid off?
19   A.  Uh-huh.
20   Q.  Are you alleging that you were laid off
21 because of your race?
22   A.  I don't know.
23   Q.  Do you have any evidence that it was
24 because of your race?
25   A.  I don't know.

Page 69

1   Q.  So now let's focus on what you are
2 complaining about, and that is that Ms. Ono made a
3 comment -- you're attributing a comment to Ms. Ono
4 that was of a racially derogatory nature?
5   A.  Yes, sir.
6   Q.  And you said that she was on the phone, and
7 you don't know who she was talking to?
8   A.  Correct.
9   Q.  And who -- strike that.
10     Where was this phone call?
11   A.  We were in the break room.
12   Q.  And who was in the room when this phone
13 call took place?
14   A.  I don't remember who else.  I do remember
15 it was myself, Claudia, Sharon.  I don't remember who
16 else was there.
17   Q.  So Ms. Ono, yourself and Ms. Carlson?
18   A.  Correct.  I believe there was someone else
19 there, but I don't remember who it was.
20   Q.  Man or a woman?
21   A.  I don't remember, because it was in the
22 break room.  And I don't know if it was before the
23 show, in between the show.  I think it was before the
24 show, because I remember Angel had just left.  And,
25 you know, she had to get her things.  And that was,

Joshua Hall   March 6, 2014
***Videotaped Deposition***

19 (Pages 70 to 73)

Page 70

1   you know -- I just remember that part.
2       Q. And did -- let me withdraw that.
3       Do you know if anyone else heard this
4   alleged statement, other than yourself?
5       A. I don't know.
6       Q. Have you ever discussed this alleged
7   statement with your co-plaintiff, Ms. Carlson?
8       A. Yes, sir.
9       Q. And when did you first discuss that
10  statement?
11      A. I believe right after it happened.
12      Q. And did you tell her what was said?
13      A. She heard what was said.
14      Q. I asked you a minute ago if anybody else --
15  to your knowledge, did anybody else hear it, and you
16  said you didn't know.
17          MS. SCHUETZ: Objection. That misstates
18  your question and the witness' testimony.
19          But you can answer.
20  BY MR. HICKS:
21      Q. So it's your understanding that Ms. Carlson
22  also heard the statement?
23      A. Yes.
24      Q. Other than you and your co-plaintiff,
25  Ms. Carlson, can you identify anybody who heard this

Page 71

1   alleged statement?
2       A. I don't know.
3       Q. And what did you and Ms. Carlson discuss
4   when that statement was allegedly made?
5       A. I can't remember.
6       Q. Don't remember anything about your
7   conversation?
8       A. I remember I was upset. I don't remember
9   the exact details.
10      Q. And did you complain about that to anyone?
11      A. I don't remember.
12      Q. Before we continue, let me ask you some
13  questions about tape recordings.
14      A. Yes, sir.
15      Q. Did you secretly tape record conversations
16  at the Monte Carlo while you were working there?
17      A. I did.
18      Q. And when did you first start tape
19  recording, secretly tape recording conversations at
20  the Monte Carlo?
21      A. I don't remember.
22      Q. Do you know what year it was?
23      A. No, sir.
24      Q. And did somebody, such as Ms. Carlson,
25  suggest to you that you should start tape recording

Page 72

1   conversations?
2       A. No, sir.
3       Q. You just did it on your own?
4       A. I don't remember why I started; I don't
5   remember exactly why.
6       Q. Prior to you starting to tape record
7   conversations at the Monte Carlo, did you have a
8   discussion with Ms. Carlson about that topic?
9       A. No. But I was at the union. We both were
10  at the union complaining about incidents, and that
11  was what came up at the union.
12      Q. When you say that is what came up, you mean
13  the idea of secretly tape recording conversations in
14  the workplace?
15      A. Yes, sir.
16      Q. Go ahead, you can finish what you were
17  about to say.
18      A. That was it.
19      Q. And did anybody at the union suggest that
20  you start secretly tape recording conversations in
21  the workplace?
22      A. Yes, sir.
23      Q. Who?
24      A. Floyd.
25      Q. What's Floyd's last name?

Page 73

1       A. I don't recall.
2       Q. And what did he say in that regard?
3       A. We were just describing to him how
4   frustrated we were about the situation that was going
5   on. And, you know, it was very frustrating because
6   no one believed anything that, you know, we kept
7   reporting these things and nothing was being done.
8   It continued. So we didn't know any other way. And
9   that was what was suggested.
10      Q. What year was this?
11      A. Again. I don't know.
12      Q. Was it 2011?
13          MS. SCHUETZ: Objection. Asked and
14  answered.
15          You can answer.
16          THE WITNESS: I don't know.
17  BY MR. HICKS:
18      Q. Was it 2010?
19          MS. SCHUETZ: Objection.
20          THE WITNESS: I don't know.
21  BY MR. HICKS:
22      Q. Was it 2009?
23          MS. SCHUETZ: Same objection.
24          THE WITNESS: I don't know.
25

Joshua Hall   March 6, 2014
***Videotaped Deposition***

20 (Pages 74 to 77)

Page 74

1  BY MR. HICKS:
2    Q.  Was it 2008?
3       MS. SCHUETZ:  Same objection.
4       THE WITNESS:  I don't know.
5  BY MR. HICKS:
6    Q.  What did you secretly tape record
7  conversations in the workplace with?  What device?
8    A.  I forget what exactly device it was.  I
9  know it was -- I believe I purchased it.  I don't
10 know.  I just purchased it.  I went to some
11 electronics store and got it.
12   Q.  A tape recorder?
13   A.  Yes, sir.
14   Q.  Was it a mini tape recorder?
15   A.  Yes, sir.
16   Q.  And were the tapes the little mini cassette
17 tapes?
18   A.  No, sir.  It was I believe -- I don't know.
19 I'm not -- I don't know much about electronics.  But
20 I just know it was -- it didn't have any tape.
21   Q.  And what store did you purchase this mini
22 tape recorder from?
23   A.  I don't remember.
24   Q.  And why did you get a mini tape recorder?
25 Was that so you could conceal it?

Page 75

1    A.  Yes, sir.
2    Q.  Approximately how many conversations did
3  you secretly tape record in the workplace?
4    A.  That I do not know.
5    Q.  Was it more or less than 50?
6    A.  I couldn't tell you.
7    Q.  More or less than 100?
8    A.  I couldn't tell you.
9    Q.  More or less than 200?
10   A.  I couldn't tell you.
11   Q.  More or less than 300?
12      MS. SCHUETZ:  Objection.  Asked and
13 answered.
14      THE WITNESS:  I couldn't tell you.
15 BY MR. HICKS:
16   Q.  More or less than 400?
17      MS. SCHUETZ:  Same objection.
18      THE WITNESS:  I don't know.
19 BY MR. HICKS:
20   Q.  More or less than 500?
21      MS. SCHUETZ:  Same objection.
22      THE WITNESS:  I don't know.
23 BY MR. HICKS:
24   Q.  So it could have been more than 500
25 conversations?

Page 76

1    A.  I don't know.
2    Q.  And did you retain all of these
3  conversations that you secretly tape recorded?
4    A.  I can't remember.
5    Q.  So you may have destroyed some of them?
6    A.  I don't remember.  I just -- I don't
7  remember any of that.
8    Q.  And where is this mini tape recorder that
9  you purchased for the purpose of secretly tape
10 recording conversations?  Where is that device today?
11   A.  It was turned in to my lawyers.
12   Q.  And was it turned in to your lawyers -- let
13 me withdraw that.
14      The complaint that was filed in this case
15 quotes alleged conversations.
16   A.  I'm sorry, can you repeat that?
17   Q.  Sure.  The complaint that your lawyers
18 filed in this case quotes conversations that were
19 allegedly secretly tape recorded.
20   A.  I don't know.
21   Q.  No, I'm telling you that that's the case.
22   A.  Oh, okay.
23   Q.  So you turned over that recording device to
24 your attorneys before the lawsuit in this case was
25 filed?

Page 77

1    A.  I don't remember when it was.  I believe it
2  was at the beginning, though.  Because it was
3  something that they informed me that I did have to
4  turn over.
5       MS. SCHUETZ:  I'm just going to remind the
6  witness not to talk about conversations that you've
7  had with counsel.  He's not asking for those
8  communications, and it would not be appropriate for
9  him to ask for them.  Okay?
10      THE WITNESS:  Okay.
11 BY MR. HICKS:
12   Q.  Did you retain a copy of any of those
13 perhaps 500-plus secretly tape recorded
14 conversations?
15   A.  I don't remember.
16   Q.  You don't know whether or not you have a
17 copy of those?
18      MS. SCHUETZ:  I'm going to object to that
19 question as vague.
20      THE WITNESS:  Can you repeat maybe?
21 BY MR. HICKS:
22   Q.  Sure.  You tape recorded an undetermined
23 number of conversations in the workplace, correct?
24 You don't know how many there were, correct?
25   A.  I don't.

Joshua Hall   March 6, 2014
***Videotaped Deposition***

21 (Pages 78 to 81)

Page 78

1  Q. And at the beginning of this lawsuit, you
2  turned over the recording device with the
3  conversations on them that were taped to your
4  attorneys, correct?
5  A. Correct.
6  Q. Did you retain for yourself a copy of those
7  secretly tape recorded conversations?
8  A. No, sir.
9  Q. So as far as you know, the original is in
10  the hands of your counsel, correct?
11  A. Correct.
12  Q. And the original has been in the hands of
13  your counsel since you gave it to them at the
14  beginning of this lawsuit?
15  A. Correct.
16  Q. Let's go back to our discussion where you
17  were identifying former colleagues who you believe
18  discriminated against you because of your race.
19  And we were talking about Sharon Jones Ono.
20  And you had just attributed a statement to Ms. Jones
21  Ono that she allegedly made on the telephone.
22  Do you recall that conversation?
23  A. Yes.
24  Q. Did you capture that alleged statement on
25  tape?

Page 79

1  A. I don't remember.
2  Q. Did Ms. Carlson, to your knowledge, capture
3  that alleged statement on tape?
4  A. I don't remember.
5  Q. Anything else that you allege Ms. Jones Ono
6  did or said, other than what you just told us about,
7  that you believe constitutes discrimination against
8  you because of your race?
9  A. It was ongoing. She said lots of things.
10  Q. And what I want to know is specifically
11  what it is you recall her saying that you are
12  alleging constituted race discrimination. And you've
13  given me one specific. What else can you tell us?
14  A. She also said -- well, she said that Angel
15  was losing -- Angel was losing her home. She needed
16  to pay her mortgage. And that myself and Claudia
17  Carlson, we were young and we could go find another
18  job. And the blacks and the Mexicans were taking the
19  white people's jobs.
20  Q. And when did this alleged statement take
21  place?
22  A. I can't remember.
23  Q. Where -- I'm sorry?
24  A. I don't even remember where we were.
25  Q. That was my next question, where did this

Page 80

1  alleged statement take place? You don't remember?
2  A. I'm sorry, no.
3  Q. And who was Ms. Ono speaking to when she
4  allegedly made this statement?
5  A. She was talking to me.
6  Q. And who else was present?
7  A. Claudia was there. And I don't know who
8  else was there.
9  Q. So the only witnesses you can recall being
10  present when this statement was allegedly made were
11  you and your co-plaintiff, Ms. Carlson?
12  A. Yes.
13  Q. And --
14  A. If I can add, with Sharon she really would
15  make sure no one else was around when she made her
16  statements but the people that she wanted to hear.
17  That way it didn't get anywhere else.
18  Q. And I'm asking you who was there, and
19  you've told me it was you and Ms. Carlson.
20  A. Correct.
21  Q. And did you secretly tape record this
22  conversation?
23  A. I don't remember.
24  Q. Did Ms. Carlson secretly tape record this
25  conversation?

Page 81

1  A. I don't know.
2  Q. I may have asked you already, when did this
3  allegedly take place?
4  A. I can't remember.
5  Q. And did you complain about that to anyone?
6  A. I did.
7  Q. To who?
8  A. I believe it was Bob.
9  Q. Bob Walker?
10  A. Yes, sir.
11  Q. You seem like you're not sure.
12  A. Yeah, I don't remember who was our
13  supervisor. We had so many supervisors. I don't
14  remember who was on that particular day that I spoke
15  with.
16  Q. Other than Bob, can you -- did you, to your
17  best recollection, complain to anybody else about
18  this alleged statement?
19  A. I don't remember. I just know eventually
20  it got to who I wanted it to get to, which was
21  Sherry Ohanian. But there was a chain of command.
22  You couldn't just go directly to. You had to --
23  that's what I was told, you have to go to your
24  supervisors first.
25  Q. Well, I've seen copies of the company's

Joshua Hall    March 6, 2014
***Videotaped Deposition***

Page 82

1   harassment policy and employee handbook that you've
2   signed for.  Let me back up.
3        While you worked for the company you
4   received copies of the company's employee handbook?
5      A.  Yes.
6      Q.  And the company's discrimination or
7   harassment policy?
8      A.  Uh-huh, yes.
9      Q.  And you understand those policies give you
10  the right to go directly to human resources, correct?
11     A.  I don't remember.
12     Q.  But it's your contention that somebody told
13  you you can't go directly to human resources?
14     A.  Yes.
15     Q.  Who told you that?
16     A.  I don't remember.
17     Q.  In any event, other than Bob Walker, do you
18  recall complaining to anyone else regarding this
19  alleged statement by Ms. Ono?
20     A.  I don't remember.
21     Q.  Was the statement that you just attributed
22  to Ms. Ono, did that take place before or after the
23  statement you attributed to her that she allegedly
24  made over the telephone?
25     A.  That was after.

Page 83

1      Q.  How long after?
2      A.  I can't tell you.
3      Q.  Any other comments or conduct that you
4   attribute to Ms. Ono that constituted race
5   discrimination?
6      A.  Not that I can think of right at the
7   moment.  It was ongoing, so it was so -- I don't
8   remember everything she said.
9      Q.  And you understand this is my only
10  opportunity to ask you to tell me what you believe
11  was discrimination by Ms. Ono?
12     A.  Yes.
13     Q.  The second person you identified as --
14  well, before I move on, have you told me everything
15  you can recall that you believe Ms. Ono said or did
16  that constituted race discrimination?
17     A.  I don't know if I've told you everything.
18  I've told you the things that I can remember as of
19  now.
20     Q.  The next person you identified as having
21  discriminated against you because of race was
22  Don Hansill.
23     A.  Yes, sir.
24     Q.  And first of all, who was Don Hansill?
25     A.  He was another usher.

Page 84

1      Q.  Coworker?
2      A.  Yes, sir.
3      Q.  How old was Mr. Hansill?
4      A.  I couldn't tell you.
5      Q.  Over 60?
6      A.  I don't know.
7      Q.  And I believe you said you weren't sure if
8   he was Hispanic or not.
9      A.  Yes, sir.
10     Q.  He walked with a cane, didn't he?
11     A.  No, sir.
12     Q.  Never saw him with a walking stick or a
13  cane?
14     A.  No, sir.
15     Q.  Never kicked a walking stick out from under
16  him?
17     A.  No, sir.
18     Q.  Go ahead.
19     A.  I'll let you finish.
20     Q.  No, no.  Do you know if he ever used one
21  for any period of time?
22     A.  I don't.  I think -- there you go.
23     Q.  Got it.  I was getting my individuals mixed
24  up.
25        What is it that Don Hansill said or did

Page 85

1   that you believe was race discrimination?
2      A.  One day we were working at the door.  We
3   had a rotation, and we were working at the door
4   accepting tickets.  And in that position, there were
5   just two people, because there were two doors that
6   were open.  So there were two people that ran that,
7   you know, that let the people in and accepted the
8   tickets.
9        That day I worked with him, this was in the
10  midst of, you know, after complaints had been made
11  about Sharon and whoever else.
12      Anyway, that day we were working at the
13  door.  And so he just strikes up a conversation about
14  back in the day, the Rat Pack.  And he was just
15  telling me about how Sammy Davis, Jr. was not allowed
16  to go into the Strip.  He had to stay somewhere else.
17  Go into the hotel -- I believe he said about the
18  Sahara.  He couldn't go into the Sahara.  He had to
19  stay -- he could perform there, but he wasn't able to
20  stay there because he was black.
21        And he told me that -- from there, the
22  conversation escalated.  And he said, well, you know,
23  he knew that -- he would hear me talking about a lot
24  of times my people are from, originally from
25  New Orleans.  And so he would say, "So that means yo

Joshua Hall   March 6, 2014
***Videotaped Deposition***

## Page 86

1   have some Creole in you, or "That means you have som
2   French in you."
3          And he said, yeah, and if anything, you
4   know, you know, "The French raped the blacks," and
5   that's why -- that's probably -- "you might want to
6   be thankful because otherwise you would be the color
7   of my shoe." His shoe was black.
8          And he said, "So you can tell," or
9   whatever, that, yeah, "yeah, you've got some type of
10  mixture in you."
11         And then he referred to another employee at
12  the Monte Carlo. He said, "Otherwise, you would be
13  that color." And this is besides the black shoe he
14  already said. He said it was an employee by the name
15  of Pal, which was very dark complected.
16     Q.  I'm sorry, what's the other employee's
17  name?
18     A.  Pal, P-a-l.
19     Q.  And is that first or last name?
20     A.  That's his first name.
21     Q.  What's his last name?
22     A.  I don't know.
23     Q.  And is Pal African-American?
24     A.  Yes. I don't believe -- I don't know
25  what -- I know he's from Africa, but I don't know.

## Page 87

1   Q.  He's dark-skinned?
2   A.  Yes, sir. And from -- did you want?
3   Q.  Sure, finish.
4   A.  So from there he says, so, yeah, so that's
5   why you've got a medium, you know, "You're like a
6   medium complexion. And that's why."
7   Q.  Before I follow up on this, any other
8   comments or conduct that you're attributing to
9   Don Hansill that you believe was race discrimination
10  towards you?
11     A.  Not that I can think of right now.
12     Q.  And when did this alleged conversation with
13  Don Hansill take place?
14     A.  I can't remember.
15     Q.  Was it in 2012?
16     A.  I don't remember.
17     Q.  Was it in 2011?
18         MS. SCHUETZ: Objection. Asked and
19  answered.
20         THE WITNESS: I don't remember.
21  BY MR. HICKS:
22     Q.  Was it in 2010?
23         MS. SCHUETZ: Same objection.
24         THE WITNESS: I don't remember.
25

## Page 88

1   BY MR. HICKS:
2      Q.  Was it in 2009?
3          MS. SCHUETZ: Same objection.
4          THE WITNESS: I can't remember.
5   BY MR. HICKS:
6      Q.  Was it in 2008?
7          MS. SCHUETZ: Same objection.
8          THE WITNESS: I can't remember.
9   BY MR. HICKS:
10     Q.  And was it Mr. Hansill who was working the
11  door with you accepting tickets when this
12  conversation allegedly took place?
13     A.  Yes.
14     Q.  Did you complain about this to anybody?
15     A.  I did.
16     Q.  Who did you complain to?
17     A.  I can't remember.
18     Q.  Do you remember what the person you
19  complained to said or did in response to your
20  complaint?
21     A.  I can't remember. I don't remember who I
22  told. I remember I informed.
23     Q.  Now, Mr. Hansill has since passed away,
24  correct?
25     A.  Correct.

## Page 89

1   Q.  Do you remember when he passed?
2   A.  I don't remember, because at that time when
3   he passed, no one in the theater -- like, there was
4   no communication between myself and any one of the
5   ushers. And I remember them -- I just remember
6   overhearing them say that, you know, he passed. And
7   I felt bad. I felt bad about that.
8   Q.  Why is that?
9   A.  Besides the fact of, you know, his comments
10  and discrimination that he did, his comments that he
11  made as far as racial comments, he did have a few
12  good points about him. He actually taught me how to
13  tie a tie.
14         So, you know, I mean, I don't want to see
15  anybody, you know, I do have a heart.
16     Q.  With regard -- Mr. Hansill was an older
17  gentleman, correct?
18     A.  Yes sir.
19     Q.  Old enough to be your father?
20     A.  Yes, sir.
21     Q.  Are you saying that he made these
22  statements to hurt you, or do you just think they
23  were ignorant statements on his part?
24     A.  I don't know.
25     Q.  Other than the statement that you have

Joshua Hall    March 6, 2014
***Videotaped Deposition***

Page 90

1  relayed to us already regarding Mr. Hansill, did you
2  and he otherwise get along okay?
3      A.  I didn't have -- I don't know where that
4  came from, that comment came from.  It sort of took
5  me for a loop.
6      Q.  It sounds like you got along.  I mean, he
7  showed you how to tie a tie.
8      A.  I guess we were decent.
9      Q.  Before I move on to the next person, I just
10 want to make sure, have you told me everything that
11 you attribute to Mr. Hansill that you believe
12 constituted race discrimination?
13     A.  At this point, what I can remember.
14     Q.  The next person you listed was Patty Perry.
15     A.  Yes, sir.
16     Q.  Who was Patty Perry?
17     A.  She was a bartender.
18     Q.  So she was not an usher?
19     A.  No, sir.  But she worked in the theater.
20     Q.  And so that I'm clear, there's a bar in the
21 theater, so when you first come in you can purchase a
22 beverage, or if you want to take, at a break, you can
23 come back and purchase a beverage and return to your
24 seat?
25     A.  Correct.

Page 91

1      Q.  And who did the bartenders report to?
2      A.  Food and beverage.
3      Q.  So they didn't report to the same
4  supervisors that you and the other ushers reported
5  to?
6      A.  No, sir.
7      Q.  And approximately how old was Patty Perry
8  at the time of these alleged events?
9      A.  I don't know.
10     Q.  Over or under 60?
11     A.  I don't know.
12     Q.  Over or under 20?  Well, I hope over since
13 she was working at a bar.
14         Over or under 30?
15     A.  I think she was over 30.
16     Q.  And what race was Patty Perry?
17     A.  Caucasian.
18     Q.  And what is it that you believe Patty Perry
19 said or did that constituted race discrimination?
20     A.  One day we were coming back from the EDR.
21 And she just out of the clear blue skies said:  I
22 want to tell you something.  You know when I first
23 saw you, she said, you know, when I first saw you
24 that -- and I'll say this, but I don't know, because
25 it might be racist, but I'm just going to say it.

Page 92

1  When I first saw you, my first thought is -- and I'm
2  not attracted to black men, but he's good looking for
3  a black man.
4      Q.  You mentioned that this statement was made
5  when you were coming back from the EDR.
6      A.  Correct.
7      Q.  That's the employee dining room?
8      A.  Yes, sir.
9      Q.  And who was present when this comment was
10 allegedly made?
11     A.  I know Claudia Carlson and Dawn Marie
12 Spain.
13     Q.  Did you tape record this conversation?
14     A.  I don't remember.
15     Q.  Did Ms. Carlson tape record this
16 conversation?
17     A.  I don't know.
18     Q.  And what did you say in response to
19 Patty Perry's comment that you just testified about?
20     A.  I looked at her and I told her that, you
21 know, I was offended.  I mean, I didn't really know
22 how to take that.
23     Q.  And what did she say?
24     A.  I don't remember.
25     Q.  Did she apologize?

Page 93

1      A.  I don't remember.
2      Q.  Was there any further discussion about that
3  comment between the two of you?
4      A.  I don't remember.
5      Q.  And did you and Ms. Carlson have any
6  subsequent conversation about that comment?
7      A.  I can't remember.
8      Q.  Did you complain about that comment to
9  anyone?
10     A.  I did.
11     Q.  To who?
12     A.  Human resources.  Or I think I went to
13 Jennifer first, Jennifer Klinefelter.  Which -- and
14 then from there, I guess she took it to human
15 resources.
16     Q.  Did human resources investigate it, to your
17 knowledge?
18     A.  I don't know.
19     Q.  You don't know one way or the other?
20     A.  I don't.
21         MR. HICKS:  We are at a point where we're
22 almost at the end of this tape.  So I don't see any
23 point in taking a break unless you-all want to, but
24 we do need to at least take a second to go off
25 camera.

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Joshua Hall   March 6, 2014
***Videotaped Deposition***

25 (Pages 94 to 97)

Page 94

1  THE WITNESS: If I can run to the rest
2  room. I've been holding it, because I knew I wanted
3  to wait.
4  MR. HICKS: Let's take a break, and then
5  we'll come back on the next tape.
6  THE VIDEOGRAPHER: This is the end of media
7  number two. We're going off the record at 11:18 a.m.
8  (A recess was taken from 11:18 a.m.
9  to 11:28 a.m.)
10  THE VIDEOGRAPHER: We're going back on the
11  record at 11:28 a.m., and this marks the beginning of
12  media number three.
13  You may proceed.
14  BY MR. HICKS:
15  Q. When Patty Perry allegedly made this remark
16  to you, do you recall jokingly responding, "You're
17  not bad looking for an old lady," or words to that
18  effect?
19  A. No, sir.
20  Q. Do you deny saying that?
21  A. I do.
22  Q. When Ms. Perry -- first of all, did you and
23  Ms. Perry get along generally?
24  A. We -- it was -- it was very -- I don't
25  know. It was a dry type of communication.

Page 95

1  Q. What do you mean "dry"?
2  A. We were colleagues, so we had to work
3  together. But, I mean, there wasn't much of a
4  relationship there.
5  Q. Do you think when Ms. Perry made this
6  comment, she was intending to insult you, or do you
7  think she was intending to compliment you by telling
8  you she thought you were a good looking man?
9  A. I don't know. I do know that if you're
10  going to tell somebody that they're good looking,
11  that the race shouldn't have anything to do with it.
12  Q. But you understand the question I'm asking,
13  right? Do you think she was trying to be hurtful and
14  mean-spirited, or do you think it was an awkward
15  compliment on her part?
16  MS. SCHUETZ: Objection. Asked and
17  answered.
18  You can answer.
19  THE WITNESS: I just know how I felt, and
20  it was hurtful.
21  BY MR. HICKS:
22  Q. Do you have any reason to believe she was
23  trying to be hurtful, or do you believe it was just
24  an awkward comment?
25  MS. SCHUETZ: Objection. Asked and

Page 96

1  answered.
2  You can answer.
3  THE WITNESS: I don't know.
4  BY MR. HICKS:
5  Q. I can't remember if I asked you this
6  question before the break, so I apologize if I did.
7  You indicated that you complained to Jennifer, and
8  then ultimately it ended up in front of human
9  resources?
10  A. Yes, sir.
11  Q. Do you know if human resources looked into
12  this?
13  A. I don't know.
14  Q. Don't know one way or the other?
15  A. I don't know.
16  Q. Anything else, other than what you've just
17  told us, that you believe Patty Perry said or did
18  that was discriminatory towards you based on your
19  race?
20  A. Another incident happened one day. We were
21  sitting on the couch. I don't know if it was -- I
22  believe it was in between the show. And we were
23  sitting on the couch. She was having a conversation
24  with Mary Jane. Mary -- she was talking about her
25  son, and I don't know if it was his girlfriend or I

Page 97

1  don't know who she was, but --
2  Q. Who was talking about whose son?
3  A. Patty was talking about Patty's son.
4  Q. Thank you.
5  A. And apparently one of his girlfriends.
6  I guess the girlfriend cheated on him with
7  a black man. And apparently the result of the --
8  there was a baby, I guess, from that.
9  So the baby was born. And she said that --
10  she was talking to Mary Jane, and she said, you know,
11  "The baby came out really dark." And, you know, I
12  just I'm just wondering if -- I can't remember -- I
13  think it was a boy, but I can't remember. I think
14  she said, "I just hope that he lightens up because,
15  you know, he came out the color of my table cloth."
16  And so she asked me, she then proceeded to
17  ask me, because I was sitting right there, if did I
18  know if the baby was going to lighten up.
19  And I told her that, you know, with -- I
20  told her I didn't know, you know. Typically with --
21  I just told her I didn't know. I can't remember from
22  there.
23  Q. You started to say "typically with." What
24  were you going to say?
25  A. I was just going to say that typically with

Joshua Hall   March 6, 2014
***Videotaped Deposition***

26 (Pages 98 to 101)

Page 98

1   mixed children, they range from colors complexions,
2   so I didn't know.
3       Q.   And did you tell her that?
4       A.   Yes, sir.
5       Q.   So you told her typically in instances
6   where children are biracial, sometimes they're
7   darker, sometimes they're lighter, who knows what's
8   going to happen?
9       A.   Yes, sir.
10          And I told her regardless, you know, if
11  it's your grandkid, you should love the kid
12  regardless. I don't see why that would matter.
13      Q.   Anything else that was said during that
14  conversation other than what you've already told us?
15      A.   She just ended it off and said, "Well, I
16  sure hope the baby lightens up."
17      Q.   When did this conversation allegedly take
18  place?
19      A.   I couldn't even tell you the date, and I
20  don't want to make something -- I don't remember the
21  date.
22      Q.   Was it in 2012?
23      A.   I can't remember.
24      Q.   Was it in 2011?
25      A.   I can't remember.

Page 99

1       Q.   Was it in 2010?
2       A.   I can't remember.
3       Q.   Was it in 2009?
4       A.   I can't remember.
5       Q.   Was it in 2008?
6       A.   I can't remember.
7       Q.   Was it in 2007?
8       MS. SCHUETZ:   Objection. Asked and
9   answered.
10          You can answer.
11      THE WITNESS:   I can't remember.
12  BY MR. HICKS:
13      Q.   Was it in 2006?
14      MS. SCHUETZ:   Objection. Asked and
15  answered.
16          You can answer.
17      THE WITNESS:   I can't remember.
18  BY MR. HICKS:
19      Q.   So who was present when this comment was
20  allegedly made, or this conversation allegedly took
21  place?
22      A.   Mary Jane.
23      Q.   Richardson?
24      A.   Yes. Myself. I can't remember if Claudia
25  was there or not. It was a few -- and there may have

Page 100

1   been some -- it was a few people there. I don't
2   remember. I know for a fact that it was myself,
3   Mary Jane and Patty, but I don't remember right now
4   who else.
5       Q.   Did you complain about this comment to
6   anyone?
7       A.   I did.
8       Q.   To who?
9       A.   I believe it was Jennifer.
10      Q.   Jennifer who?
11      A.   Klinefelter.
12      Q.   And do you know if she followed up on it?
13      A.   I don't.
14      Q.   Do you know if human resources looked into
15  it?
16      A.   I don't.
17      Q.   And how long after this conversation
18  allegedly took place did you complain?
19      A.   I can't remember.
20      Q.   Was it more or less than six months?
21      A.   I can't remember.
22      Q.   Was it more or less than a year?
23      A.   I can't remember.
24      Q.   Going back to the previous comment you had
25  told us about where Patty Perry allegedly said you

Page 101

1   were good looking for a black man, or words to that
2   effect.
3       A.   Yes.
4       Q.   You indicated that you complained to
5   Jennifer, who took it to human resources?
6       A.   Yes.
7       Q.   How long after that comment was allegedly
8   made did you complain to human resources -- or strike
9   that.
10          How long after that comment was made did
11  you complain to Jennifer?
12      A.   I can't remember.
13      Q.   Was it more or less than six months?
14      A.   I can't remember.
15      Q.   Was it more or less than a year?
16      A.   I can't remember.
17      Q.   Was it more or less than two years?
18      A.   I can't remember.
19      Q.   Did you tape record this conversation that
20  took place on the couch where you, Mary Jane
21  Richardson and Patty were present?
22      A.   I can't remember.
23      Q.   Anything else that you're accusing
24  Patty Perry of saying or doing that constituted race
25  discrimination?

Joshua Hall   March 6, 2014
***Videotaped Deposition***

27 (Pages 102 to 105)

Page 102

1     A.  Yes, sir.
2     Q.  Tell us about that.
3     A.  One day, it was myself and Claudia Carlson
4  inside of the break room.  And the break room and the
5  bar are about, I don't know, they're in close
6  proximity to each other.
7          She was -- Patty was talking to Shaldale,
8  which was the other bartender.
9     Q.  Patty Perry?
10    A.  Patty Perry was talking to Shaldale
11 Diamond.  And I was sitting down.  And from the bar
12 in the break room where the chairs were located you
13 can see into the break room.
14          And so Patty Perry was looking at me and
15 talking to Shaldale, and making sure -- and then
16 looking back at me, and she starts saying, "You know,
17 I just love that part of Frank Caliendo's comedy
18 where he mentions Swartzin-nigger."  And she said,
19 "Isn't that just so funny, how he says
20 Swartzin-nigger?"
21          And so then she looks back over at me.  And
22 she just said, "I just think he's so funny."  And
23 then she looked back over at me and started laughing;
24 her and Shaldale both started laughing.
25    Q.  So first let's get an idea of where the bar

Page 103

1  is --
2     A.  Yes, sir.
3     Q.  -- in relationship to the break room.
4          If you were looking at the bar, would the
5  break room be to your left or to your right?
6     A.  If you were at the bar?
7     Q.  Yeah, if you were facing the bar as a
8  customer, let's say.  You walked up and you were
9  facing the bar.
10    A.  The break room would be to your right.
11    Q.  And how far away from where -- well, where
12 were Patty Perry and Shaldale Diamond standing when
13 this conversation allegedly took place?
14    A.  Behind the bar.
15    Q.  And how tall is the bar?
16    A.  I don't know the exact measurement.
17    Q.  Does it go up to about waist high?
18    A.  I couldn't tell you.
19    Q.  And who was in the break room at the time
20 this conversation allegedly took place?
21    A.  Claudia and myself.
22    Q.  Anyone else?
23    A.  That was it.
24    Q.  And from where Patty and Shaldale Diamond
25 were standing, is there a clear line of sight into

Page 104

1  the break room?
2     A.  Yes, sir.
3     Q.  Were you standing or sitting in the break
4  room?
5     A.  Sitting down.
6     Q.  Were you facing the door and, therefore,
7  facing Patty and Shaldale?
8     A.  Yes, sir.
9     Q.  And where was Ms. Carlson facing?
10    A.  I can't remember where she was sitting.
11    Q.  Were you and Ms. Carlson just talking on
12 your break when this took place?
13    A.  To each other?
14    Q.  Yes.
15    A.  Yes, sir.
16    Q.  So is it fair to say Ms. Carlson was facing
17 you?
18    A.  No, sir.  I believe she was sitting on the
19 side of me.
20    Q.  So you think you and Ms. Carlson were
21 having a conversation where you were sitting right
22 next to each other?
23    A.  Yes, sir.
24    Q.  And you were facing -- both facing the
25 door?

Page 105

1     A.  Correct.
2     Q.  Just out of curiosity, why would you being
3  sitting at a table having a conversation sitting
4  right next to each other as opposed to across from
5  each other?
6     A.  Who said anything about a table?
7     Q.  Good point.  Was there a table?
8     A.  No, sir.
9     Q.  So why would you be sitting right next to
10 each other in chairs -- oh, you were on the couch?
11    A.  No.  The way the break room was designed is
12 there were two chairs by the locker that were like
13 these are, like right next to, like me and her.
14    Q.  Okay.
15    A.  Okay?  And then there was another chair on
16 the other side like where you're sitting.
17    Q.  Okay.
18    A.  Okay?  Now, where you're sitting, let's say
19 for instance, that's when you're coming into the
20 break room, okay?  And we were sitting, me and
21 Claudia; we were sitting as you were going to leave
22 to exit.  So that's why you can see the bar.
23    Q.  And you're saying that you and Claudia were
24 sitting right next to each other?
25    A.  Right beside each other, correct.

Joshua Hall   March 6, 2014
***Videotaped Deposition***

28  (Pages 106 to 109)

Page 106

1    Q.  And there was nobody else in the break
2  room?
3    A.  No, sir.
4    Q.  And how far is it from where Patty Perry
5  and Shaldale Diamond were standing to where you and
6  Ms. Carlson were sitting?
7    A.  I don't know the exact measurement.  I do
8  know that you can easily have a conversation.
9    Q.  What do you mean?
10    A.  From the bar, and hear each other.
11    Q.  I guess that depends on how good somebody's
12  hearing is.
13    A.  You got a point.
14    Q.  Depends on how much background noise there
15  might be.
16    A.  Everyone was in the showroom, and the doors
17  were closed.
18    Q.  Was it more or less than 100 feet?
19    A.  I couldn't tell you.  I don't know the
20  measurement.
21    Q.  And is it your testimony that you could
22  hear their entire conversation?
23    A.  Yes, sir.
24    Q.  Were you part of that conversation?
25    A.  No, sir.

Page 107

1    Let me retrack.  I couldn't hear their
2  entire conversation.  I just heard the part when
3  she -- I couldn't hear like -- I heard parts that
4  they wanted me to hear, I guess you could say.
5    Q.  You couldn't hear the entire conversation?
6    A.  The way that they were talking is when she
7  raised her voice, when she said that particular part.
8  She said, "Don't you just love that part of Frank
9  Caliendo," as she was looking in.  So it was like --
10  it was a few -- it was when she -- how can I explain
11  it?
12    Her tone, she raised her tone when -- the
13  part for me to hear when she wanted me to hear it.
14    Q.  When did this conversation take place?
15    A.  I don't remember.
16    Q.  Was it 2012?
17    A.  I don't remember.
18    Q.  Was it 2011?
19    MS. SCHUETZ:  Objection.  Asked and
20  answered.
21    THE WITNESS:  I don't remember.
22  BY MR. HICKS:
23    Q.  Was it 2010?
24    MS. SCHUETZ:  Same objection.
25    THE WITNESS:  I don't remember.

Page 108

1  BY MR. HICKS:
2    Q.  Was it 2009?
3    MS. SCHUETZ:  Same objection.
4    THE WITNESS:  I don't remember.
5  BY MR. HICKS:
6    Q.  Was it 2008?
7    MS. SCHUETZ:  Same objection.
8    THE WITNESS:  I don't remember.
9  BY MR. HICKS:
10    Q.  Was it 2007?
11    MS. SCHUETZ:  Same objection.
12    THE WITNESS:  I don't remember.
13  BY MR. HICKS:
14    Q.  Was it 2006?
15    MS. SCHUETZ:  Same objection.
16    THE WITNESS:  I don't remember.
17  BY MR. HICKS:
18    Q.  And did you say anything in response to
19  this alleged -- these alleged comments?
20    A.  No, sir.
21    Q.  Did you complain to -- strike that.
22    Did you and Ms. Carlson discuss these
23  comments at that time?
24    A.  Yes, sir.
25    Q.  Did you tape record these comments?

Page 109

1    A.  I don't remember.
2    Q.  Did Ms. Carlson tape record these comments?
3    A.  I don't know.  I can't remember.
4    Q.  What did you and Ms. Carlson discuss as it
5  related to these comments?
6    A.  Just couldn't believe that she was saying
7  that.
8    Q.  What was said?  Anything?  Between the two
9  of you, that is, you and Ms. Carlson?
10    A.  Not much.  Claudia just looked at me and
11  she -- I don't remember what she said.  But she just
12  looked at me and she came up and she said don't --
13  just don't even pay attention.
14    Q.  And did you complain about these comments?
15    A.  Yes, sir.
16    Q.  To who?
17    A.  I remember it was one of the supervisors.
18  I can't remember which one.
19    Q.  How long after this incident did you
20  complain?
21    A.  I don't remember.
22    Q.  Was it within six months?
23    A.  I don't remember.
24    Q.  Was it within a year?
25    A.  I don't remember.

Joshua Hall   March 6, 2014
***Videotaped Deposition***

Page 122

1    Q. And she said you need to hear something, or
2 words to that effect?
3    A. It was something like that.
4    Q. And did she have the recording with her
5 when she said that?
6    A. I believe she did.
7    Q. And was it on her iPhone?
8    A. I don't know.
9    Q. Do you have any recollection of it being on
10 something other than her iPhone?
11    A. No, sir.
12    Q. And did you say what is it, or ask any
13 questions before she played it?
14    A. I can't remember.
15    Q. So you may have asked her what is it, what
16 am I going to be listening to, you just don't
17 remember one way or the other?
18    A. I don't remember.
19    Q. Do you know if she told you here's what's
20 on the tape?
21    A. I can't remember.
22    Q. So you don't remember one way or another
23 whether or not she said I heard them say "f'ing N" on
24 this tape, you don't know?
25    A. I can't remember. It was so long ago, and

Page 123

1 there were so many different events that had taken
2 place besides that.
3    Q. So I'm going to play the tape, and what I
4 would like you to do is tell me when we get to the
5 part where you believe the phrase "f'ing N" is used.
6 Okay?
7    A. Yes.
8    Q. Okay. Before we do that, though, do you
9 recall what the conversation was between Patty Perry
10 and Sharon Ono that was being secretly tape recorded?
11 Do you know what the conversation was about
12 immediately before and immediately after the part
13 where you believe you hear "f'ing N"?
14    A. I couldn't tell you verbatim what they were
15 talking about.
16    Q. So what I want you to do today when I let
17 you listen to this, is listen as carefully as you
18 can, and hopefully it will refresh your recollection
19 as to what you believe they were talking about
20 immediately before and immediately after you believe
21 you heard that statement. Okay?
22    A. Okay. Can you repeat that real quick?
23    Q. Sure. As I understand your testimony, you
24 believe you heard reference to "f'ing N" during this
25 tape, correct?

Page 124

1    A. Yes.
2    Q. And you've already testified you don't
3 recall your name specifically being referenced,
4 right?
5    A. Yes.
6    Q. So what I'm asking you now is when you
7 listen to this tape, I want -- I'm going to ask you
8 when you're done, what is it that you believe they
9 were talking about before the "f'ing N" comment, or
10 the alleged "f'ing N" comment, and what is it that
11 you believe they were talking about after the alleged
12 "f'ing N" comment, okay?
13    A. Okay.
14    Q. So first things first. I'm going to play
15 it, and you tell me when you think you -- you tell me
16 when you hear what you believe to be the "f'ing N"
17 comment.
18    A. Okay.
19        (Playing tape.)
20        THE WITNESS: Can you rewind it a little
21 bit and turn it up, turn the volume up?
22 BY MR. HICKS:
23    Q. It's up as high as it will go. So I'm
24 going to rewind it a little bit.
25    A. That's where it starts, where she says bad

Page 125

1 things about this place or something to that sort.
2    Q. So you think you just heard it a second
3 ago?
4    A. No, no, no. I haven't heard it yet.
5    Q. My apologies.
6    A. But I'm just saying this is the start of
7 when things...
8    Q. What I want you to do is tell me when you
9 think you hear it. I'm going to pick up right where
10 we left off.
11    A. Okay.
12        (Playing tape.)
13        THE WITNESS: Can you start it again?
14 BY MR. HICKS:
15    Q. Sure. So for the record, you haven't heard
16 it? You didn't hear it in that?
17    A. This -- I don't -- this -- start it again.
18    Q. Well, let me make sure I understand. Did
19 you hear it on what we just listened to?
20    A. On this, I have to hear it again to make my
21 determination. Because again, it's been so long to
22 where I have to hear it again.
23    Q. That's fine, and I'll let you listen to it
24 again. But at this point, you haven't heard it,
25 correct?

Joshua Hall    March 6, 2014
***Videotaped Deposition***

33 (Pages 126 to 129)

### Page 126

1    A. I don't know.
2    Q. And I'll play it again for you in a minute.
3    Let me just ask a couple of questions.
4          You can hear parts of the discussion that
5    these two women are having, correct?
6    A. Yes.
7    Q. And can you tell -- could you catch any of
8    the substance of the topics that they were
9    discussing?
10    A. I don't know. I don't know.
11    Q. For example, earlier did you hear them
12    talking about Earth Day or Moon Day or something that
13    was in April? Did you hear that?
14    A. No.
15    Q. And did you hear them talking about
16    something to do with their hair, that it washes right
17    out? Did you hear that discussion?
18    A. I heard her say something about her hair.
19    Q. And did you hear them discussing a condo in
20    Hawaii, and spending the month of August there and
21    retirement? Did you hear that?
22    A. Again, you would have to play it again,
23    because some of these things that you're -- I mean, I
24    was listening for a specific part. I remember -- I
25    don't know if this -- this is the same recording.

### Page 127

1    Q. That's my understanding.
2    A. Because I don't know if this is the same
3    recording.
4    Q. Okay. And we can figure that out later.
5    A. Okay.
6    Q. I can play it one more time, if you want?
7    A. Okay.
8    Q. If you're convinced you've --
9    A. Yeah, because this, I don't know...
10    MS. SCHUETZ: Counsel, for --
11    MR. HICKS: No, no, no.
12    MS. SCHUETZ: I have a question for you.
13    MR. HICKS: No. I --
14    MS. SCHUETZ: Can you identify on the
15    record which recording you're playing, please? So
16    that we don't have any confusion. You haven't
17    identified it. That's all.
18    MR. HICKS: How am I supposed to -- by what
19    measure am I supposed to identify this?
20    THE WITNESS: For example, all of the
21    recordings produced by plaintiff had titles in
22    numerical order.
23    MR. HICKS: This is number 13.
24    MS. SCHUETZ: Thank you. That's all I
25    wanted to know.

### Page 128

1    MR. HICKS: I didn't know if our numbering
2    was the same as your numbering.
3    MS. SCHUETZ: Okay.
4    BY MR. HICKS:
5    Q. Anyway, I'll play it again, and I won't
6    talk so I don't interrupt your thought process.
7    (Playing tape.)
8    THE WITNESS: Right there. That was it.
9    This was it.
10    BY MR. HICKS:
11    Q. So I'll replay that in a minute.
12    Immediately before that, there was a discussion about
13    Earth Day and Moon Day and that being in April, did
14    you hear that?
15    A. I heard her saying something about that.
16    What keyed me in on it is when she said, "I've been
17    hearing some bad things about this place."
18    Q. You think you just heard that?
19    A. Play it again.
20    Q. Okay. And I won't belabor it. I just want
21    to make sure I am looking at the tape that you were
22    referring to, and now it sounds like you're positive
23    this is the tape?
24    A. Oh, yeah.
25    Q. Okay.

### Page 129

1    (Playing Video.)
2    A. "I've been hearing some bad news about this
3    place." Right there. Again.
4    Q. I just want to make sure we're talking
5    about the same tape.
6    A. That's it.
7    Q. All right. So let's pick up where we left
8    off, which was you've already told me everything
9    about this and your complaint after this was played
10    for you, correct?
11    A. Correct.
12    Q. And the person who you believe was speaking
13    was Patty Perry?
14    A. I know that was Patty.
15    Q. So tell me, is there anything else, other
16    than what you've already testified to, that you
17    believe Patty Perry said or did that was racially
18    discriminatory?
19    A. At this point, I can't think of -- at this
20    point, my mind is -- she would always say things, but
21    I can't think of -- as far as specifics go, that's
22    what I can think of at this point.
23    Q. And you understand that this deposition is
24    my opportunity to ask you what you remember, and your
25    opportunity to share with me what you recall.

Joshua Hall   March 6, 2014
***Videotaped Deposition***

### Page 130

1   correct?
2       A.  Correct.
3       Q.  You understand I won't most likely be able
4   to take another deposition of you.  You understand
5   that, right?
6       A.  Yeah.
7       Q.  So let's go to the next person you
8   identified as having, in your opinion, discriminated
9   against you because of your race.
10          Ms. Diamond, Shaldale Diamond.  Do you
11  allege that Shaldale Diamond discriminated against
12  you by saying or doing something based on your race?
13      A.  Shaldale never really just out front said
14  something like Sharon and Patty and Joey and Don.
15  She was more so of an instigator.
16          So I can't -- the only time that I can
17  remember with her being a part of that was more so,
18  as far as a racial comment, in your opinion, back and forth
19  with Patty.  And Patty was actually the vocal one.
20          So I can't remember Shaldale just
21  actually -- I don't remember right now her telling me
22  anything racial.
23      Q.  And I just want to make sure we're clear
24  before I move on to the next person.
25      A.  Yeah, you can move on to the next one.

### Page 131

1       Q.  So there's nothing that Shaldale Diamond
2   said or did that you're accusing her of being
3   racially discriminatory towards you; is that
4   accurate?
5       A.  Not that I can think of right now.  She was
6   just more so comments.  She would say like brain
7   damage, brain damage, brain damage.  I don't know
8   what that meant, so I don't know what she meant by
9   that.
10      Q.  And you understand that my questions go to
11  alleged race based --
12      A.  Exactly.  Not that I can think of now.
13      Q.  Because you and I kind of cut each other
14  off on the sentences, I'm going to ask you again.  I
15  know what your answer is, but is there anything that
16  you're accusing Shaldale Diamond of saying or doing
17  that constituted race discrimination?
18      A.  No, sir.
19      Q.  The next person you listed was Jose Guzman.
20          By the way, what is Ms. Diamond's race?
21      A.  Caucasian.
22      Q.  Jose Guzman, what position did he hold?
23      A.  He was an usher.
24      Q.  And do you allege that Mr. Guzman engaged
25  in conduct or made comments constituting race

### Page 132

1   discrimination?
2       A.  Without a doubt.
3       Q.  And tell me what it is that you believe
4   Mr. Guzman said or did that constituted race
5   discrimination.
6       A.  When he first started working there, he --
7   I remember he came into the break room, and he
8   said -- he had met me, and I can't remember what was
9   going on, but I believe we were getting off that day
10  or something.  And this was the first day -- he had
11  started -- I don't know when he started, but I just
12  remember we were in the break room.
13          And he saw me, and for some reason I had my
14  coat on, and it was a leather jacket.  And he was
15  just like, you know -- this was later on, he told me,
16  he said, you know:  When I first started and I saw
17  you I was thinking, you know, you thought you were
18  all like cool or something.  He said to that effect.
19          And he said that but then once you started
20  talking, he said:  "I said, oh, okay, he's one of
21  those Wayne Brady's."
22          And so after that, I asked him, I said
23  well, "What do you mean Wayne Brady's?"
24          He said:  "You know, well spoken, fair
25  skinned.  You know, back in the day they used to

### Page 133

1   call them" -- and then he told me, he whispered, he
2   said:  "Back in the day they used to call them house
3   niggers.  The presentable blacks, the hireable
4   blacks."
5           And I said oh?  Okay.  And I was -- I just
6   remember that.
7       Q.  When did this conversation allegedly take
8   place?
9       A.  I can't remember the year or the month.
10      Q.  Was it 2012?
11      A.  I don't remember.
12      Q.  Was it 2011?
13      A.  I can't remember.
14      Q.  Was it 2010?
15      A.  I can't remember.
16      Q.  Was it 2009?
17      A.  I can't remember.
18      Q.  Was it 2008?
19      A.  I can't remember.
20      Q.  Who was present when this conversation
21  allegedly took place?
22      A.  I can't remember.
23      Q.  Is there anybody that you can remember
24  being there that could confirm or deny this
25  conversation?

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Joshua Hall   March 6, 2014
***Videotaped Deposition***

Page 134

1    A. I know Claudia was always around. She was
2 there that particular time. But I don't know anybody
3 else who was there at that time.
4        MR. HICKS: Can you read that answer back.
5        (The record was read as requested.)
6 BY MR. HICKS:
7    Q. So you're saying that Claudia was present
8 when this conversation took place?
9    A. Yes.
10   Q. Anybody else other than your co-plaintiff
11 who was allegedly present during this conversation?
12   A. That particular time, I can't remember.
13   Q. And did you secretly tape record this
14 conversation?
15   A. I can't remember.
16   Q. Did Ms. Carlson secretly tape record this
17 conversation?
18   A. I can't remember.
19   Q. Do you do a Wayne Brady impression?
20   A. A Wayne Brady impression?
21   Q. Yes.
22   A. What do you mean?
23   Q. What's ambiguous about my question? Did
24 you ever do a Wayne Brady impression?
25   A. I don't even know what a Wayne Brady

Page 135

1 impression is.
2    Q. All right. Did you ever impersonate
3 Wayne Brady, or pretend like you were talking like
4 Wayne Brady?
5    A. No, sir.
6    Q. So if somebody testified under oath that
7 you jokingly pretended like you were Wayne Brady and
8 tried to impersonate him, would they be lying?
9    A. Yes, sir.
10   Q. Now, you indicated that Mr. Guzman used the
11 phrase "house N," correct?
12   A. Correct.
13   Q. Did you ever use that phrase?
14   A. No, sir.
15   Q. So you've never used that phrase in a
16 discussion about slavery in the United States?
17   A. I don't remember ever having that
18 conversation.
19   Q. So you're denying that you've ever used the
20 phrase "house N" in the context of a historical
21 discussion about slavey? Are you denying that you
22 ever did that?
23   A. I can't say that. I mean, in history or
24 something, I mean, I don't know. I can't -- that's
25 something I can't answer. I don't recall. I'll say.

Page 136

1    Q. So you may have used the phrase "house N,"
2 you may not, you just don't remember, correct?
3    A. I don't remember ever using that unless I
4 was repeating what I was told from Joey.
5    Q. So it's your testimony that the only time
6 you would have used the phrase "house N" would be if
7 you were repeating what Mr. Guzman had said?
8    A. I can't really answer. I don't really know
9 what you mean. Can you clarify that a little bit
10 more? Because I don't know. What do you mean like
11 have I ever used that?
12   Q. Sure. I'm going to have witnesses who
13 testify that you're the one that used that phrase.
14   A. Okay.
15   Q. Have you ever used the phrase "house N"?
16   A. Oh, no, absolutely not.
17   Q. Do you use the phrase "N"? Do you use the
18 word "nigger" or "nigga"?
19   A. Maybe when I was younger, like in a --
20 like -- there's two ways that you can use that word.
21   Q. I don't use it at all by the way.
22   A. I don't anymore, you know, now that I'm
23 older and I know the history behind that name.
24   Q. A lot of men died to protect -- to object
25 to the use of that name, right?

Page 137

1    A. Exactly. And --
2    Q. And women.
3    A. Exactly. And I don't even call my personal
4 friends that because I feel that it's disrespectful.
5        Can you repeat it?
6    Q. So you've used the word "nigger" when you
7 were younger, but you've since recognized that it's a
8 sign of disrespect and you don't use it at all?
9    A. Never nigger, but I've used "nigga" before.
10   Q. Let's get back to this conversation that
11 you allegedly had with Mr. Guzman.
12       If I understand what you're saying, and
13 correct me if I misstate it, Mr. Guzman said to you
14 that when he first started, he thought you thought
15 you were all that?
16   A. He said more so like all cool, so I don't
17 know what he meant by it.
18   Q. But the conversation you just relayed to us
19 is one that you had with Mr. Guzman after you had
20 been working together and after you had gotten to
21 know each other. It wasn't something that took place
22 the first day, right?
23   A. It didn't take place the first day. I
24 don't know if we -- I can't remember when exactly it
25 took place.

Joshua Hall   March 6, 2014
***Videotaped Deposition***

36 (Pages 138 to 141)

### Page 138

1    Q. But he said to you, but when he got to know
2  you, he formed a different opinion of you than he had
3  when he first met you?
4    A. He said once I started talking.
5    Q. Okay. So when he made this comment to you
6  that he thought you were well spoken, do you think he
7  was trying to insult you?
8    A. I don't know what he was trying to do.
9    Q. When you and him had this conversation that
10  you just relayed to us, was he being aggressive with
11  you?
12    A. I can't remember.
13    Q. Was he being polite, notwithstanding the
14  context of the conversation?
15    A. I don't remember.
16    Q. Did you get the impression he was trying to
17  be complimentary, notwithstanding the awkward attempt
18  to compliment you?
19    A. I don't know what I thought at that time.
20  I do know that in a later conversation, he explained
21  to me or whatever that he was a racist, and that he
22  hung out with a friend by the name of Justin. One of
23  his friends was very racist. And --
24    Q. Let's stick to this conversation for now,
25  and we'll get to the one that you're talking about

### Page 139

1  now.
2    A. Okay.
3    Q. So I'm just talking about during this first
4  conversation, did you get the impression he was
5  trying to insult you?
6    A. I don't know what he was trying to do.
7    Q. Fair enough.
8      Did you say anything to him after he made
9  these comments?
10    A. I just told him that, you know, if the only
11  conversation that me and him can have is, it just
12  seemed like every time he had a conversation with me
13  it was about race. And I just told him if that's all
14  that we can talk about, we don't need to talk.
15    Q. Did you say that during this conversation
16  that we're talking about now, or was that later?
17    A. I can't remember.
18    Q. Tell me if there was anything else said by
19  you or Mr. Guzman during this conversation that we're
20  talking about where he stated that you were well
21  spoken, he referred to you as Wayne Brady, et cetera.
22  Anything else that was said other than what you've
23  already testified to that you can remember?
24    A. I can't remember.
25    Q. And did you discuss it with Ms. Carlson?

### Page 140

1    A. I believe she was there.
2    Q. I mean, when Mr. Guzman walked away, for
3  example, did you guys discuss it?
4    A. I can't remember.
5    Q. How old was Mr. Guzman at the time?
6    A. I don't know.
7    Q. Is he around your age?
8    A. He's younger than me.
9    Q. Did you complain about this at that time?
10    A. Yes. I believe I did.
11    Q. To who?
12    A. My supervisor. I believe -- I can't
13  remember which one again. It was somebody, but I
14  wrote a voluntary statement.
15    Q. And did you complain at or around the time
16  that Mr. Guzman made this statement, or did you
17  complain sometime later?
18    A. I can't remember.
19    Q. Did you complain within six months of this
20  statement?
21    A. I can't remember.
22    Q. Did you complain within a year of this
23  statement?
24    A. I can't remember.
25    Q. Did you complain within two years of this

### Page 141

1  statement?
2    A. I can't remember.
3    Q. And do you know -- do you have any
4  recollection as to -- well, you already testified.
5  You don't remember who you complained to, right?
6    A. It was one of the supervisors.
7    Q. Do you recall who?
8    A. No, sir.
9    Q. Anything else other than what you've
10  testified to that you believe Jose Guzman said or did
11  that was racially discriminatory or harassing?
12    A. He would just -- I mean, there was so many
13  times and things that he would say like racial
14  comments.
15    Q. And that's what I'm asking you about. I
16  want you to tell me what you specifically recall.
17    A. I don't know. They just -- he -- it was
18  just everyday conversation. I mean, with him, every
19  time I spoke with him, it would always be something
20  about a nigger or about black people.
21      One time we were walking to the car in the
22  parking garage, and there were a group of black dudes
23  that were walking the same direction. And he started
24  rolling up his sleeves. And I'm looking at him like
25  what's going on? You know, I didn't know what was

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Joshua Hall   March 6, 2014
***Videotaped Deposition***

Page 142

1  going on.
2      And he said that -- I asked him, I said are
3  you okay? And he said: Oh, it's just when I was in
4  school, like black dudes used to -- he said that
5  black dudes used to bully him. And that he just --
6  he just doesn't like when it's a big group of them
7  because he's just like -- and we were going to get on
8  the elevator, but he didn't want to get on the same
9  elevator as them.
10     And he said but, yeah, like -- and I said,
11  well, you know, I'm black, too. I don't understand
12  like why you're not -- and he said well, you're
13  different. You know, you're one of those Wayne
14  Brady's again. So whenever he would get a chance.
15     Q. So you said that every time you spoke with
16  Mr. Guzman he would use the "N" word or make some
17  racially derogatory remark, correct?
18     A. Almost every conversation until I had to
19  stop him. I would always -- I just told him we
20  shouldn't talk if this is what -- if this is the only
21  way we can communicate, if race has to come up,
22  because I'm just not interested.
23     Q. How long -- how many months or weeks or
24  years is it that you're alleging Mr. Guzman almost
25  every time when he saw you he would say something

Page 143

1  racially derogatory? How long did that go on before
2  you said something to him that we can't talk?
3     A. I can't remember.
4     Q. Was it more or less than a year?
5     A. I can't remember.
6     Q. Was it more or less than two years?
7     A. I can't remember.
8     Q. More or less than three years?
9     A. It was throughout his employment. So I
10  don't know how long he worked there, but I mean
11  throughout his employment. Whenever -- we worked
12  together, so every time -- I don't know how many
13  times I would see him.
14     Q. Was it more or less than three years?
15     A. I don't know.
16     Q. So during this time period that almost
17  every time you saw Mr. Guzman he allegedly made a
18  racially derogatory remark, did you ever secretly
19  tape record him and get those remarks on tape?
20     A. I don't know.
21     Q. Well, you were tape recording these
22  conversations for the purpose of proving that there
23  was race discrimination, correct?
24     A. Correct.
25     Q. And if almost every time Mr. Guzman was in

Page 144

1  your presence he made a racially derogatory remark,
2  it seems like it would make sense for you to try to
3  tape record him, correct?
4     A. Correct.
5     Q. And as you sit here today, do you have any
6  specific recollection of capturing on tape a racially
7  derogatory remark by Mr. Guzman?
8     A. I know that at some point they found out
9  that we were taping. And by that time, it was very
10  hard to catch anything like that because they knew we
11  were recording them.
12     Q. I'm going to ask my question again because
13  I didn't get an answer.
14     To your knowledge, did you ever tape record
15  Mr. Guzman making any racially derogatory remarks?
16     A. I don't remember.
17     Q. Let's go to this last statement that you
18  attributed to, or this last conversation that you
19  attributed to Mr. Guzman.
20     It's your testimony that you and he were
21  walking in a parking lot?
22     A. Yes.
23     Q. And where was that?
24     A. Monte Carlo.
25     Q. And it's your testimony that a group of

Page 145

1  African-American men were also in the parking lot?
2     A. Correct. They were headed over -- they
3  were in the parking lot walking the same way, same
4  direction.
5     Q. How many gentlemen were there?
6     A. I can't remember the exact number. It was
7  a group, maybe -- it was about five, six.
8     Q. And it's your testimony that you recall
9  Mr. Guzman sort of rolling up his sleeves?
10     A. Yes, sir.
11     Q. And you asked him if he was okay?
12     A. Yes, sir.
13     Q. And that's when he told you that when he
14  was a kid in school, he used to get bullied by a
15  group of African-American boys?
16     A. I don't remember if he said a group or an
17  individual. I don't remember. I just know he said
18  it was -- he used to get bullied by black dudes.
19     Q. And he told you he was uncomfortable
20  getting on the elevator with a whole bunch of other
21  African-American men as a result of this experience?
22     A. We were going to get on the elevator. He
23  said he was just -- when he sees a group, he gets --
24  he's uncomfortable.
25     Q. And you said, well, I'm black or I'm

Joshua Hall    March 6, 2014
***Videotaped Deposition***

Page 146

1  African-American.  And then he said, well, you're
2  different?
3      A.  Correct.
4      Q.  So --
5      A.  Well, wait.  He also said something else.
6      Q.  He said you're one of those Wayne Brady's?
7      A.  Correct.
8      Q.  So he wasn't -- well, let me ask you this:
9  If he was bullied by a group of African-American boys
10  when he was a kid, I mean, are you saying he
11  shouldn't be nervous?  I'm not sure what -- were you
12  passing judgment on him?
13          MS. SCHUETZ:  Object to the form.
14          You can answer.
15          MR. HICKS:  Sure.  I'll rephrase the
16  question.
17  BY MR. HICKS:
18      Q.  When he relayed this to you, did you sense
19  that he was pointing the finger at you or saying he
20  was uncomfortable with you?
21      A.  Well, he said that he was okay with me
22  because I was one of those Wayne Brady's.
23      Q.  So was there any further discussion between
24  you and Mr. Guzman about this?
25      A.  I can't remember.

Page 147

1      Q.  Did you complain about this?
2      A.  I did.
3      Q.  To who did you complain to?
4      A.  I do not remember.  I don't remember.
5      Q.  And did you complain immediately after this
6  conversation?
7      A.  I can't remember.
8      Q.  Did you complain within six months of this
9  conversation?
10      A.  It's been a very long time, sir.  And I
11  don't remember exact details.
12      Q.  Did you complain within six months of this
13  conversation?
14      A.  I can't remember.
15      Q.  Did you complain within a year of this
16  conversation?
17      A.  I can't remember.
18      Q.  Did you complain within two years of this
19  conversation?
20      A.  I can't remember.
21      Q.  And when did this conversation allegedly
22  take place?
23      A.  I don't remember the exact date.
24      Q.  Was it the year 2012?
25      A.  I can't remember.

Page 148

1      Q.  Was it the year 2011?
2      A.  I don't remember.
3      Q.  Was it the year 2010?
4      A.  I don't remember.
5      Q.  Was it the year 2009?
6      A.  I don't even remember.
7      Q.  Was it the year 2008?
8      A.  I can't remember, and I don't want to say
9  the wrong date.
10      Q.  Was it in 2007?
11      A.  I know for a fact it wasn't then because he
12  didn't work there.
13      Q.  Now, you said you complained.  Did you
14  complain immediately?
15      A.  I can't remember.
16      Q.  Anything else that you're alleging that
17  Jose Guzman said or did that constituted race
18  discrimination towards you or anyone else?
19      A.  It was ongoing.  So I can't -- I can't even
20  remember all the things he said.  But the ones that,
21  the things that I do remember right now, I've told
22  you.
23      Q.  Anyone else, other than the people that
24  we've talked about that you're alleging discriminated
25  against you on the basis of your race, other than the

Page 149

1  people you've already told me about?
2      A.  I believe Sherry Ohanian did.
3      Q.  Now, you didn't name her originally.  Why
4  are you adding her now?
5      A.  Because earlier I do believe that I told
6  you that I couldn't remember everybody right then,
7  but as the time goes by, you told me that if I
8  remember somebody else, didn't you tell me that I
9  could --
10      Q.  I did, and I want you to do that.
11      A.  Okay.
12      Q.  Is there anybody else -- before we get to
13  Sherry and the details of Sherry, is there anybody
14  else that you're claiming engaged in racially
15  discriminatory conduct?
16      A.  I believe Carol.
17      Q.  And what's Carol last name?
18      A.  Lawson.
19      Q.  Anyone else?
20      A.  Not that I can think of right now.
21      Q.  So let's talk about Sherry Ohanian.
22  Sherry Ohanian was in human resources?
23      A.  Correct.
24      Q.  And what is it that you allege Sherry
25  Ohanian said or did that constituted race

Joshua Hall    March 6, 2014
***Videotaped Deposition***

Page 150

1   discrimination?
2       A.  It wasn't what she said.  I believe what
3   she did was all of the incidents that I reported and
4   she said she investigated, like she was in control of
5   the human resources.  And I mean, as many complaints
6   you know, I mean, I tried to let her know that this
7   was going on to my best, you know, like, I don't know
8   what else I could have done to be more clear to her
9   of what was going on.
10      And it continued to go on.  And I just -- I
11  feel -- yeah, it just continued to go on.
12      Q.  So what is it that you are alleging
13  Sherry Ohanian did that constituted race
14  discrimination?
15      A.  I believe that she allowed for me to stay
16  under those -- work under those conditions, and I
17  believe she continued to do that because I was black.
18      Q.  And what is the basis for that serious
19  allegation?
20      A.  All of the time that I had to work under
21  those conditions.  Under -- and she was -- she was in
22  control as far as I knew.  She was the vice president
23  of human resources.  She was the one that I had to
24  report all of these things to, and she never did
25  anything about it.  Because I continued to have to

Page 151

1   deal with it.  It continued to go on after all of the
2   allegations, all of the reports.
3       Q.  So first of all, what is your proof that
4   Sherry Ohanian deliberately allowed race
5   discrimination for the purpose of discriminating
6   against you?  What's your proof of that allegation?
7       A.  The fact that it never stopped the whole,
8   throughout the duration of my employment.  And I
9   ended up having to leave because of it.
10      Q.  So you testified earlier that it wasn't
11  anything Sherry Ohanian said, it was just what she
12  did, correct?
13      A.  Correct.
14      Q.  And if I understand your allegation, your
15  allegation is you complained about race
16  discrimination, and it continued after your
17  complaints.  And because it continued after your
18  complaints, Sherry Ohanian must not have done her
19  job?
20      A.  I don't know what she did.  I just know
21  that it continued to go on.
22      Q.  So for all you know, Sherry Ohanian could
23  have been doing a thorough investigation behind the
24  scenes, correct?
25      A.  I don't know what she did.  It just

Page 152

1   continued to go on.
2       Q.  But you don't have any proof that
3   Sherry Ohanian did anything -- strike that.
4       You don't have any proof that
5   Sherry Ohanian acted in a way that was designed to
6   discriminate against you because of your race, do
7   you?
8       A.  I don't know what she did.
9       Q.  Do you have any proof that Sherry Ohanian
10  acted in any way designed to discriminate against you
11  because of your race?
12      MS. SCHUETZ:  Objection.  Asked and
13  answered.
14      You can answer.
15      THE WITNESS:  I don't know what she did.
16  BY MR. HICKS:
17      Q.  Anything else that you're accusing
18  Sherry Ohanian of doing that you believe constituted
19  race discrimination other than what you've already
20  testified to?
21      A.  Not that I can think of now.
22      Q.  The last person you listed was
23  Carol Wasson.
24      A.  Correct.
25      Q.  And who was Carol Wasson?

Page 153

1       A.  She was one of my supervisors.
2       Q.  So she was a supervisor of the ushers?
3       A.  Yes.
4       Q.  And what is it that you believe
5   Carol Wasson did or said that constituted race
6   discrimination?
7       A.  Well, it wasn't what she said.  It was what
8   she would do was any time that I would -- she was
9   around and I would try to ask her a question, she
10  would always just ignore me.  I would have to ask her
11  like three or four times the same thing before she
12  would respond.
13      Then one day in the midst of all of the
14  things, she came into the theater, and she had me
15  working on the main floor.  Now, this is while
16  everything was going on.
17      And I asked her, you know, I said that
18  particular day, the mezzanine was really, really,
19  really busy.  And she allowed for Sharon and
20  Mary Jane and Arianna, whoever wanted to work
21  together, she let them work together.
22      I asked her could I go to the mezzanine?
23  And she told me no.  And I asked her why not?
24  Because she had just let Sharon change.  Sharon was
25  at the door initially.  And Sharon asked her could

Joshua Hall    March 6, 2014
***Videotaped Deposition***

Page 154

1    she go on to the main floor, she said yes.  So Sharon
2    comes in with me.
3          And so then once I asked her, I said, well,
4    can I go to the mezzanine because the mezzanine is
5    busy.
6          She said no.  And I asked her why?
7          She said, "Because I'm the supervisor and I
8    said no."
9          And I asked her -- I said okay, well, you
10   know, I don't know.  And she said, well, I'm the
11   supervisor, and again, and said no, you don't
12   question me, something to that effect.
13         And I don't know when, but after that she
14   wrote me up and said that I was rude and
15   discourteous.
16      Q.  Before I go back and ask you about the
17   details of these, anything else that Carol Wasson did
18   that you are accusing -- strike that.
19         Anything else that Carol Wasson did that
20   you're alleging was racially discriminatory?
21      A.  Just besides ignoring me whenever.
22      Q.  You've already mentioned that.  Anything
23   else?
24      A.  Not that I can think of at the moment.
25      Q.  So the two things you identified is that

Page 155

1    she would ignore you, and sometimes you would have to
2    ask three or four times before she would respond.
3    And the other things was she wouldn't allow you to go
4    on the mezzanine on this one occasion.
5          Let's talk first about her allegedly
6    ignoring you.
7      A.  Yes.
8      Q.  What do you mean she would ignore you?
9      A.  Anytime I ask her a question, like she just
10   would ignore me.
11      Q.  Anytime you asked her a question she would
12   ignore you?
13      A.  Anytime.
14      Q.  And when you say ignore, do you mean she
15   wouldn't do what you wanted her to do, or she would
16   pretend like she didn't hear you?
17      A.  She would pretend like she didn't hear me.
18      Q.  Is it your allegation that she did that
19   because your African-American?
20      A.  I don't know.
21      Q.  You don't have any proof that she ignored
22   you because you're African-American, do you?
23      A.  I don't.
24      Q.  So let's go to the other allegation, and
25   that is that you wanted to go work on the mezzanine

Page 156

1    and she told you no, "I'm the supervisor and I said
2    no."
3          First of all, why did you want to go work
4    on the mezzanine?
5      A.  That particular day, Sharon, Mary Jane, I
6    believe Arianna, I can't remember who were all, but I
7    had already been having issues with them trying to --
8    at that point, they were trying to, I don't know,
9    just working with them, they were already, you know,
10   the names and the whatever.  All of the different
11   things that they had going on, I didn't want to work
12   around them.
13      Q.  So you didn't want to work with Sharon, MJ
14   and Arianna, correct?
15      A.  Especially once that particular day Sharon
16   changed from the door to come inside.  I was nervous.
17   I didn't know what she had planned.
18      Q.  And where was Claudia Carlson working at
19   this time?
20      A.  In the mezzanine.
21      Q.  So that's why you wanted to work on the
22   mezzanine, right?  Because Claudia was there?
23      A.  Yes.
24      Q.  And your supervisor, Ms. Wasson, said no,
25   you're going to work over here.  And you pushed her a

Page 157

1    little bit, not physically, but you asked her why,
2    right?
3      A.  I believe I asked her -- no, I told her
4    that the mezzanine was full, and typically they put
5    two people up there in the mezzanine whenever the
6    mezzanine was full.  The main floor wasn't full.  So
7    I couldn't understand.  I just told her, I said,
8    well, the mezzanine is full, are you just going to
9    have one person up there?
10         And when she had Sharon come in, she let
11   Sharon change places, so I was kind of interested in
12   that.
13      Q.  So you wanted to work with Claudia, and
14   Ms. Wasson said no, I want you working here.  And
15   after you kind of pressed her a little bit, she sort
16   of put her foot down and said, look, I'm the
17   supervisor, don't question me, and then you got
18   written up, correct?
19      A.  I believe.  I never pushed -- I just asked
20   her that one time.  Like I told her about the
21   mezzanine, and she left.  She didn't say anything at
22   that point.  She just said -- she did say she was the
23   supervisor, but she didn't write me up right then.
24      Q.  But you were written up for --
25      A.  Being rude and discourteous.  I believe.  I

Joshua Hall    March 6, 2014
***Videotaped Deposition***

Page 158

1  can't remember the exact, what the words.
2      Q. And do you know when this took place?
3      A. I don't.
4      Q. Do you have any proof that Ms. Wasson told
5  you she wasn't going to allow you to work on the
6  mezzanine because you're African-American?
7      A. No.
8      Q. Anything else that you believe Ms. Wasson
9  did that constituted race discrimination?
10     A. Not at this moment.
11     Q. You've identified the following individuals
12  as having said or done something that you believe
13  constituted race discrimination: Sharon Ono,
14  Dan Hansill --
15     A. Don.
16     Q. I'm sorry, Don Hansill. Patty Perry,
17  Shaldale Diamond, Jose Guzman, Sherry Ohanian and
18  Carol Wasson.
19         Is there anybody else that you're accusing
20  of saying or doing something that constituted race
21  discrimination?
22     A. I can't remember.
23     MR. HICKS: We're almost at the end of the
24  tape.
25     THE WITNESS: All right.

Page 159

1      MR. HICKS: So why don't we take a
2  five-minute break to allow the videographer to switch
3  out the tape, and you can stretch your legs if you
4  want to.
5      THE VIDEOGRAPHER: This marks the end of
6  media number four. We're going off the record at
7  2:03 p.m.
8      (A recess was taken from 2:03 p.m.
9      to 2:36 p.m.)
10     THE VIDEOGRAPHER: We're back on the record
11  at 2:36 p.m. This marks the beginning of media
12  number five.
13     You may proceed.
14     BY MR. HICKS:
15     Q. I may have asked you this already. It's
16  been a long couple of days. I apologize if I have.
17         Are you contending that anyone at the
18  Monte Carlo discriminated against you or harassed you
19  based on your gender?
20     A. No, sir.
21     Q. Let me have marked as Exhibit 1 an
22  acknowledgment for the Monte Carlo Resort Casino
23  Policies and Procedures.
24     (Exhibit 1 was marked for
25     identification.)

Page 160

1  BY MR. HICKS:
2      Q. Mr. Hall, do you recognize your signature
3  on Exhibit 1?
4      A. Yes.
5      Q. And to the best of your recollection, you
6  signed this document on or about May 4th of 2005?
7      A. Yes.
8      Q. And this is an acknowledgment for receipt
9  of the Monte Carlo employee handbook?
10     A. Yes.
11     MR. HICKS: I would like to have marked as
12  Exhibit 2 the employee acknowledge -- the Employee
13  Receipt Acknowledgment for the workplace harassment
14  standard policy.
15     (Exhibit 2 was marked for
16     identification.)
17  BY MR. HICKS:
18     Q. Mr. Hall, do you recognize your signature
19  on Exhibit 2, which is the employee acknowledgment
20  for the workplace harassment policy?
21     A. Yes.
22     MR. HICKS: I would like to have marked as
23  Exhibit 3 the Employee Handbook Receipt.
24     (Exhibit 3 was marked for
25     identification.)

Page 161

1  BY MR. HICKS:
2      Q. Mr. Hall, do you recognize your signature
3  on Exhibit 3, which is the Employee Handbook Receipt?
4      A. Yes.
5      MR. HICKS: I'm going to have marked as
6  Exhibit 4, the employee handbook.
7      (Exhibit 4 was marked for
8      identification.)
9  BY MR. HICKS:
10     Q. Mr. Hall, my understanding is that
11  Exhibit 4 is the employee handbook that you received
12  during your employment at the Monte Carlo.
13         Do you have any reason to believe that this
14  is -- that this is not the copy you received?
15     A. I don't know. Do they change it over the
16  years?
17     Q. Sure. It's revised over the years.
18     A. So I mean, I worked there for six years, so
19  I'm sure there was some revisions made. I mean, I
20  would think so.
21     Q. And while you were working at the company,
22  did you have occasion to look at the employee
23  handbook?
24     A. I'm sorry?
25     Q. While you worked for the Monte Carlo, did

Joshua Hall   March 6, 2014
***Videotaped Deposition***

Page 166

1   And she testified that at some point she
2   became aware of the fact that co-workers were
3   complaining about you and her creating a hostile work
4   environment.
5   So are you telling us that even after
6   yesterday's deposition and the testimony she gave,
7   you didn't even look at this document?
8   A. Yesterday I was sitting at the other end of
9   the table.
10   Q. Right. And your counsel had a copy of this
11   document when she left the room.
12   A. I didn't see this.
13   Q. So is it your testimony that today is the
14   first time you've seen this document?
15   A. Yes.
16   Q. Notwithstanding the fact that today is the
17   first time you've seen this document, were you made
18   aware of the fact prior to today that your coworkers
19   were complaining about you and Ms. Carlson creating a
20   hostile work environment?
21   A. Can you repeat the question?
22   Q. Sure. Prior to today, were you aware of
23   the fact that your coworkers had complained about you
24   and Ms. Carlson creating a hostile work environment?
25   A. I don't -- I can't remember. I guess -- I

Page 167

1   don't remember. I can't -- if I'm unsure of
2   something, I'm unsure of this. I don't remember.
3   Q. So you may have been aware of it, you just
4   don't know one way or the other?
5   A. I don't remember.
6   Q. I want to have marked as Exhibit 10 an
7   employee acknowledgment dated May of 2011.
8   (Exhibit 10 was marked for
9   identification.)
10   BY MR. HICKS:
11   Q. Mr. Hall, do you recognize your signature
12   on Exhibit 10, which is the Employee Handbook
13   Acknowledgment dated May of 2011?
14   A. I don't know. I don't know if the pen went
15   out. I don't know. It's sort of gapped in between
16   my name. It looks like my handwriting, but I'm not
17   sure.
18   Q. Have you ever been involved in a lawsuit
19   involving Rockin Industries?
20   A. No, sir.
21   Q. Have you ever been involved in a lawsuit
22   involving somebody by the name of Brett Klotay
23   (phonetic)?
24   A. No, sir.
25   Q. Or Don Asamura?

Page 168

1   A. No, sir.
2   Q. Have you ever been involved in a lawsuit
3   involving The Carburetor Shop?
4   A. No, sir.
5   Q. Have you ever been involved in a lawsuit
6   involving American Express?
7   A. No, sir.
8   Q. Have you ever been involved in a lawsuit
9   involving Anthony Zanetti (phonetic)?
10   A. No, sir. I have never been involved in a
11   lawsuit before. This is the first time.
12   Q. You testified earlier in the deposition
13   that you used to use the "N" word when you were
14   young, but that at some point when you were a younger
15   man you recognized the inappropriateness of it,
16   correct?
17   A. Correct.
18   Q. So did you stop using that word when you
19   were in high school?
20   A. I can't remember when. I don't remember
21   when I stopped.
22   Q. Did you stop using it within the last --
23   I'm just trying to get an idea of when you -- when
24   you recognized that that word was not a word that you
25   wanted to use or would use.

Page 169

1   Was it before you came to work for the
2   Monte Carlo?
3   A. I don't remember.
4   Q. Did you throw the word around when you were
5   working for the Monte Carlo?
6   A. I don't remember.
7   Q. So you're complaining about the fact that
8   some of your coworkers used that word, correct?
9   A. Correct.
10   Q. Did you encourage the use of that word by
11   using it yourself?
12   A. No, sir.
13   Q. So is it fair to say you haven't used that
14   word since you came to -- that you did not use that
15   word once you started working for the Monte Carlo?
16   That you had stopped using it prior to coming to work
17   for the Monte Carlo? Is that a fair statement?
18   A. I can't remember.
19   Q. You testified earlier that you used the
20   name Dakoven.
21   A. Dakoven.
22   Q. And have you made videos?
23   A. Videos?
24   Q. Music videos.
25   A. I have.

Joshua Hall    March 6, 2014
***Videotaped Deposition***

Page 170

1  Q. Let me show you --
2  MS. SCHUETZ: Counsel, before you proceed
3  with that, I'm going to object to the use of this to
4  the extent it has not been produced in discovery in
5  this case.
6  MR. HICKS: You can object all you want,
7  Counsel. This is right off of his Facebook page,
8  which I hope you've looked at.
9  BY MR. HICKS:
10  Q. I'm going to show you a video that was on
11  your Facebook, and tell me if you can see -- because
12  I know there's a little bit of a glare in the room.
13  And if there is, I can twist it.
14  Can you see the screen?
15  A. Can you bring it down just a little bit?
16  MR. HICKS: Let's do this. Let's go off
17  the record just for a minute so I can move some of
18  these wires around so I don't accidentally unplug it.
19  THE VIDEOGRAPHER: We're going off the
20  record at 2:53 p.m.
21  (A discussion was held off the record.)
22  (Mr. Stafford entered the room.)
23  THE VIDEOGRAPHER: We're back on the record
24  at 2:56 p.m.
25  You may proceed.

Page 171

1  BY MR. HICKS:
2  Q. The first video I want to show you,
3  Mr. Hall, is a video that I believe to be of you and
4  your friends walking down the Las Vegas Strip.
5  Okay, and this was posted on your Facebook.
6  So what we're going to do is John Stafford
7  of our office here is going to start it and turn it
8  so that you can view this. I don't need to see it.
9  (Playing video.)
10  THE WITNESS: Can I ask you a question?
11  BY MR. HICKS:
12  Q. No.
13  Let me ask you a question: Do you
14  recognize yourself in that video?
15  A. I do.
16  Q. And was that on the Las Vegas Strip?
17  A. Yes, sir.
18  Q. And do you recognize the other gentleman
19  with you in that video?
20  A. Yes, sir.
21  Q. Who was with you in that video?
22  A. A friend of mine by the name of O'Mari
23  (phonetic). There was a friend, Dante. And I forgot
24  who else was in that video.
25  Q. Okay. And there was a statement while

Page 172

1  walking down the Strip, after checking out a woman
2  who walked by, to the effect: "Where they bitches
3  at, mother fucker? They may be giving you the eye.
4  They be giving me the eye. Shit."
5  Did you hear that?
6  A. I did.
7  Q. Who made that statement?
8  A. It wasn't me.
9  Q. Who made that statement?
10  A. I believe that was Dante.
11  Q. And was Dante directing that statement to
12  you?
13  A. I can't remember.
14  Q. Who was it that he was referring to that
15  they gave the eye to?
16  A. Me, yeah. That's what you mean? Yeah.
17  Q. And then there was a statement on that
18  video by one of the gentlemen to the effect of,
19  "Ain't going to talk to none of them. Fuck all that,
20  slavery, slavery."
21  Who made that statement?
22  A. I believe that was Dante, again.
23  Q. And there was also a statement: "Where the
24  bitches at, man? We need to have a flock of them."
25  Who made that statement?

Page 173

1  A. I believe that was Dante again.
2  Q. And then at the end you saw where the four
3  of you gentlemen walked by where Metro had detained a
4  gentleman?
5  A. Yes, sir.
6  Q. And the gentleman was African-American?
7  A. I can't remember.
8  Q. And the statement was made, "Look at this
9  shit. Always fucking with the nigga. What the fuck
10  they do? And they ain't even in North Town. North
11  town your ass would never get out of jail."
12  Who made that statement?
13  A. I believe that was Dante again.
14  Q. You testified earlier about your videos.
15  Let me have John bring up the second one, and this is
16  approximately three minutes long.
17  So we'll start it, and John will show it to
18  you so you can see. I'm sure you're familiar with
19  it. And this is approximately three minutes.
20  (Playing video.)
21  BY MR. HICKS:
22  Q. Is that one of your videos?
23  A. Yes, sir.
24  Q. At the end of that video on the screen --
25  let me describe -- let me describe that video first,

Joshua Hall    March 6, 2014
***Videotaped Deposition***

45  (Pages  174 to 177)

Page 174

1  because the record won't reflect it, and it's not on
2  camera.  And you correct me if I describe it
3  incorrectly.
4        The video is a series of photographs of
5  attractive, sometimes scantily clad women, correct?
6    A.  I guess it just depends on who's looking at
7  it.
8    Q.  Well, what about that statement do you
9  disagree with?
10   A.  I thought that the pictures were tasteful.
11   Q.  I didn't say they weren't.  I'm just asking
12  you a question.
13        Some of them, the women, scantily clad,
14  correct?
15   A.  In your opinion.
16   Q.  Well, I'm asking for your opinion.
17   A.  That's not my opinion.
18   Q.  Okay.  And there were several photographs
19  throughout this video of different women, correct?
20   A.  Correct.
21   Q.  And there were comments that you added
22  about each of the women, correct?
23   A.  Correct.
24   Q.  For example, on one photograph, you put the
25  words, "My baby,"

Page 175

1        On another one, "Still fine."
2        On another one, "Sexy as hell."
3        On another one, "She bad."
4        On another one, "Personal favorite."
5        Correct?
6    A.  Correct.
7    Q.  And at the end of the video on the screen,
8  there's a statement, and it says it's by you:
9  "Thanks for listening and checking out the ladies I
10  wouldn't mind having in my favorite sexual position."
11        Right?
12   A.  Did it say that?  I can't remember.
13   Q.  Do you want me to show it to you?
14   A.  Yeah.
15   Q.  Sure.  We'll go to the very end, and it's
16  on the screen.
17        By the way, the name of that song is what?
18   A.  I'm sorry.  I'm sorry.  I just -- the name
19  is Sexual Positions, the title.
20   Q.  So this is the last screen.  And can you
21  just read what it says into the record.
22   A.  "Thanks for listening and checking out the
23  ladies I wouldn't mind having in my favorite sexual
24  position."
25   Q.  And is this you singing on this video?

Page 176

1    A.  Yes, sir.
2    Q.  Did you write the lyrics?
3    A.  Yes, sir.
4    Q.  Let me ask you about some of the lyrics.
5        "Are you free tomorrow night?  I want to
6  take it all the way.  I'm a freak, so what you like?
7  So many ways to have you screaming my name.  I got
8  different position for every time you move."
9        Were those some of the lyrics that you
10  wrote and sang?
11   A.  Yes, sir.
12   Q.  Continuing:  "I'm going to lick on your
13  clit.  I'm licking, I'm trying to make it wet.  Now,
14  get down on your knees.  That telling me working up a
15  sweat."
16        Did I get it close?
17        "Now get down on your knees, that feeling.
18  Got me working up a sweat."
19        Did I get that right?
20   A.  It's along those lines.
21   Q.  And then were these lyrics also saying,
22  "Doggie style, missionary, I'm going to set the mood.
23  Sit back and relax, and let me take control of you"?
24  Were those lyrics that you wrote and performed?
25   A.  Yes.

Page 177

1    Q.  And when was this video created?
2    A.  I can't remember.
3    Q.  Was it while you were working at the
4  Monte Carlo?
5    A.  I believe during the time of the layoff.
6    Q.  So it was while you were working at the
7  Monte Carlo?
8    A.  Well, I wasn't working there.  I was laid
9  off.
10   Q.  And then -- you worked at the Monte Carlo,
11  you were laid off for a short period, and you came
12  back and worked at the Monte Carlo, correct?
13   A.  But when I was wrote that song, I was still
14  laid off.
15   Q.  I understand.  But it was during that time
16  period.  You were laid off and subsequently recalled
17  to the Monte Carlo, correct?
18   A.  Correct.
19   Q.  And you showed this video to Joey Guzman,
20  didn't you?
21   A.  No, I didn't.
22   Q.  Did you share any of your music videos with
23  any of your coworkers?
24   A.  No, I didn't.
25   Q.  Were any of your coworkers friends on

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Joshua Hall   March 6, 2014
***Videotaped Deposition***

46 (Pages 178 to 181)

### Page 178

1  Facebook?
2       A.  I believe at a time Joey was.  I believe.
3       Q.  You showed this video to Claudia Carlson,
4  didn't you?
5       A.  I can't say who -- I mean, if you're on my
6  Facebook page, I mean, I don't know.
7       Q.  I'm talking about Claudia Carlson.  You
8  showed this video to Claudia Carlson, didn't you?
9       A.  I've never showed that particular video to
10  her; I don't remember showing that video to her.
11       Q.  You may have, you just don't recall?
12       A.  I have never, never shown that video.  I
13  put that video on-line.  So once you put something
14  on-line, it's public records.
15       Q.  Exactly.
16       A.  I mean, I don't know who -- I don't know if
17  Claudia has seen that before.
18       Q.  You knew when you put this on-line it was
19  available to the public, correct?
20       A.  Correct.
21       Q.  Including Claudia Carlson?
22       A.  I guess you could say.
23       Q.  Would you agree with me that this video is
24  disrespectful to women?
25       A.  No.

### Page 179

1       Q.  Would you want a picture of your daughter
2  or your sister put on-line to music with these lyrics
3  and these kind of comments attached to them?
4       A.  I don't think any of those comments were
5  disrespectful.
6       Q.  So you would be okay if it was your sister
7  or your daughter?
8       A.  What comments?  You said -- I said "still
9  fine."
10       Q.  How about, "I'm going to lick on your clit.
11  I'm licking.  I'm trying to make it wet."  You find
12  that respectful of women?
13       A.  My intentions weren't to be disrespectful.
14       Q.  I'm not asking you about your intentions.
15  I'm just asking you as you sit here now, don't you
16  find that disrespectful of women?
17       MS. SCHUETZ:  Objection.  Asked and
18  answered.
19       You can answer.
20       THE WITNESS:  No.
21  BY MR. HICKS:
22       Q.  You would agree with me it objectifies
23  women in a sexual way, doesn't it?
24       A.  Do you recall when you asked me at the very
25  beginning if I had any other names that I go by?

### Page 180

1       Q.  I do recall that.
2       A.  And I told you my alterego was Dakoven.  So
3  what Dakoven would say, Joshua wouldn't say.  And
4  that's the beauty of having an alterego.
5       Q.  So you think it's okay if you adopt an
6  alterego to say or do anything you want?
7       A.  As long as it's not illegal.
8       Q.  Doesn't this contradict, "Let's and let's
9  God"?
10       A.  Let go and let God?
11       Q.  Let go and let God.
12       A.  No, I don't think so.
13       Q.  So let me just get back to the question you
14  haven't answered yet, and I'll move on to the next
15  video.
16       You would be okay if this was your daughter
17  or your sister?
18       A.  Okay with what?
19       Q.  With somebody such as yourself putting them
20  in a video to these kind of lyrics and this kind of
21  language?
22       A.  I feel as if -- I feel if they would take
23  pictures like that, then if somebody wanted to put
24  lyrics to it like that, it kind of would go
25  together.

### Page 181

1       Q.  What do you mean "if they would take
2  pictures like that," what do you mean by that?
3       A.  If they took pictures with -- they had on
4  bikinis, so I mean it's -- I mean, it sort of kind of
5  goes together.
6       Q.  So now you're agreeing with me that they're
7  scantily clad?  They're in bikinis.
8       A.  I still don't agree that it's scantily
9  clad.  I think that it's, again, tasteful.
10       Q.  I'm not saying it's not tasteful.  That's a
11  matter of judgment, I suppose.
12       So is it your testimony that because they
13  have bikinis on, that attaching these lyrics to them
14  is okay?
15       A.  Again, my alterego.  That's my alterego.
16       Q.  So you come in and out of your alterego, is
17  that what you're saying?
18       A.  When I'm in the studio, yes, sir.  I have
19  an alterego, and his name is Dakoven.  And he does
20  and says things that Joshua would not say.
21       Q.  Right.  And then Joshua turns around and
22  puts this on the internet for everybody to see it,
23  correct?
24       A.  That was Dakoven at that time.
25       Q.  So you're not taking responsibility for

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Joshua Hall    March 6, 2014
***Videotaped Deposition***

Page 182

1  that?
2      A.  I told you that I have a separate name, and
3  it's an alterego.  And so Dakoven is Dakoven.  When
4  I'm in my Dakoven mode, that's something that Dakoven
5  would do.
6      You have to realize the music industry
7  is --
8      Q.  Honestly, I'm not interested in the music
9  industry.  I'm interested in what we're talking
10  about.
11      MS. SCHUETZ: Counsel, let him finish his
12  answer.
13      MR. HICKS: No.  You can ask him questions
14  if you want.
15  BY MR. HICKS:
16      Q.  So basically, you're saying you're not
17  taking responsibility -- Joshua Hall is not taking
18  responsibility for posting this on the internet.  Am
19  I hearing that right?
20      A.  You are.
21      Q.  Let's go to the next video.  This one is
22  three minutes and 15 seconds.
23      A.  Sir, what does this have to do with...
24      MR. HICKS: Here's the next video.
25      (Playing video.)

Page 183

1  BY MR. HICKS:
2      Q.  Do you recognize that video?
3      A.  Yes, sir.
4      Q.  Is that one of yours?
5      A.  I didn't make that video.
6      Q.  Are you in that video?
7      A.  Yes, sir.
8      Q.  And are you singing in that video?
9      A.  Yes, sir.
10      Q.  And are there photographs of you in that
11  video?
12      A.  Yes, sir.
13      Q.  Now, in that video there are also
14  photographs of women with their behinds bare,
15  correct?
16      A.  Yes, sir.
17      Q.  And there are photographs of you flashing
18  gang signs, right?
19      A.  No, sir.
20      Q.  What are you flashing?
21      A.  For clarification, I've never been in a
22  gang.
23      Q.  I'm not suggesting you were.
24      A.  That was actually my middle finger, and
25  that was Dakoven.  Again, I was in my alterego.

Page 184

1      Q.  First of all, you're denying there were any
2  gang signs flashed in that video?
3      A.  If there were, I don't know what they were.
4  I've never been in a gang.
5      Q.  You don't have to be in a gang to flash a
6  gang sign, do you?
7      A.  I don't understand why you would flash a
8  gang sign if you're not in a gang.
9      Q.  So what you're saying is you were flipping
10  the camera off with your middle finger?
11      A.  Correct.
12      Q.  And what was the point of that?
13      A.  Again, the music industry, they like weird
14  things.  They like that.  That's what they like.
15      Q.  And did you write this song?
16      A.  Not all of it.
17      Q.  So you wrote some of it?
18      A.  Yes, sir.
19      Q.  And when did you -- when was this produced?
20  Was it while you were out on leave?
21      A.  Yes, sir.
22      Q.  Let me read some of the lyrics and then ask
23  you some questions:
24      "I met you in VIP.  Body banging on me."
25      A.  That rapping part was not me.  The only

Page 185

1  part that was me was the singing part.  So any of the
2  rapping parts, for clarification, I didn't have
3  anything to do with.
4      Q.  Let's go through them.  So you're not
5  taking any responsibility for the phrase, "I met you
6  in VIP.  Body banging on me"?
7      A.  I didn't write that, so I don't
8  understand -- you know, like this was how this
9  particular thing worked.  When this gentleman asked
10  me if I would sing a hook for him, the song was his.
11  It was already written.  He wrong the song.
12      I heard the song and I told him yeah, no
13  problem.  I do music.  I love music.  That's my
14  passion.
15      So I said no problem.  You know, when I am
16  on a song, it doesn't necessarily have anything to do
17  with who I am as a person.
18      Q.  Well, I'm asking you about the lyrics.
19      There was another lyric in there that read
20  as follows, or went as follows: "I ask you if you
21  want to drink two shots of patron on me.  I see it in
22  your eyes.  You want to be alone with me."
23      Was that your language or his?
24      A.  That was his.
25      Q.  And who is he, by the way?

All-American Court Reporters (702) 240-4393
www.aacrlv.com

## Joshua Hall   March 6, 2014
### ***Videotaped Deposition***

48 (Pages 186 to 189)

**Page 186**

1    A. His name is Andre.
2    Q. And you knew that these lyrics were in the
3 video, correct?
4    A. Yes, sir.
5    Q. And then it says: "I don't mean to bother
6 you, but is something about you that makes a nigger
7 fall for you."
8       Were those your words or his?
9    A. His.
10    Q. And you knew that was in the video, right?
11    A. Yes.
12    Q. And then it says, "I'm not a simp, but I
13 admit a nigga is feeling you."
14       Were those your lyrics or his?
15    A. Those were mine.
16    Q. So earlier when you said you stopped using
17 that kind of language a long time ago, the fact is
18 you continued to use that kind of language while you
19 worked at the Monte Carlo, didn't you?
20    A. I told you I didn't remember the last time
21 I said that word, but I did agree that I've said that
22 word before. And it's never been in the context
23 of -- it was more of a -- there's two different ways
24 you can use that word. And this particular way that
25 you're referring to is not in a racial way. Nigger

**Page 187**

1 is meant in a racial way. Nigga, even though I don't
2 agree with that word, I will say, I don't agree with
3 that word. And I agree it shouldn't be said, even
4 between two African-Americans, they shouldn't call
5 each other that.
6    Q. But you specifically inserted it into this
7 video while you were -- during the time period that
8 you were employed by the Monte Carlo, right?
9    A. I was employed, but I was not working
10 there. And again, that was Dakoven, not Joshua.
11    Q. So did Dakoven ever appear outside the
12 studio?
13    A. What do you mean? I don't understand.
14    Q. Well, when you went out to a club, were you
15 Dakoven or were you Joshua?
16    A. When I'm at work, I'm always Joshua.
17    Q. That's not what I'm asking you.
18       Did Dakoven ever leave the studio?
19    A. Whenever I'm in music -- whenever I'm doing
20 any form of music, I'm Dakoven. So Dakoven, who
21 knows where he may be.
22    Q. Is it your testimony Dakoven can say or do
23 whatever he wants, that's irrelevant to Joshua Hall?
24    A. Again, Dakoven is my alterego. And that's
25 something for music, the music industry. It has

**Page 188**

1 nothing to do with me personally.
2       Some of the views don't even -- again, you
3 can see Dakoven is just a different person. It's
4 again an alterego.
5    Q. So that we're clear --
6    A. It's fantasy.
7    Q. Exactly. So that we're clear, this Dakoven
8 is fantasy. You understand Dakoven is Josh Hall,
9 right?
10    A. An alterego of Josh Hall.
11    Q. And Joshua Hall knows full well what's
12 going into these videos, doesn't he? Don't you?
13    A. Again, my alterego is Dakoven.
14    Q. Mr. Hall, you're the one that -- you can
15 call yourself whatever you want when you're on
16 screen. The fact is you inserted this language into
17 this video, correct?
18       MS. SCHUETZ: Objection. Asked and
19 answered.
20       You can answer.
21 BY MR. HICKS:
22    Q. Right?
23    A. Sir, again, what Dakoven does, Joshua
24 doesn't have anything to do with.
25    Q. Let's listen to the next one. And this is

**Page 189**

1 a video with you, and as you refer to it, your crew.
2    A. I never said anything about my crew.
3    Q. Well, let's listen, because I think you did
4 in this video, but you correct me if I'm wrong.
5       (Playing video.)
6 BY MR. HICKS:
7    Q. Was that you on that video?
8    A. Yes, sir.
9    Q. When did you shoot that video?
10    A. I don't remember.
11    Q. It was while you were working for the
12 Monte Carlo, correct?
13    A. I don't remember.
14    Q. And you used the "N" word several times in
15 that video, didn't you?
16    A. I did.
17       MR. HICKS: Let's go to the next video.
18       THE WITNESS: Sir, what's the purpose? I
19 mean...
20       (Showing video.)
21 BY MR. HICKS:
22    Q. Do you recognize that video, Mr. Hall?
23    A. Yes, sir.
24    Q. And is that one of the videos that you
25 produced?

Joshua Hall    March 6, 2014
***Videotaped Deposition***

Page 190

```
1        A.  I can't remember.
2        Q.  Well, I'm pretty sure it says you did on
3   this video.
4        A.  If it says it, then it was me.
5        Q.  What's the name of that video?
6        A.  Keep Hating.
7        Q.  Even Hating Fort Jason?
8        A.  Featuring.
9        Q.  Featuring Jason?
10       A.  Yes, sir. I'm mean, that's an abbreviation
11  for featuring.
12       Q.  And who is Jason?
13       A.  Another artist.
14       Q.  And whose picture is it that's at the very
15  beginning of this video?
16       A.  Mine.
17       Q.  So when you said you're not sure if you
18  produced this, you're 100 percent positive you did
19  produced this, aren't you?
20       A.  What do you mean by "produced"?
21       Q.  Well, did you have anything to do with
22  putting this video together?
23       A.  I don't remember. There's videos on there,
24  and some of them I put up. Some of them I didn't.
25       Q.  I'm asking you about this one.
```

Page 191

```
1        A.  This particular one, I don't remember.
2        Q.  Let's take a look at the first picture in
3   it.
4            Who is that?
5        A.  Again, that's myself.
6        Q.  Okay.
7        A.  That's Dakoven, actually. I mean, if you
8   just want to be technical.
9        Q.  Let's not play games with that. That's a
10  picture of you, right?
11       A.  Dakoven. It's me, but it's my alterego
12  Dakoven. Again, it was when I was in that mode.
13       Q.  And you participated in putting together
14  this video while you were on leave of absence from
15  the Monte Carlo, correct?
16       A.  I can't remember.
17       Q.  In this video, there are pictures
18  throughout the video, correct?
19       A.  Yeah.
20       Q.  And there are pictures of you flipping off
21  the camera?
22       A.  Yes, sir.
23       Q.  Pictures of you standing in front of a
24  burning building?
25       A.  Yes, sir.
```

Page 192

```
1        Q.  A picture of you -- excuse me, a picture of
2   a woman grinding a dance pole?
3        A.  I'm sorry. I mean, I don't mean to laugh,
4   but yeah.
5        Q.  Let's talk about some of the lyrics. First
6   of all, do you know any of the people in this video
7   other than yourself?
8        A.  Yeah.
9        Q.  Who else is in that video that you might
10  know?
11       A.  I saw myself, Jason. I saw Claudia.
12       Q.  Yeah, Claudia Carlson is in that video,
13  isn't she?
14       A.  Yes.
15       Q.  And let's talk about the lyrics. Some of
16  the lyrics of that video that Claudia Carlson was
17  in -- by the way, before we do that, you asked
18  Claudia Carlson to be in that video, didn't you?
19       A.  I didn't. Actually, this isn't a video
20  where people were present. These are pictures that I
21  took apparently. When you make a video, you take
22  pictures and you just post them together. These are
23  just random pictures that were laying around. You
24  have to fill the video. And with U-Tube, you upload
25  the song, and it gives you a certain time frame to
```

Page 193

```
1   put pictures in.
2            You can get the pictures from anywhere.
3   That doesn't mean the people are present.
4        Q.  Listen, listen. This is a video with your
5   music, correct?
6        A.  Correct.
7        Q.  That was you singing, right?
8        A.  Some of the time.
9        Q.  And those were lyrics written by you,
10  right?
11       A.  Not all of them.
12       Q.  And these pictures that went to this video
13  included you, Claudia Carlson, and some other people
14  correct?
15       A.  The pictures that they didn't specifically
16  go to that video. They were just uploaded on there.
17       Q.  Whatever. Let's not quibble about that,
18  okay? We'll let a jury decide whether or not it's a
19  video with pictures or not.
20           MS. SCHUETZ: Counsel, I object to your
21  tone, which is becoming rude and abusive to the
22  witness. You can continue.
23           MR. HICKS: Welcome to the legal community.
24  I'm being anything but rude. I'm asking very direct
25  questions, and I'm getting a witness who is starting
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Joshua Hall   March 6, 2014
***Videotaped Deposition***

50 (Pages 194 to 197)

### Page 194

1  to wiggle on me, and I'm trying to make sure we get
2  back on --
3      MS. SCHUETZ:  Counsel, again, the objection
4  is to tone, not your words or your questions.  But
5  you can continue.
6  BY MR. HICKS:
7      Q.  Let's talk about some of the lyrics.
8      A.  Yes, sir.
9      Q.  "Mind own business.  Fuck these bitches.
10  All I care about is riches.  And you know I'm going
11  to get it."
12      Those were some of the lyrics, correct?
13      A.  Those weren't the lyrics.
14      Q.  I wrote them down.  I listened to it.
15  You're telling me that those lyrics are not in this
16  video?
17      A.  Those words are incorrect that you just
18  read.
19      Q.  Let's go through it.  "Mind own business."
20  Was that in there?
21      A.  Yes.
22      Q.  "Fuck these bitches."  Was that in there?
23      A.  Yes.
24      Q.  "All I care about is riches."  Was that in
25  there?

### Page 195

1      A.  Yes.
2      Q.  "And you know I'm going to get it."  Was
3  that in there?
4      A.  Yes.
5      Q.  All right.
6      A.  I didn't write that also.
7      Q.  Well, now you're -- that was my next
8  question.  Are you saying that those were written by
9  somebody else?
10      A.  The gentleman that was in the video wrote
11  that song.
12      Q.  And you sang them, didn't you?
13      A.  I did.
14      Q.  And you understood -- I mean, you knew the
15  words.  It wasn't a surprise to you when you sang
16  these for this, was it?
17      A.  It was no surprise.
18      Q.  So let me continue.  "I'm a real digga,
19  gaming I'm bitch till I'm a gold digger."
20      Did I get that right?
21      A.  I don't recognize those lyrics.
22      Q.  Are you denying that those lyrics were in
23  there?
24      A.  Can you show me on those?
25      Q.  Sure.  Let's go listen to it.

### Page 196

1      A.  Because I don't remember that.
2      Q.  I don't know exactly where it was, but it's
3  going to be near the front.
4      A.  If we can find it, that would be great.
5      Q.  It starts with, "I'm a real digga," like
6  gold digger.
7      MR. HICKS:  You don't need to show it.
8  Let's just listen to it.
9      (Listening to video.)
10      THE WITNESS:  You can stop it.
11  BY MR. HICKS:
12      Q.  Let's change videos, because we're just at
13  the very end of this video, and we'll pick up with my
14  question when we change.
15      MS. SCHUETZ:  No problem.  Can I take this
16  time to use the rest room?
17      MR. HICKS:  Sure.
18      THE VIDEOGRAPHER:  We're going off the
19  record at 3:38 p.m., and this marks the end of media
20  number five.
21      (A recess was taken from 3:38 p.m.
22      to 3:49 p.m.)
23      THE VIDEOGRAPHER:  We're back on the record
24  at 3:49 p.m., and this marks the beginning of media
25  number six.

### Page 197

1      You may proceed.
2  BY MR. HICKS:
3      Q.  Mr. Hall, before we went off the record, we
4  listened to a part of the song where you wanted to
5  hear it back to make sure you knew what it said.
6      It says, "I'm a real" -- does it say digga
7  or nigga?
8      A.  I believe -- I don't know.
9      Q.  Well, it's your song.  What does it say?
10      A.  I believe it's -- I don't know.  I can't...
11      Q.  Let's just listen to that part one more
12  time.
13      (Playing video.)
14  BY MR. HICKS:
15      Q.  It sounds to me like it says, "I'm a real
16  nigga, gaming on a bitch till I'm a gold digga."
17      A.  I didn't write that part, in my defense.
18      Q.  That's not my question.
19      Is that what it says?
20      A.  That is what it says.
21      Q.  I'm sorry, you sang that, though, correct?
22      A.  I did.  Dakoven actually, if you want to get
23  technical.
24      Q.  So you're not taking responsibility for
25  saying that, Mr. Hall?

Joshua Hall    March 6, 2014
***Videotaped Deposition***

### Page 198

1    A.  I'm not taking responsibility?  Again, I
2 explained to you that I have an alterego and --
3    Q.  I heard all that.  I understand that.
4    A.  He appeals to the music industry and what's
5 going on.  And that -- I mean, you can call it what
6 you want.  I make no apologies for what I do in the
7 studio as Joshua Hall.  And what I did at the Monte
8 Carlo, that is what I will take responsibility for.
9 And again --
10    Q.  And you make no apologies for what you post
11 on the internet, correct?
12    A.  I don't.
13    Q.  So let's continue the lyrics: "Give a fuck
14 about a bitch, dumb bitch."
15    A.  I'm sorry, but I don't even remember saying
16 that.  I think it's funny that you're reading these
17 words back because you -- if you're -- I feel like
18 verbatim, you should write the words down.  And
19 you're -- that's -- I didn't -- I didn't write that
20 song again.
21    Q.  First of all, you think calling women dumb
22 bitches is funny?
23    A.  I didn't call -- did I say that?  Are you
24 sure that I said that?
25    Q.  First of all, you're laughing about it.

### Page 199

1 You think it's funny?
2    A.  Because the way that you just said it, and
3 the fact that it's not me.
4    Q.  So that's funny?
5    A.  I think the fact -- can you listen back to
6 it and --
7    Q.  Sure.
8    A.  -- see who that is?
9    Q.  It starts with, "Give a fuck about a
10 bitch."
11       (Playing video.)
12    THE WITNESS:  And that wasn't me.  That was
13 actually Jason.
14 BY MR. HICKS:
15    Q.  Okay.  That's in your music video, though,
16 that you're participating in, correct?
17    A.  It is.  But that's not me.  I can't take
18 responsibility for something someone else said.  I
19 will take responsibility for what I said.
20    Q.  So is it your testimony on camera under
21 oath that all kinds of mischief can take place on
22 this video that you're a part of, and you're not
23 going to take responsibility for any of it unless it
24 came out of your mouth?
25    MS. SCHUETZ:  Objection the form.

### Page 200

1 You can answer.
2 BY MR. HICKS:
3    Q.  Is that what you're saying?
4    A.  Can you repeat the question?
5    Q.  Sure.  This is a music video that you're a
6 part of, correct?
7    A.  It's not a music video, for clarification.
8 It's a -- it's music with pictures.
9    Q.  It doesn't matter what we call it.  I'm
10 going to call it a music video, but we're talking
11 about the same thing.
12       You participated in putting this together
13 and putting it on the internet, correct?
14    A.  I don't remember.
15    Q.  What do you mean you don't remember?
16    A.  I don't remember, you know, if I put it
17 together or if I -- I participated.  What do you mean
18 as far as just the writing of the song?
19    Q.  I don't know.  I'm not sure what's unclear
20 about my question.  It's on your U-Tube page,
21 correct?
22    A.  Correct.
23    Q.  And you put it on your U-Tube page, didn't
24 you?
25    A.  I don't remember.

### Page 201

1    Q.  Well, do you believe somebody else put it
2 on your U-Tube page?
3    A.  If it's on my U-Tube page, then apparently
4 it's supposed to be there.
5    Q.  What do you mean "it's supposed to be
6 there"?  Meaning you put it there, right?
7    MS. SCHUETZ:  Counsel, I object to your
8 tone.
9    THE WITNESS:  Anything that -- again, I
10 make no apologies.  You can play as many videos as
11 you like.  I make no apologies for anything that I've
12 put on the internet under the name of Dakoven.
13 BY MR. HICKS:
14    Q.  So let's continue with the lyrics.
15    "Give a fuck about a bitch, dumb bitch.
16 Jason gang affiliated, born in the Midwest, and now
17 I'm out in Vegas."
18       Those were part of the lyrics of this,
19 correct?
20    A.  Not my lyrics.  That is Jason.  Did you
21 hear him say his name?
22    Q.  So now you're -- let me just put it this
23 way:  Those were a part of the lyrics in this song on
24 this video clip, correct?
25    A.  Yes, sir.

Joshua Hall   March 6, 2014
***Videotaped Deposition***

53 (Pages 206 to 209)

Page 206

1    (Exhibit 11 was marked for
2    identification.)
3  BY MR. HICKS:
4    Q.  Mr. Hall, this is a request for leave.
5  It's a two-page document that was produced in this
6  case.
7      Do you see where in the middle of the page
8  up at the top it says Monte Carlo Request for Leave?
9    A.  Okay.  Yes.
10   Q.  And do you see where it says "Name" just a
11  couple of lines down?
12   A.  I do.
13   Q.  Whose name is there?
14   A.  Mine.
15   Q.  Does that refresh your recollection as to
16  whether or not you took a leave?
17   A.  It does.
18   Q.  And what did you take a leave for?
19   A.  Stress.
20   Q.  And is it your contention that you took a
21  leave -- well, what do you mean by stress?
22   A.  At this time, it was when all of the
23  discrimination and racial comments, all of that was
24  going on, and I was just overwhelmed.
25   Q.  So you were distraught, or overwhelmed to

Page 207

1  use your word, by allegedly discriminatory language
2  that was used at work?
3    A.  And the conditions.  The fact that nobody
4  was doing anything after I reported it.
5    Q.  So while you were on leave, allegedly
6  because of discriminatory language at work, you were
7  making these videos where you were using all sorts of
8  language, including the "N" word, correct?
9      MS. SCHUETZ:  Objection to form.
10   You can answer.
11     THE WITNESS:  This particular -- those were
12  put on -- I mean, you would have to check the dates.
13  But again, when I was laid off, not when I was on
14  leave.  When I was on leave, by that time there was
15  no music being made.
16  BY MR. HICKS:
17   Q.  So by the time you were on leave of absence
18  in --
19   A.  2011.
20   Q.  -- 2011 took place, you had already made
21  all these videos?
22   A.  Correct.
23   Q.  Okay.  During what time period were you on
24  leave?
25   A.  On leave or unemployment?

Page 208

1    Q.  Leave of absence.
2    A.  I don't remember the exact dates.
3    Q.  You went on a leave of absence
4  October 30th, 2011, correct?
5    A.  Okay.
6    Q.  And did you ever come back and actually
7  work after you took your leave of absence?
8    A.  I don't believe so.
9    Q.  And do you recall that Claudia Carlson was
10  SPI'd?  Suspended pending investigation?
11   A.  I believe so.
12   Q.  And she told you that she was suspended
13  pending investigation?
14   A.  I can't remember if she told me, or I can't
15  remember how I knew.  I was aware.
16   Q.  And you had not yet gone on leave yet, had
17  you?  When she was suspended pending investigation
18  you were still working at the Monte Carlo, correct?
19   A.  I believe so.
20   Q.  And after she was suspended pending
21  investigation, that's when you took a leave of
22  absence, correct?
23   A.  Correct.
24   Q.  And you took a leave of absence in large
25  part because Ms. Carlson was no longer at work with

Page 209

1  you, correct?
2    A.  Correct.
3    Q.  And why did you take a leave of absence
4  because Ms. Carlson was no longer working with you?
5    A.  Because at that time, conditions were
6  already at an extreme level.  Me and Claudia
7  basically had to -- we were -- we were -- no one else
8  in the theater -- I mean, they had alienated --
9  everybody was -- I mean, I didn't even talk.  The
10  conditions were, it was a hostile work environment.
11  There were racial comments going around.  I did not
12  want to be there by myself.  I wasn't going to be
13  there by myself.  I didn't even want to go to work.
14  I didn't even want to go to work it was that bad.
15   Q.  You testified a moment ago that you took a
16  leave --
17   A.  Because I was stressed.
18   Q.  -- in part because Claudia was no longer
19  there.
20   A.  I never said I took a leave because she was
21  no longer there.  I said I was stressed out.
22     MR. HICKS:  Can we go back to that part of
23  the Q&A that probably occurred about two minutes ago?
24  His answer was "correct." I believe, if that helps.
25     (The record was read as requested.)

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Joshua Hall   March 6, 2014
***Videotaped Deposition***

54 (Pages 210 to 213)

### Page 210

1  BY MR. HICKS:
2  Q.  Were you telling us the truth a moment ago
3  when you testified that way?
4  A.  Yes.  I guess -- can I respond?
5  Q.  And when did you first retain legal
6  counsel?  Was it while you were on leave of absence
7  or before?
8  A.  I can't remember.
9  Q.  And while you were on leave of absence, did
10  you go to Harmony Healthcare?
11  A.  I believe so.
12      MR. HICKS:  Let me have one page of the
13  Harmony records produced, or excuse me, marked.
14      (Exhibit 12 was marked for
15      identification.)
16  BY MR. HICKS:
17  Q.  My understanding, Mr. Hall, is that these
18  are the Harmony records while you were on your leave
19  of absence.
20      Do you see four lines down -- well, do you
21  see where it says subjective/objective observations?
22  Do you see that?
23  A.  Yes.
24  Q.  Do you see where it says, makes reference
25  to your appointment being scheduled by a lawyer, four

### Page 211

1  lines down?
2  A.  Where does it say that?
3  Q.  Four lines down, scheduled by a lawyer.
4  A.  I don't know.  I scheduled my appointment
5  at Harmony Healthcare, so I'm not quite sure what
6  that means.
7  Q.  But you can see where it says:  Regarding
8  the issues related to work scheduled by a lawyer.
9      Do you see those words on this?
10  A.  What does that mean?
11  Q.  I'm asking first of all --
12  A.  I don't know what that means.
13  Q.  Okay.  And we can always ask the individual
14  who entered this.
15  A.  Okay.
16  Q.  Does that refresh your recollection as to
17  whether or not you had a lawyer when you were seeing
18  Harmony Healthcare?
19  A.  I cannot -- I don't remember.
20  Q.  Do you deny that you had a lawyer when you
21  saw Harmony, or you just don't remember?
22  A.  I just don't remember.
23      MR. HICKS:  Let's mark as next in order an
24  e-mail dated January 28th, 2013.
25      (Exhibit 13 was marked for

### Page 212

1      identification.)
2  BY MR. HICKS:
3  Q.  Go ahead and read that, and when you're
4  done let me know.
5  A.  Okay, I'm done.
6  Q.  First of all, let me just ask you this:
7  When did your leave of absence expire?
8  A.  I don't remember.
9  Q.  Do you recognize this e-mail string?
10  A.  No.
11  Q.  It was produced by your lawyers in this
12  case.  You understand that this has to do with your
13  lawsuit?
14  A.  Uh-huh.  Yes.
15  Q.  On the first page, where it says, "Hi,
16  Mr. White:  I'm attaching Right to Sue request forms
17  for our clients, Joshua Hall and Claudia Carlson.
18  Let me know if you have any questions.  Thanks.
19  Rebecca."
20      Do you see that?
21  A.  I do.
22  Q.  Do you know who Rebecca is?
23  A.  I do.
24  Q.  Who is Rebecca?
25  A.  She is one of the lawyers.

### Page 213

1  Q.  One of the lawyers representing you?
2  A.  Correct.
3  Q.  And prior to filing your lawsuit, you filed
4  a charge of discrimination with the Equal Employment
5  Opportunity Commission, correct?
6  A.  I did.
7  Q.  And in this -- well, let me back up.
8      Were you asking the Equal Employment
9  Opportunity Commission to investigate your
10  allegations?
11  A.  I believe that was the case.
12  Q.  And you wanted them investigated by the
13  Equal Employment Opportunity Commission?
14  A.  I did.
15  Q.  You understand in this e-mail that's being
16  sent by Rebecca to the Equal Employment Opportunity
17  Commission, she's asking the Equal Employment
18  Opportunity Commission to cease investigating this?
19  A.  I didn't -- I don't -- I don't remember
20  this.  So I mean, I see what it says, but...
21  Q.  So is today the first time you learned that
22  your lawyers asked the Equal Employment Opportunity
23  Commission to cease investigating this?
24      MS. SCHUETZ:  Objection.  I'm going to
25  object to that question on the basis of

Joshua Hall   March 6, 2014
***Videotaped Deposition***

## Page 214

1 attorney/client privilege.
2      Don't answer the question, please, Josh.
3      MR. HICKS: Well, I'm asking is today the
4 first time you've learned it. I haven't asked about
5 a communication between him and his counsel.
6      MS. SCHUETZ: You actually have. The
7 question you asked --
8      MR. HICKS: It's a yes or no question.
9      MS. SCHUETZ: The question you asked calls
10 for a communication between attorney and client.
11      MR. HICKS: So I assume from your
12 statement, then, you did inform him that --
13      MS. SCHUETZ: You can make no assumption
14 I am simply saying that I object to the question
15 based on attorney/client privilege. It calls for him
16 to disclose what he did or not discuss with his
17 counsel concerning this issue.
18      MR. HICKS: Let me finish.
19      MS. SCHUETZ: Please.
20      MR. HICKS: I'm not asking him to tell me
21 what you and he discussed, or anybody in your office
22 and he discussed. All I'm asking is prior to this
23 document dated January 28th, 2013, did he know one
24 way or the other whether or not his lawyers had
25 directed the EEOC to cease investigating this. If

## Page 215

1 the answer is no, that's one thing. If the answer is
2 yes, that communication could have come from
3 anywhere.
4      MS. SCHUETZ: Uh-huh. So for example, you
5 could amend your question to say: Other than from
6 your lawyers, did you learn, et cetera. And your
7 question would be okay and not call for any
8 communications.
9      MR. HICKS: I don't think that's necessary,
10 but I'll adopt it to avoid a dispute.
11 BY MR. HICKS:
12     Q. Other than your lawyers, did anybody else
13 tell you that your lawyers had instructed the EEOC
14 not to investigate this charge?
15     A. I don't remember.
16     Q. Now, when your leave of absence expired,
17 you resigned your employment with the Monte Carlo,
18 correct?
19     A. Correct.
20     Q. And you knew at the time you resigned your
21 employment at the Monte Carlo that Claudia Carlson's
22 employment with the company had ended, right?
23     A. Correct.
24     Q. Let me have marked as -- let me first of
25 all ask a couple of foundational questions.

## Page 216

1     Do you have a Twitter account?
2     A. I do, but I don't remember the last time I
3 used it.
4     Q. Well, maybe I can refresh your
5 recollection.
6      MR. HICKS: Let's have marked as next in
7 order pages from the plaintiff's Twitter account.
8      (Exhibit 14 was marked for
9      identification.)
10 BY MR. HICKS:
11     Q. Mr. Hall, I've had marked various tweets by
12 you on your account.
13     Let me ask you to go to the third page at
14 the very bottom dated June 1st, 2011. Can you read
15 that tweet that you did into the record.
16     A. "I see u grindin hard ma nigga much
17 respect."
18     Q. And are you the one who tweeted that?
19     A. If it was on my account, I'm assuming I
20 did.
21     Q. And who were you tweeting that to?
22     A. I don't remember. I don't remember.
23     Q. Let's go to the next page. The fifth
24 tweet. Can you read that into the record.
25     A. "Shit go hard ma nigga. You independent o

## Page 217

1 wit a label?"
2     Q. And is that your tweet?
3     A. I'm assuming it is if it's on my account.
4     Q. And the tweet right below that, can you
5 read that into the record.
6     A. "Kinda remind me of that nigga tone loc
7 shit go hard tho."
8     Q. And that's your tweet?
9     A. I'm assuming it is.
10     Q. Let's go to the back of this document. The
11 second to the last page. The second to the last
12 tweet in December -- December 23rd, 2010. Can you
13 read that one into the record.
14     A. "This shit hard subject, flows, and beat
15 all on point yall niggaz keep bring" and then it
16 stops.
17     Q. And is that your tweet?
18     A. I'm assuming it is.
19     Q. Let's go to the last page. And the fourth
20 tweet down dated December 2nd, 2010. Can you read
21 that one into the record.
22     A. I'm sorry? Can you repeat?
23     Q. The fourth one from the top.
24     A. "Yall niggaz killed it much respect stay
25 grindin."

Joshua Hall   March 6, 2014
***Videotaped Deposition***

56 (Pages 218 to 221)

## Page 218

1    Q.  I'm sorry.  Can you read it much slower.
2    A.  "Yall niggaz killed it much respect stay
3  grindin."
4    Q.  And then the last tweet that you entered on
5  this page, what does that say?
6    A.  "Flows active bruh I see u yall niggaz out
7  there grindin stay up."
8    Q.  And those were all your tweets as far as
9  you know?
10    A.  I'm assuming they are, if they're on my
11  page.
12    Q.  You mentioned Mr. Guzman earlier.
13    A.  Yes, sir.
14    Q.  Mr. Guzman is Hispanic, correct?
15    A.  I don't know what race he is.
16    Q.  Other than what you've testified to at this
17  deposition, is there any other discrimination,
18  harassment, retaliation or any other conduct that
19  you're claiming constituted unlawful conduct in this
20  lawsuit?
21    A.  All of the retaliation -- I did file for
22  retaliation.  I don't -- it's all on file.
23    Q.  Well, you understand that today is my
24  opportunity to ask you questions, right?
25    A.  I do.

## Page 219

1    Q.  And you understand that if I ask you to
2  tell me everything that you're complaining about in
3  this lawsuit today, and then later on, for example,
4  this case goes to trial and you start adding new
5  stuff, you understand I'm going to comment to the
6  jury on that, right?
7    A.  I understand that.
8    Q.  And you understand how if you leave stuff
9  out today and you add it later on at trial, it's
10  going to look like you made stuff up later on.  Do
11  you understand that?
12    A.  I get it.
13    Q.  So is there anything else that you're
14  complaining about in this lawsuit other than what
15  you've already testified to?
16    A.  Right now, that's what I can think of,
17  so...
18      MR. HICKS:  Why don't we take a short
19  break.  I'll look at my notes.  Maybe a ten-minute
20  break.  It will give me a chance to see if there's
21  anything else that I want to ask about.
22      Counsel, do you have any idea if you're
23  going to have any questions or not?
24      MS. SCHUETZ:  It's going to be quite long,
25  I think actually.  So we me might want to start

## Page 220

1  making preparations for how late we're going to go.
2  I notice it is already 4:20.  We're going to go past
3  5:00 most likely.
4      MR. HICKS:  Okay.  So let me take ten
5  minutes to get my notes together.
6      MS. SCHUETZ:  All right.  And I'm going to
7  require a break at that point to look through my
8  stuff, too.  Probably a decent break.  So I can get
9  started now, but realistically we might have to break
10  again, just letting you know.
11      MR. HICKS:  Okay.
12      THE VIDEOGRAPHER:  We're going off the
13  record at 4:20 p.m.
14        (A recess was taken from 4:20 p.m.
15        to 4:37 p.m.)
16      THE VIDEOGRAPHER:  We're back on the record
17  at 4:37 p.m., and this marks the beginning of media
18  number seven.
19      You may proceed.
20      MR. HICKS:  Yes.  We've taken a short
21  break.  I've taken a look at my notes to see if there
22  are any additional questions that I have.  And I
23  don't.
24      It's 4:37.  We are going to take a short
25  break so Counsel can take a look at her notes, and

## Page 221

1  she's indicated that she has some questions she wants
2  to ask when she's done with what I expect to be a
3  short break.
4      THE VIDEOGRAPHER:  Thank you.  We're going
5  off the record at 4:37 p.m.
6        (A recess was taken from 4:37 p.m.
7        to 5:05 p.m.)
8        (Calling the Magistrate.  No answer
9        to Phone Call.)
10        (Ms. Carlson left the room.)
11      THE VIDEOGRAPHER:  We're going back on the
12  record at 5:19 p.m.
13      You may proceed.
14      MR. HICKS:  We took a break at 4:37.  It's
15  now?
16      THE VIDEOGRAPHER:  5:19.
17      MR. HICKS:  5:19.  Counsel has been in the
18  other conference room during this entire time period.
19      About five minutes ago, Counsel came and
20  asked the deponent to go into the room with her and
21  her co-counsel.  I objected to that because I thought
22  it was improper, and I thought it was contrary to
23  what Magistrate Judge Leen had specifically
24  instructed us, which was if you wouldn't do it in
25  court, don't do it at the deposition.

Joshua Hall   March 6, 2014
***Videotaped Deposition***

59 (Pages 230 to 233)

Page 230

1  for you to do -- to question your own witness. And
2  the simple courtesy of clarifying what he was talking
3  about is not asking too much.
4      We're wasting time. Go ahead.
5      MS. SCHUETZ: I've put my position on the
6  record.
7      I can also note for the record that defense
8  counsel took over an hour and a half in breaks today.
9      Could you please read back the witness'
10  answer so far.
11      (The record was read as requested.)
12  BY MS. SCHUETZ:
13      Q.  Would you like to continue your answer?
14      A.  Yes. And that he would go around and do
15  random things to black people.
16      Q.  Did you ever hear any comments at the
17  Monte Carlo regarding slavery?
18      MR. HICKS: Objection. Leading.
19  BY MS. SCHUETZ:
20      Q.  You may answer.
21      A.  I can't remember.
22      Q.  Okay. Did you ever hear any comments made
23  about Mexicans at the Monte Carlo?
24      MR. HICKS: Objection. Leading.
25

Page 231

1  BY MS. SCHUETZ:
2      Q.  You can answer.
3      A.  I did.
4      Q.  All right. Did you ever hear any comments
5  made about Mexicans in Claudia Carlson's presence at
6  the Monte Carlo?
7      MR. HICKS: Objection. Leading.
8  BY MS. SCHUETZ:
9      Q.  You can answer.
10      A.  I did.
11      Q.  Are some of those comments described in the
12  complaint in this case?
13      MR. HICKS: Objection. Leading.
14  BY MS. SCHUETZ:
15      Q.  You can answer.
16      A.  Yes.
17      MR. HICKS: When you say "complaint," are
18  you referring to the complaint drafted by your
19  office?
20      MS. SCHUETZ: That is correct.
21      MR. HICKS: The civil complaint?
22      MS. SCHUETZ: The civil complaint in this
23  case.
24  BY MS. SCHUETZ:
25      Q.  May there have been other incidents not

Page 232

1  described in the complaint of comments made about
2  Mexicans at the Monte Carlo for which you were
3  present?
4      A.  Yes.
5      MR. HICKS: Whoa, whoa, whoa.
6      Can you read that question back, please?
7      (The record was read as requested.)
8      MS. SCHUETZ: And we have the witness'
9  answer already.
10  BY MS. SCHUETZ:
11      Q.  Have you ever used the "N" word at the
12  Monte Carlo?
13      A.  No.
14      Q.  Have you ever used the "N" word at any
15  workplace?
16      A.  No.
17      MR. HICKS: Can I ask clarification,
18  Counsel?
19      MS. SCHUETZ: No. You may follow up.
20      MR. HICKS: Are you questioning Dakoven, or
21  questioning Mr. Hall?
22      MS. SCHUETZ: Sir, you may follow up with
23  as many questions as you like.
24      MR. HICKS: I just need to know, are you
25  questioning Mr. Dakoven or Mr. Hall?

Page 233

1      MS. SCHUETZ: You may follow up with your
2  follow-up questions later.
3  BY MS. SCHUETZ:
4      Q.  Did Counsel earlier ask you if you feel you
5  were harassed because of your gender?
6      A.  Yes.
7      Q.  Do you feel that you experienced sexual
8  harassment at work?
9      MR. HICKS: Objection. Leading. Asked and
10  answered.
11  BY MS. SCHUETZ:
12      Q.  You can answer.
13      A.  Yes.
14      Q.  What did you experience that was sexual
15  harassment at work?
16      A.  My supervisor making inappropriate comments
17  and inappropriate invites, as well as gestures.
18      Q.  All right. Could you please tell me about
19  inappropriate comments made by your supervisor.
20      A.  One of the comments he made to me was he
21  asked me if I -- he told me that -- I found one day
22  at the end of the show we were cleaning up.
23      Usually like once the show is over, we
24  would go and pick up, like, you know, anything. We
25  didn't clean, but we would pick up, just like see if

Joshua Hall    March 6, 2014
***Videotaped Deposition***

### Page 234

1    anybody left their wallet, cell phone. That was
2    typical of something that happened after the
3    show.
4         So this particular day I found, I believe
5    it was like some lip gloss or lipstick. It was
6    something. And so I picked it up, and the procedure
7    was to take it to the supervisor, turn it in.
8         So that's what I did. And he asked me if I
9    was sure it wasn't mine.
10   Q.   Okay. What was the supervisor's name?
11   A.   Manny Quiroga.
12   Q.   Did Mr. Quiroga make any other
13   inappropriate comments?
14   A.   Yes.
15   Q.   How often did he make such comments?
16        MR. HICKS: Objection. Vague. Overbroad.
17   Foundation. Calls for speculation.
18   BY MS. SCHUETZ:
19   Q.   You may answer.
20   A.   Pretty often.
21   Q.   For example, could you estimate how many
22   times per week he made such comments?
23        MR. HICKS: Objection. Asked and answered.
24   Calls for speculation. Foundation.
25        THE WITNESS: Three or four.

### Page 235

1    BY MS. SCHUETZ:
2    Q.   To clarify the record, were these comments
3    he made in your presence?
4    A.   Yes. As well as there were other people;
5    there were other ushers present, as well as one time
6    there was a camera girl present. Her name was
7    Jessica.
8    Q.   Earlier you testified, in response to my
9    question about what you experienced that was sexual
10   harassment, that you had a supervisor who made
11   inappropriate invites; is that correct?
12   A.   Correct.
13   Q.   Could you tell me about inappropriate
14   invites?
15   A.   One particular time he invited me to
16   Long Beach. He said that there was an extra seat,
17   and he would like to know if I was interested in
18   coming.
19        Another time he invited me to the gay club.
20        Those are the invites that I recall.
21   Q.   You additionally testified, in response to
22   my question about what you experienced that was
23   sexual harassment at work, that a supervisor made
24   gestures; is that correct?
25   A.   Correct.

### Page 236

1         MR. HICKS: Objection. Leading.
2         Counsel, why don't you just mic up and
3    testify?
4    BY MS. SCHUETZ:
5    Q.   Can you please tell me about gestures.
6    A.   There was one particular time he -- we had
7    stanchions in the theater. And we usually had them
8    to control the lines. And so he used -- one day he
9    used the stanchion in front of me and started pole
10   dancing, as well as licking his lips looking at me.
11   Q.   Did you complain to anyone concerning any
12   of the comments or behavior?
13   A.   I did. Initially, I confronted him and
14   told him that it was inappropriate, and that I was
15   uncomfortable with it. And at that time, there was
16   also a shop steward present who witnessed him
17   admitting the whole thing.
18   Q.   Who was that shop steward?
19   A.   His name -- his first name was Jose. I
20   can't remember his last name. I'm thinking it's
21   Cabrerro, but I could be wrong.
22        Also, if I can add, I did remember that,
23   but when he asked about gender, it kind of threw me
24   off. I didn't know what he was talking about as far
25   as sexual harassment.

### Page 237

1    Q.   That was going to be my next question. So
2    is it correct that as a nonlawyer, you don't
3    understand the difference between sexual harassment,
4    harassment on the basis of gender?
5    A.   Correct.
6         MR. HICKS: Objection. Leading. This is
7    exactly why it's inappropriate to take your witness
8    into another room.
9         MS. SCHUETZ: Counsel --
10        MR. HICKS: No, no, I'm going to finish.
11   This is why it's inappropriate to take your client or
12   a witness into the other room in the middle of
13   testimony so that you can tell them what to testify
14   about. This is exactly why the judges don't like
15   this.
16        MS. SCHUETZ: Counsel, if you believe I
17   have told this client to testify about all of these
18   things in two minutes, you believe I have superhuman
19   powers.
20        Additionally, I would ask you to refer to
21   the case I cited.
22        MR. HICKS: I'm referring to you. And I'm
23   referring to your conduct, and I think it's totally
24   inappropriate.
25        MS. SCHUETZ: You've had your say on the

Joshua Hall   March 6, 2014
***Videotaped Deposition***

61 (Pages 238 to 241)

Page 238

1    record.
2    BY MS. SCHUETZ:
3        Q.  What, if anything, happened following the
4    conversation to which you testified between yourself,
5    Mr. Quiroga and the shop steward, Jose?
6            MR. HICKS:  Can you re-read that question?
7    I didn't hear it.
8            (The record was read as requested.)
9            THE WITNESS:  Are you talking about after
10   the meeting, or with the same -- like, right at that
11   meeting?
12   BY MS. SCHUETZ:
13       Q.  We can start with at the meeting.
14       A.  At the meeting, he apologized with tears.
15   And the shop steward let him know that that was
16   inappropriate.
17           I believe I went to human resources.  I
18   went to my supervisor and human resources.  And afte
19   that I didn't hear -- I didn't hear anything.
20           Actually, LaDawndre told me that -- I had
21   to ask her.  I initiated -- I asked her, you know,
22   what happened, and she told me he denied it.
23           And I asked her -- well, I told her, I said
24   there was a shop steward there when he was
25   apologizing that witnessed that.  And she didn't want

Page 239

1    to talk anymore.
2        Q.  Following the events you just described,
3    did anything happen with regard to Mr. Quiroga?
4        A.  Shortly after that, I got a write-up from
5    him.  I don't remember what the write-up was about,
6    but I do remember asking him if it was retaliation
7    because it seemed as if it was for me approaching him
8    about his actions.
9        Q.  Did you complain to anyone about that?
10       A.  I did.  My supervisor and I believe human
11   resources.
12       Q.  Was that write-up retracted?
13       A.  No.  I also filed a grievance, and not to
14   my knowledge.
15           MS. SCHUETZ:  All right.  Counsel, it's
16   your turn to ask questions if you have any.
17           MR. HICKS:  I do have some follow-up
18   questions.
19
20           FURTHER EXAMINATION
21   BY MR. HICKS:
22       Q.  Mr. Hall, you just testified in response to
23   your attorney's questions that Patty used the phrase
24   "colored" at work on one occasion, referring to the
25   camera girl, correct?

Page 240

1        A.  Correct.
2        Q.  When I asked you earlier in the deposition
3    to tell me everything that Patty said or did that you
4    believe constituted race discrimination, you didn't
5    tell me about this alleged comment, did you?
6        A.  I also told you at the time that I couldn't
7    remember at the time.
8        Q.  I understand.  That's why I told you -- you
9    understood, because I explained it on the record,
10   that I wanted you to tell me everything you
11   remembered, right?
12       A.  I told you that I didn't remember
13   everything at the time.  She said so many things,
14   it's impossible to remember everything she said.
15       Q.  And you only testified about this alleged
16   colored statement after you met with your attorney,
17   correct?
18       A.  I guess you could say.
19       Q.  So when you met with your attorney, was
20   your recollection refreshed about this alleged
21   colored statement?
22       A.  Not at all.
23       Q.  So did you just out of the blue
24   miraculously remember this?
25       A.  The way that the questions that you were

Page 241

1    asking me, I mean, I just, again, so many things
2    happened, I could not remember everything.  I
3    still -- there's still things that I can't remember
4    that happened.
5        Q.  Do you want to answer my question now?
6        A.  I did.
7        Q.  What is it that caused you to remember this
8    alleged color statement?
9        A.  Again, it was the questions that you were
10   asking.  Again, many things happened since then.  I
11   couldn't remember.
12       Q.  So do you know --
13       A.  There's nothing specific that made me
14   remember that.
15       Q.  So your sudden recollection of this colored
16   statement doesn't have anything to do with your
17   meeting with your lawyer; is that what you're telling
18   us?
19       A.  No, sir.
20       Q.  Is that what you're telling us?
21       A.  Yes, sir.
22       Q.  You testified that -- in response to your
23   lawyer's questions, that Mr. Guzman referred to you
24   as Wayne Brady daily, correct?
25       A.  I said that it was very often.  I don't

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Joshua Hall   March 6, 2014
***Videotaped Deposition***

Page 250

1    A.  Yes.
2    Q.  And did that cause you to suffer severe
3  emotional distress?
4    A.  I thought that it was very embarrassing.
5  He did it in front of other ushers, as well as people
6  from other departments, and I felt like it was
7  inappropriate.
8    Q.  And do you believe that caused you to
9  suffer severe emotional distress?
10    A.  I believe that, along with other things was
11  very stressful.
12    Q.  Do you believe that the statement or the
13  joke by Manny, "Are you sure it's not yours," with
14  reference to the lip gloss, was a significant
15  contributor to the emotional distress you complained
16  about?
17    A.  Yes.
18    Q.  And did you believe it was a significant
19  contributor to your need to seek medical treatment?
20    A.  Yes.
21    Q.  And did you immediately seek medical
22  treatment for that statement?
23    A.  I sought out medical treatment as a whole
24  for everything that was going on. It wasn't for one
25  particular incident. This is as a whole for

Page 251

1  everything that was going on.
2    Q.  All I'm doing right now is asking about
3  this statement, though.
4    A.  And I'm telling you my answer.
5    Q.  Your lawyers sent you to a doctor, didn't
6  they?
7    A.  I went to a doctor myself.
8    Q.  Well, that's not what I'm asking. Your
9  lawyers sent you to a doctor, didn't they?
10    A.  I don't remember.
11    Q.  What doctor did you see?
12    A.  Sang Tran.
13    Q.  And is that Dr. Tran a man or a woman?
14    A.  It's a man.
15    Q.  And what kind of doctor -- what kind of
16  physician is Mr. Tran?
17    A.  I'm not sure.
18    Q.  Is he a psychiatrist?
19    A.  No.
20    Q.  Is he a psychologist?
21    A.  No.
22    Q.  So he's not a mental health care provider?
23    A.  No.
24    Q.  But you're saying that you went to see
25  Dr. Tran because you were emotionally upset as a

Page 252

1  result, in part, of being asked if the lip gloss was
2  yours?
3    A.  As a whole, everything that happened. A
4  combination of everything that was going on that I
5  complained about and wrote written statements about
6  over years, and me being retaliated against and
7  losing my job.
8    Q.  You said Manny made other --
9    A.  It was stressful.
10    Q.  You said Manny made other inappropriate
11  comments pretty often, approximately three to four
12  times a week.
13    A.  He just would say random things that were
14  inappropriate. I don't -- again, like --
15    Q.  Do you remember what those statements were,
16  other than what you've already testified to?
17    A.  There was somebody on the stage, a woman on
18  the stage with some high heels. And I don't know how
19  it came up, but he said, "You would look nice in
20  those heels."
21    Q.  And you didn't tell us about that a minute
22  ago. Did you just remember this?
23    A.  I did.
24    Q.  And did that cause you to suffer emotional
25  distress?

Page 253

1    A.  As a whole, I thought it was inappropriate.
2    Q.  That's not my question.
3    A.  Yes.
4    Q.  So Manny jokingly asked you, or stated to
5  you, "You would look good in those heels," and that
6  caused you emotional distress, right?
7    A.  Yes.
8    Q.  And did anybody else hear -- any other
9  witnesses to these statements by Manny?
10    A.  Yes.
11    Q.  Who?
12    A.  There was a camera girl by the name of
13  Jessica. There was another usher by the name of
14  Kathy Zucker or Zicker, I believe.
15    And they were present, both present, when
16  Manny made the comment. And I believe Claudia was
17  present as well.
18    Q.  And that would be the co-plaintiff in this
19  case?
20    A.  Claudia Carlson.
21    Q.  You testified that --
22    A.  Things are actually coming to mind now that
23  I'm talking to you.
24    Q.  You testified, in response to your
25  attorney's question, that Manny inappropriately

Joshua Hall   March 6, 2014
***Videotaped Deposition***

Page 254

1 invited you to Long Beach.
2 A. Correct.
3 Q. What was in Long Beach?
4 A. I have no clue. He just said that we're
5 going to Long Beach this weekend and I've got an
6 extra seat, would you like to come?
7 Q. And that's all he said?
8 A. I don't remember his exact words verbatim,
9 but it was in that -- that's what it ended up --
10 that's what he asked me, if I would -- it was an
11 invite.
12 Q. And did he say -- when he said "we," do you
13 know who he was referring to?
14 A. I don't.
15 Q. And when he said "an extra seat," do you
16 know what he was referring to?
17 A. I don't.
18 Q. Is Manny gay?
19 A. Yes.
20 Q. And are you uncomfortable around gays and
21 lesbians?
22 A. No, sir.
23 Q. So why would a statement, an innoxious
24 statement, hey, would you like to go to Long Beach,
25 I've got an extra seat, set you off so bad just

Page 255

1 because the man was gay?
2 MS. SCHUETZ: Objection to form.
3 You can answer.
4 THE WITNESS: Because of the way he did
5 it in front of other people. I thought it was
6 embarrassing.
7 BY MR. HICKS:
8 Q. Isn't it true that you yourself are
9 uncomfortable around gay people?
10 A. No, sir.
11 Q. Do you think that kind of overreaction to
12 an innoxious question is normal?
13 MS. SCHUETZ: Objection to form.
14 You can answer.
15 THE WITNESS: I have no problem with gay
16 people.
17 BY MR. HICKS:
18 Q. When you -- you also said you felt you
19 were -- let me back up.
20 Is it your testimony that Manny's innocuous
21 invitation to Long Beach because they had an extra
22 seat, did that cause you emotional distress?
23 MS. SCHUETZ: Object to the form.
24 You can answer.
25 THE WITNESS: Yes. Along with the other,

Page 256

1 again, things. There was a build-up. This wasn't
2 the only thing.
3 BY MR. HICKS:
4 Q. Right now I'm just talking about this.
5 So it's your testimony that Manny's
6 statement to you, "Would you like to go to
7 Long Beach, I got an extra seat" contributed to
8 causing you severe emotional distress?
9 A. Correct.
10 Q. Okay. And you also testified that you felt
11 you were sexually harassed. Do you believe Manny's
12 invitation to go to Long Beach constitutes sexual
13 harassment of you?
14 A. Yes.
15 Q. Okay.
16 A. Why would he ask me? I didn't -- he wasn't
17 a personal friend of mine.
18 Q. Well, you worked with him, right?
19 A. Yes.
20 Q. Maybe he had an extra ticket to a baseball
21 game.
22 MS. SCHUETZ: Objection to form. That's
23 not a question.
24 BY MR. HICKS:
25 Q. You thought this was sexual harassment,

Page 257

1 Mr. Hall, because you're jumping to the conclusion
2 that just because Manny was gay he was asking you to
3 do something sexual in Long Beach, weren't you?
4 MS. SCHUETZ: Objection. That's vague and
5 confusing.
6 You can answer.
7 THE WITNESS: He made prior advancements,
8 like the pole dance and licking his lips at me. So I
9 mean, I don't know, but it just seemed a little
10 confusing to me.
11 BY MR. HICKS:
12 Q. So you're telling us that Manny's innocuous
13 invitation to go to Long Beach because he had an
14 extra seat, you're saying that that was sexual in
15 nature, right?
16 MS. SCHUETZ: Objection to form.
17 You can answer.
18 THE WITNESS: Along with his other events,
19 yes.
20 BY MR. HICKS:
21 Q. And you said Manny invited you to go to a
22 club, correct?
23 A. Correct.
24 Q. And you're -- you declined to go. You said
25 I'm not interested or no thanks?

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Joshua Hall   March 6, 2014
***Videotaped Deposition***

Page 269

```
 1              CERTIFICATE OF REPORTER

 2          I, the undersigned, a Certified Shorthand

 3   Reporter of the State of Nevada, do hereby certify:

 4          That the foregoing proceedings were taken

 5   before me at the time and place herein set forth;

 6   that any witnesses in the foregoing proceedings,

 7   prior to testifying, were duly sworn; that a record

 8   of the proceedings was made by me using machine

 9   shorthand which was thereafter transcribed under my

10   direction; that the foregoing transcript is a true

11   record of the testimony given to the best of my

12   ability.

13          Further, that before completion of the

14   proceedings, review of the transcript [ x ] was

15   [  ] was not requested pursuant to NRCP 30(e).

16          I further certify I am neither financially

17   interested in the action, nor a relative or employee

18   of any attorney or party to this action.

19          IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21

22   Dated: March 14, 2014

23

24   _____
     GALE SALERNO, RMR, CCR #542
25
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com